# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME MORTGAGE
ASSETS TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH
CERTIFICATES SERIES 2006-3
Plaintiff-Appellee

## VS

KATHERINE L. CAITO
Defendant-Appellant

On Appeal from a Final Judgment Entered
After an Opinion and Order Granting Summary Judgment and
Denying a Motion to Strike
Entered in the United States District Court for the District of Rhode Island

## APPENDIX OF APPELLANT
## KATHERINE L. CAITO

John B. Ennis
Rhode Island Bar # 2135
Court of Appeals Bar # 47641
John B. Ennis, Esq.
1200 Reservoir Avenue
Cranston, RI 02920
Tel: (401)943-9230
Fax: (401)679-0035
Email: Jbelaw75@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of this Appendix of Appellant was served on counsel of Recore via the Court's ECF system on September 28, 2020.

/s/ John B. Ennis

1. Docket . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 1

2. Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 11

3. Answer to Amended Complaint. .. . . . . . . . . . . . . . . . . . p. 68

4. Appellee's Motion for Summary Judgment . . . . . . . . . . . . . . . p. 74

5. Sony Prudent's affidavit for Summary Judgment.. . . . . . . . . . . p. 77

6. Appellant's affidavit in Response to Motion

for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 89

7. Appellant's Statement of Undisputed Facts . . . . . . . . . . . . . . . p. 100

8. Appellee's Response to Undisputed Facts of Appellant . . . . . . p. 104

9. Affidavit of Sony Prudent . . . .. . . . . . . . . . . . . . . . . . . . . . . p. 108

10. Motion to Strike Affidavit of Sony Prudent . . . . . . . . . . . . . . . p. 114

11. Affidavit Of Katherine Caito . . . . . . . . . . . . . . . . . . . . . . . . . p. 116

12. Appllant's Statement of Disputed Facts in Support of

Opposition to Motion for Summary Judgment . . . . . . . . . . . . . . . . . . p. 212

13. Appellant's Statement of undisputed Facts in Support of

Opposition to Motion for Summary Judgment . . . . . . . . . . . . . . . . . . p. 218

14. Affidavit of Joseph C. Manera . . . . . . . . . . . . . . . . . . . . . . . . .. p. 224

15. Supplemental Affidavit of Sony Prudent in Support of Appellee's

Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 230

ii

1

# U.S. District Court
## District of Rhode Island (Providence)
### CIVIL DOCKET FOR CASE #: 1:18-cv-00427-JJM-LDA

Citibank, N.A. as Trustee v. Caito                     Date Filed: 08/03/2018
Assigned to: District Judge John J. McConnell, Jr.     Date Terminated: 01/27/2020
Referred to: Magistrate Judge Lincoln D. Almond        Jury Demand: Defendant
Case in other court:    U.S. Court of Appeals for the First     Nature of Suit: 220 Real Property:
    Circuit, COA20-1100                               Foreclosure
Cause: 28:1332 Diversity–Contract Dispute              Jurisdiction: Diversity

**Plaintiff**

**Citibank, N.A.**                          represented by   **Ethan Z. Tieger**
*as Trustee for American Home Mortgage*                      Hinshaw & Culbertson LLP
*Assets Trust 2006–3, Mortgage Backed*                       321 South Main Street
*Pass–Through Certificates Series*                           Suite 301
*2006–3*                                                     Providence, RI 02903
                                                             401–751–0842
                                                             Fax: 401–751–0072
                                                             Email: etieger@hinshawlaw.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Samuel C. Bodurtha**
                                                             Hinshaw & Culbertson LLP
                                                             56 Exchange Terrace
                                                             5th Floor
                                                             Providence, RI 02903
                                                             (401) 751–0842
                                                             Fax: (401) 751–0072
                                                             Email: sbodurtha@hinshawlaw.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Katherine L. Caito**                      represented by   **John B. Ennis**
                                                             1200 Reservoir Avenue
                                                             Cranston, RI 02920
                                                             401–943–9230
                                                             Fax: 946–5006
                                                             Email: Jbelaw75@gmail.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Interested Party**

**Internal Revenue Service**                                1

1

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/03/2018 | 1 | | COMPLAINT ( filing fee paid $ 400.00, receipt number 0103−1247391 ), filed by Citibank, N.A. as Trustee for American Home Mortgage Assets Trust 2006−3, Mortgage Backed Pass−Through Certificates Series 2006−3. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Civil Cover Sheet, # 7 Summons)(Tieger, Ethan) (Entered: 08/03/2018) |
| 08/06/2018 | | | CASE CONDITIONALLY ASSIGNED to District Judge John J. McConnell, Jr. and Magistrate Judge Lincoln D. Almond. Related Case Number 13−cv−429 based upon the indication on the cover sheet that a related case previously was assigned to the presiding judge. The assignment is subject to the presiding judge's determination that the cases, in fact, are related. (Potter, Carrie) (Entered: 08/06/2018) |
| 08/06/2018 | 2 | | CASE OPENING NOTICE ISSUED (Potter, Carrie) (Entered: 08/06/2018) |
| 08/06/2018 | 3 | | Summons Issued as to Katherine L. Caito. (Potter, Carrie) (Entered: 08/06/2018) |
| 08/07/2018 | | | CASE PERMANENTLY ASSIGNED: Since District Judge John J. McConnell, Jr. has determined that this case is in fact related to CA 13−429−JJM, this case is permanently assigned to District Judge John J. McConnell, Jr. for all further proceedings (Barletta, Barbara) (Entered: 08/07/2018) |
| 09/04/2018 | 4 | 9 | AMENDED COMPLAINT *Verified for Judicial Foreclosure* against Katherine L. Caito, filed by Citibank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Tieger, Ethan) (Entered: 09/04/2018) |
| 09/21/2018 | 5 | | Summons Request filed by Citibank, N.A.. (Tieger, Ethan) (Entered: 09/21/2018) |
| 09/21/2018 | 6 | | Summons Request filed by Citibank, N.A.. (Tieger, Ethan) (Entered: 09/21/2018) |
| 09/21/2018 | 7 | | Summons Issued as to Internal Revenue Service and U.S. Attorney (Attachments: # 1 Summons)(Potter, Carrie) (Entered: 09/21/2018) |
| 10/18/2018 | 8 | | AFFIDAVIT of Service, filed by Citibank. N.A. for summons and complaint Internal Revenue Service served on 10/10/2018, answer due 10/30/2018. (Tieger, Ethan) (Entered: 10/18/2018) |
| 10/18/2018 | 9 | | AFFIDAVIT of Service, filed by Citibank, N.A. for summons and complaint Katherine L. Caito served on 10/10/2018, answer due 10/30/2018. (Tieger, Ethan) (Entered: 10/18/2018) |
| 10/30/2018 | 10 | | MOTION for an Extension of Time to File Response/Reply as to 4 Amended Complaint *to November 28, 2018* filed by Katherine L. Caito. **Responses due by 11/13/2018.** (Ennis, John) (Entered: 10/30/2018) |
| 10/31/2018 | | | TEXT ORDER granting 10 Motion for Extension of Time to File Response/Reply; Reset Deadlines: Katherine L. Caito answer due 11/28/2018 − So Ordered by District Judge John J. McConnell, Jr. on 10/31/2018. (Urizandi, Nisshy) (Entered: 10/31/2018) |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/03/2018 | 1 | | COMPLAINT ( filing fee paid $ 400.00, receipt number 0103–1247391 ), filed by Citibank, N.A. as Trustee for American Home Mortgage Assets Trust 2006–3, Mortgage Backed Pass–Through Certificates Series 2006–3. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Civil Cover Sheet, # 7 Summons)(Tieger, Ethan) (Entered: 08/03/2018) |
| 08/06/2018 | | | CASE CONDITIONALLY ASSIGNED to District Judge John J. McConnell, Jr. and Magistrate Judge Lincoln D. Almond. Related Case Number 13–cv–429 based upon the indication on the cover sheet that a related case previously was assigned to the presiding judge. The assignment is subject to the presiding judge's determination that the cases, in fact, are related. (Potter, Carrie) (Entered: 08/06/2018) |
| 08/06/2018 | 2 | | CASE OPENING NOTICE ISSUED (Potter, Carrie) (Entered: 08/06/2018) |
| 08/06/2018 | 3 | | Summons Issued as to Katherine L. Caito. (Potter, Carrie) (Entered: 08/06/2018) |
| 08/07/2018 | | | CASE PERMANENTLY ASSIGNED: Since District Judge John J. McConnell, Jr. has determined that this case in fact related to CA 13–429–JJM, this case is permanently assigned to District Judge John J. McConnell, Jr. for all further proceedings (Barletta, Barbara) (Entered: 08/07/2018) |
| 09/04/2018 | 4 | 9 | AMENDED COMPLAINT *Verified for Judicial Foreclosure* against Katherine L. Caito, filed by Citibank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Tieger, Ethan) (Entered: 09/04/2018) |
| 09/21/2018 | 5 | | Summons Request filed by Citibank, N.A.. (Tieger, Ethan) (Entered: 09/21/2018) |
| 09/21/2018 | 6 | | Summons Request filed by Citibank, N.A.. (Tieger, Ethan) (Entered: 09/21/2018) |
| 09/21/2018 | 7 | | Summons Issued as to Internal Revenue Service and U.S. Attorney (Attachments: # 1 Summons)(Potter, Carrie) (Entered: 09/21/2018) |
| 10/18/2018 | 8 | | AFFIDAVIT of Service, filed by Citibank, N.A. for sumons and complaint Internal Revenue Service served on 10/10/2018, answer due 10/30/2018. (Tieger, Ethan) (Entered: 10/18/2018) |
| 10/18/2018 | 9 | | AFFIDAVIT of Service, filed by Citibank, N.A. for summons and complaint Katherine L. Caito served on 10/10/2018, answer due 10/30/2018. (Tieger, Ethan) (Entered: 10/18/2018) |
| 10/30/2018 | 10 | | MOTION for an Extension of Time to File Response/Reply as to 4 Amended Complaint *to November 28, 2018* filed by Katherine L. Caito. **Responses due by 11/13/2018.** (Ennis, John) (Entered: 10/30/2018) |
| 10/31/2018 | | | TEXT ORDER granting 10 Motion for Extension of Time to File Response/Reply; Reset Deadlines: Katherine L. Caito answer due 11/28/2018 – So Ordered by District Judge John J. McConnell, Jr. on 10/31/2018. (Urizandi, Nisshy) (Entered: 10/31/2018) |

| 11/30/2018 | 11 |  | APPLICATION for Clerk's Entry of Default filed by Citibank, N.A. as to Katherine L. Caito. (Tieger, Ethan) (Entered: 11/30/2018) |
| 11/30/2018 | 12 |  | MOTION for an Extension of Time to File Response/Reply as to 4 Amended Complaint, Order on Motion for Extension of Time to File Response/Reply, Set/Reset Deadlines *to December 7, 2018* filed by Katherine L. Caito. **Responses due by 12/14/2018.** (Ennis, John) (Entered: 11/30/2018) |
| 11/30/2018 | 13 |  | DECLARATION re 11 Application for Clerk's Entry of Default by Citibank, N.A.. (Attachments: # 1 Exhibit A)(Tieger, Ethan) (Entered: 11/30/2018) |
| 11/30/2018 | 14 |  | RESPONSE IN OPPOSITION by Katherine L. Caito re 11 Application for Clerk's Entry of Default . (Ennis, John) (Entered: 11/30/2018) |
| 11/30/2018 | 15 | 66 | ANSWER to 4 Amended Complaint by Katherine L. Caito.(Ennis, John) (Entered: 11/30/2018) |
| 12/03/2018 |  |  | TEXT ORDER granting 12 Motion for Extension of Time to File; Reset Deadlines: Katherine L. Caito answer due 12/5/2018 – So Ordered by District Judge John J. McConnell, Jr. on 12/3/2018. (Barletta, Barbara) (Entered: 12/03/2018) |
| 12/11/2018 | 16 |  | NOTICE of Hearing: Telephonic Rule 16 Conference set for Tuesday, 1/15/2019 at 09:15 AM before District Judge John J. McConnell, Jr. The Court will initiate the call. Counsel shall provide the Clerk with contact information if it differs from the docket sheet. (Barletta, Barbara) (Entered: 12/11/2018) |
| 01/11/2019 | 17 |  | RULE 16 STATEMENT by Citibank, N.A.. (Bodurtha, Samuel) (Entered: 01/11/2019) |
| 01/15/2019 |  |  | Minute Entry for proceedings held before District Judge John J. McConnell, Jr.: Telephonic Rule 16 Conference held on 1/15/2019; John B. Ennis and Samuel C. Bodurtha participated (Barletta, Barbara) (Entered: 01/15/2019) |
| 01/15/2019 |  |  | TEXT PRETRIAL SCHEDULING ORDER: All Factual Discovery to close by 4/15/2019; Plaintiff's Motion for Summary Judgment shall be filed on or before 5/15/2019; Defendant's Response shall be filed on or before 7/15/19 and Plaintiff's reply shall be filed on or before 7/30/19. No extensions of these deadlines will be granted – So Ordered by District Judge John J. McConnell, Jr. on 1/15/2019 (Barletta, Barbara) (Entered: 01/15/2019) |
| 05/02/2019 | 18 |  | MOTION for Protective Order filed by Citibank, N.A.. **Responses due by 5/16/2019.** (Bodurtha, Samuel) (Entered: 05/02/2019) |
| 05/02/2019 | 19 |  | MEMORANDUM IN SUPPORT by Citibank, N.A. in support of 18 MOTION for Protective Order . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(Bodurtha, Samuel) (Entered: 05/02/2019) |
| 05/02/2019 | 20 |  | MOTION for an Extension of Time to Complete Discovery filed by Citibank, N.A.. **Responses due by 5/16/2019.** (Bodurtha, Samuel) (Entered: 05/02/2019) |
| 05/03/2019 |  |  | TEXT ORDER granting 20 Motion for Extension of Time. Plaintiff does not need to respond to Defendant's discovery requests until 14 days after the Court rules on the Motion for Protective Order – So Ordered by District Judge John J. McConnell, Jr. on 5/3/2019 (Barletta, Barbara) (Entered: 05/03/2019) |

4

| 05/15/2019 | 21 | 71 | MOTION for Summary Judgment *on Count 1 of Its First Amended Verified Complaint for Judicial Foreclosure* filed by Citibank, N.A.. **Responses due by 5/29/2019.** (Attachments: # 1 Supporting Memorandum, # 2 Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, # 3 Affidavit, # 4 Exhibit A)(Tieger, Ethan) (Entered: 05/15/2019) |
| 05/15/2019 | 22 | 105 | MOTION for Summary Judgment filed by Katherine L. Caito. **Responses due by 5/29/2019.** (Attachments: # 1 Supporting Memorandum, # 2 Affidavit, # 3 Exhibit 1, # 4 Exhibit Statement of Undisputed facts)(Ennis, John) (Entered: 05/15/2019) |
| 05/16/2019 | 23 | | MOTION for an Extension of Time to File Response/Reply as to 18 MOTION for Protective Order *to May 22, 2019* filed by Katherine L. Caito. **Responses due by 5/30/2019.** (Ennis, John) (Entered: 05/16/2019) |
| 05/17/2019 | | | TEXT ORDER granting 23 Motion for Extension of Time to File Response to 18 MOTION for Protective Order ; Reset Deadlines: **Response due by 5/22/2019.** – So Ordered by District Judge John J. McConnell, Jr. on 5/17/2019. (Barletta, Barbara) (Entered: 05/17/2019) |
| 05/22/2019 | 24 | | MOTION for an Extension of Time to File Response/Reply as to 18 MOTION for Protective Order *to May 27, 2019* filed by All Defendants. **Responses due by 6/5/2019.** (Ennis, John) (Entered: 05/22/2019) |
| 05/23/2019 | | | TEXT ORDER granting 24 Motion for Extension of Time to File Response to 18 MOTION for Protective Order ; Reset Deadlines: **Response due by 5/27/2019.** – So Ordered by District Judge John J. McConnell, Jr. on 5/23/2019. (Barletta, Barbara) (Entered: 05/23/2019) |
| 05/27/2019 | 25 | | MOTION for an Extension of Time to File Response/Reply as to 18 MOTION for Protective Order *to June 3, 2019* filed by Katherine L. Caito. **Responses due by 6/10/2019.** (Ennis, John) (Entered: 05/27/2019) |
| 05/28/2019 | | | TEXT ORDER granting 25 Motion for Extension of Time to File Response to 18 MOTION for Protective Order; **Responses due by 6/3/2019.** So Ordered by District Judge John J. McConnell, Jr. on 5/28/2019. (Jackson, Ryan) (Entered: 05/28/2019) |
| 05/29/2019 | 26 | | MOTION for an Extension of Time to Oppose Defendant's Motion for Summary Judgment and for Clarification on Pretrial Scheduling Order filed by Citibank, N.A.. **Responses due by 6/12/2019.** (Tieger, Ethan) (Entered: 05/29/2019) |
| 05/30/2019 | | | TEXT ORDER granting 26 Motion for Extension of Time to Respond to Defendant's Motion for Summary Judgment up to and including 6/28/19. So Ordered by District Judge John J. McConnell, Jr. on 5/30/2019. (Jackson, Ryan) (Entered: 05/30/2019) |
| 06/03/2019 | 27 | | MOTION for an Extension of Time to File Response/Reply as to 18 MOTION for Protective Order *to June 7, 2019* filed by Katherine L. Caito. **Responses due by 6/17/2019.** (Ennis, John) (Entered: 06/03/2019) |
| 06/03/2019 | | | AMENDED TEXT ORDER: Plaintiff's response to 22 MOTION for Summary Judgment shall be filed by 7/15/19 and Defendant's reply shall be filed by 7/30/19. No further extensions of these deadlines will be granted – So Ordered by District Judge John J. McConnell, Jr. on 6/3/2019 (Barletta, Barbara) (Entered: 06/03/2019)5 |

4

# U.S. District Court
## District of Rhode Island (Providence)
### CIVIL DOCKET FOR CASE #: 1:18-cv-00427-JJM-LDA

Citibank, N.A. as Trustee v. Caito
Assigned to: District Judge John J. McConnell, Jr.
Referred to: Magistrate Judge Lincoln D. Almond
Case in other court:     U.S. Court of Appeals for the First
                   Circuit, COA20-1100
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 08/03/2018
Date Terminated: 01/27/2020
Jury Demand: Defendant
Nature of Suit: 220 Real Property:
Foreclosure
Jurisdiction: Diversity

**Plaintiff**

**Citibank, N.A.**
*as Trustee for American Home Mortgage*
*Assets Trust 2006-3, Mortgage Backed*
*Pass-Through Certificates Series*
*2006-3*

represented by **Ethan Z. Tieger**
Hinshaw & Culbertson LLP
321 South Main Street
Suite 301
Providence, RI 02903
401-751-0842
Fax: 401-751-0072
Email: etieger@hinshawlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel C. Bodurtha**
Hinshaw & Culbertson LLP
56 Exchange Terrace
5th Floor
Providence, RI 02903
(401) 751-0842
Fax: (401) 751-0072
Email: sbodurtha@hinshawlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Katherine L. Caito**

represented by **John B. Ennis**
1200 Reservoir Avenue
Cranston, RI 02920
401-943-9230
Fax: 946-5006
Email: Jbelaw75@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Internal Revenue Service**

6

| | | |
|---|---|---|
| 06/04/2019 | | TEXT ORDER granting 27 Motion for Extension of Time to File Response to 18 MOTION for Protective Order ; Reset Deadlines: **Responses due by 6/7/2019.** – So Ordered by District Judge John J. McConnell, Jr. on 6/4/2019 (Barletta, Barbara) (Entered: 06/04/2019) |
| 06/07/2019 | 28 | MOTION for an Extension of Time to File Response/Reply as to 18 MOTION for Protective Order *to June 11, 2019* filed by Katherine L. Caito. **Responses due by 6/21/2019.** (Ennis, John) (Entered: 06/07/2019) |
| 06/10/2019 | | TEXT ORDER granting 28 Motion for Extension of Time to File Response to 18 MOTION for Protective Order ; Reset Deadlines: **Response due by 6/11/2019.** – So Ordered by District Judge John J. McConnell, Jr. on 6/10/2019. (Barletta, Barbara) (Entered: 06/10/2019) |
| 06/11/2019 | 29 | MOTION for an Extension of Time to File Response/Reply as to 18 MOTION for Protective Order *to June 14, 2019* filed by Katherine L. Caito. **Responses due by 6/25/2019.** (Ennis, John) (Entered: 06/11/2019) |
| 06/12/2019 | | TEXT ORDER granting 29 Motion for Extension of Time to File Response to 18 MOTION for Protective Order ; Reset Deadlines: **Response due by 6/14/2019; NO FURTHER EXTENSIONS WILL BE GRANTED.** – So Ordered by District Judge John J. McConnell, Jr. on 6/12/2019. (Barletta, Barbara) (Entered: 06/12/2019) |
| 06/14/2019 | 30 | MOTION for an Extension of Time to File Response/Reply as to 18 MOTION for Protective Order *to June 17, 2019* filed by Katherine L. Caito. **Responses due by 6/28/2019.** (Ennis, John) (Entered: 06/14/2019) |
| 06/17/2019 | 31 | RESPONSE In Opposition to 18 MOTION for Protective Order filed by Katherine L. Caito. **Replies due by 6/24/2019.** (Attachments: # 1 Supporting Memorandum Memorandum, # 2 Exhibit Discovery Dispute letter)(Ennis, John) (Entered: 06/17/2019) |
| 06/17/2019 | 32 | Addendum re 31 Response to Motion, *for Protective Order* by Katherine L. Caito. (Attachments: # 1 Exhibit Certified Copy of SEC filing, # 2 Exhibit Certified Copy of SEC Filing, # 3 Exhibit Certified Copy of SEC filing)(Ennis, John) (Entered: 06/17/2019) |
| 06/17/2019 | 33 | Addendum re 31 Response to Motion, *for Protective Order* by Katherine L. Caito. (Attachments: # 1 Exhibit December 5, 2012 Consent Order Ocwen and New York, # 2 Exhibit December 19, 2014 Consent Order Ocwen and New York, # 3 Exhibit March 27, 2017 Consent Order Ocwen and New York, # 4 Exhibit Consent Order Ocwen and Rhode Island)(Ennis, John) (Entered: 06/17/2019) |
| 06/17/2019 | 34 | Addendum re 31 Response to Motion, *for a Protective Order* by Katherine L. Caito. (Attachments: # 1 Exhibit Texas Complaint by Servicer after Bankruptcy, # 2 Exhibit Exhibit to complaint in Texas Litigation, # 3 Exhibit Wells Fargo AP in AHM Bankruptcy)(Ennis, John) (Entered: 06/17/2019) |
| 06/17/2019 | | TEXT ORDER denying 30 Motion for Extension of Time to File Response. The Court in granting the last extension said no further extensions. The Defendant has offered no compelling reason for this Court to disregard that Order – – So Ordered by District Judge John J. McConnell, Jr. on 6/17/2019. (Barletta, Barbara) (Entered: 06/17/2019) |

| 06/17/2019 | | | TEXT ORDER granting 18 Motion for Protective Order– So Ordered by District Judge John J. McConnell, Jr. on 6/17/2019. (Barletta, Barbara) (Entered: 06/17/2019) |
|---|---|---|---|
| 07/15/2019 | 35 | 154 | RESPONSE In Opposition to 22 MOTION for Summary Judgment filed by Citibank, N.A.. **Replies due by 7/22/2019.** (Bodurtha, Samuel) (Entered: 07/15/2019) |
| 07/15/2019 | 36 | | MEMORANDUM IN SUPPORT by Citibank, N.A. in support of 35 Response to Motion . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit)(Bodurtha, Samuel) (Entered: 07/15/2019) |
| 07/15/2019 | 37 | 156 | RESPONSE In Opposition to 22 MOTION for Summary Judgment *Defendant Katherine L. Caito's Statement of Undisputed Facts in Support of Her Summary Judgment Motion* filed by Citibank, N.A.. **Replies due by 7/22/2019.** (Bodurtha, Samuel) (Entered: 07/15/2019) |
| 07/15/2019 | 38 | 160 | AFFIDAVIT re 37 Response to Motion, 35 Response to Motion, 36 Memorandum in Support *of Sony Prudent in Support of Plaintiff's Objection to Defendant's Motion for Summary Judgment* by Citibank, N.A.. (Bodurtha, Samuel) (Entered: 07/15/2019) |
| 07/15/2019 | 39 | 164 | AFFIDAVIT re 38 Affidavit, 37 Response to Motion, 35 Response to Motion, 36 Memorandum in Support *of Samuel C.Bodurtha in Support of Plaintiff's Objection and Opposition to Defendant's Motion for Summary Judgment* by Citibank, N.A.. (Bodurtha, Samuel) (Entered: 07/15/2019) |
| 07/15/2019 | 40 | 167 | MOTION to Strike *Affidavit of Sony Prudent for Summary Judgment* filed by Katherine L. Caito. **Responses due by 7/29/2019.** (Attachments: # 1 Supporting Memorandum, # 2 Affidavit Affidavit of Defendant, # 3 Exhibit A–1, # 4 Exhibit A–2, # 5 Exhibit A–3, # 6 Exhibit A–4, # 7 Exhibit A–5, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit)(Ennis, John) (Entered: 07/15/2019) |
| 07/15/2019 | 41 | | RESPONSE In Opposition to 21 MOTION for Summary Judgment *on Count I of Its First Amended Verified Complaint for Judicial Foreclosure* filed by Katherine L. Caito. **Replies due by 7/22/2019.** (Attachments: # 1 Supporting Memorandum, # 2 Affidavit Affidavit of Kerri Hall, # 3 Exhibit K, # 4 Exhibit L, # 5 Affidavit Affidavit of Katherine Caito, # 6 Exhibit A–1, # 7 Exhibit A–2, # 8 Exhibit A–3, # 9 Exhibit A–4, # 10 Exhibit A–5, # 11 Exhibit Texas Litigation Citibank, # 12 Exhibit SEC record 1, # 13 Exhibit SEC record 2, # 14 Exhibit SEC record 3, # 15 Exhibit Sec record 4, # 16 Exhibit Ocwen Consent Order 2012, # 17 Exhibit Ocwen Consent Order 2017, # 18 Exhibit Ocwen Consent Order 2014, # 19 Exhibit Ocwen Consent Order RI, # 20 Exhibit AHM BK)(Ennis, John) (Entered: 07/15/2019) |
| 07/15/2019 | 42 | 278 | STATEMENT OF DISPUTED FACTS by Katherine L. Caito re 41 Response to Motion,,,. (Ennis, John) (Entered: 07/15/2019) |
| 07/15/2019 | 43 | 284 | STATEMENT OF DISPUTED FACTS by Katherine L. Caito. (Ennis, John) (Entered: 07/15/2019) |
| 07/15/2019 | 44 | | MOTION for an Extension of Time filed by Katherine L. Caito. **Responses due by 7/29/2019.** (Ennis, John) (Entered: 07/15/2019) |
| 07/16/2019 | | | 8 |

| | | | |
|---|---|---|---|
| | | | TEXT ORDER granting 44 Motion for Extension of Time to 7/16/19 to file supplemental affidavit – So Ordered by District Judge John J. McConnell, Jr. on 7/16/2019 (Barletta, Barbara) (Entered: 07/16/2019) |
| 07/16/2019 | 45 | | MOTION for an Extension of Time To File Supplemental Affidavit and Statement of Disputed Facts and Undisputed Facts *to July 17, 2019* filed by Katherine L. Caito. **Responses due by 7/30/2019.** (Ennis, John) (Entered: 07/16/2019) |
| 07/17/2019 | | | TEXT ORDER granting 45 Motion for Extension of Time to 7/17/19 to file supplemental affidavit – So Ordered by District Judge John J. McConnell, Jr. on 7/17/2019 (Barletta, Barbara) (Entered: 07/17/2019) |
| 07/17/2019 | 46 | 289 | AFFIDAVIT re 41 Response to Motion,,, by Katherine L. Caito. (Ennis, John) (Entered: 07/17/2019) |
| 07/29/2019 | 47 | 295 | RESPONSE In Opposition to 40 MOTION to Strike *Affidavit of Sony Prudent for Summary Judgment* filed by Citibank, N.A.. **Replies due by 8/5/2019.** (Attachments: # 1 Affidavit, # 2 Exhibit 1 to Prudent Affidavit)(Bodurtha, Samuel) (Entered: 07/29/2019) |
| 07/30/2019 | 48 | | Joint MOTION for an Extension of Time *of Deadline to File Reply Memoranda in Support of Summary Judgment* filed by Citibank, N.A.. **Responses due by 8/13/2019.** (Bodurtha, Samuel) (Entered: 07/30/2019) |
| 07/31/2019 | | | TEXT ORDER granting 48 Motion for Extension of Time; Reset Deadlines: ( **Reply shall be filed on or before 8/27/2019.**) – So Ordered by District Judge John J. McConnell, Jr. on 7/31/2019. (Barletta, Barbara) (Entered: 07/31/2019) |
| 08/26/2019 | 49 | | NOTICE by Citibank, N.A. *of Withdrawal of Appearance of Ethan Z. Tieger* (Tieger, Ethan) (Entered: 08/26/2019) |
| 08/27/2019 | 50 | 370 | REPLY to Response re 41 Response to Motion,,, filed by Citibank, N.A.. (Bodurtha, Samuel) (Entered: 08/27/2019) |
| 08/27/2019 | 51 | 380 | RESPONSE IN OPPOSITION by Citibank, N.A. re 43 Statement of Disputed Facts . (Attachments: # 1 Exhibit 1)(Bodurtha, Samuel) (Entered: 08/27/2019) |
| 08/27/2019 | 52 | | MOTION for an Extension of Time to File , MOTION for an Extension of Time Memoranda and Reply and Supplemental Responses to August 30, 2019 filed by Katherine L. Caito. **Responses due by 9/10/2019.** (Ennis, John) (Entered: 08/27/2019) |
| 08/28/2019 | | | TEXT ORDER granting 52 Motion for Extension of Time to File to file replies in support of 22 MOTION for Summary Judgment , 40 MOTION to Strike *Affidavit of Sony Prudent for Summary Judgment*; Reset Deadlines: ( **Replies due by 8/30/2019.**). NO FURTHER EXTENSIONS WILL BE GRANTED – So Ordered by District Judge John J. McConnell, Jr. on 8/28/2019. (Barletta, Barbara) (Entered: 08/28/2019) |
| 08/30/2019 | 53 | 448 | REPLY to Response re 47 Response to Motion, *With Memorandum Incorporated* filed by Katherine L. Caito. (Attachments: # 1 Exhibit AA, # 2 Exhibit BB, # 3 Exhibit CC, # 4 Exhibit DD, # 5 Exhibit EE, # 6 Exhibit FF, # 7 Exhibit GG)(Ennis, John) (Entered: 08/30/2019) |
| 08/30/2019 | 54 | 508 | |

9

7

| | | |
|---|---|---|
| | | REPLY to Response re 35 Response to Motion filed by Katherine L. Caito. (Attachments: # 1 Exhibit Regulation)(Ennis, John) (Entered: 08/30/2019) |
| 12/18/2019 | 55 | ORDER denying 40 Motion to Strike ; granting 21 Motion for Summary Judgment; denying 22 Motion for Summary Judgment. Citibank shall present a form of judgment to the Court after conferring with opposing counsel– So Ordered by Chief Judge John J. McConnell, Jr. on 12/18/2019. (Barletta, Barbara) (Entered: 12/18/2019) |
| 01/17/2020 | 56 | NOTICE OF APPEAL by Katherine L. Caito as to 55 Order on Motion to Strike,, Order on Motion for Summary Judgment,,, ( filing fee paid $ 505.00, receipt number 0103–1466254 )<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 1/24/2020. (Ennis, John) (Entered: 01/17/2020) |
| 01/17/2020 | 57 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated record on appeal consisting of notice of appeal, order(s) being appealed, and a certified copy of the district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b). 56 Notice of Appeal. Documents Sent: 55, 56. (Attachments: # 1 Record)(Hicks, Alyson) (Entered: 01/17/2020) |
| 01/21/2020 | | USCA Case Number COA20–1100 for 56 Notice of Appeal., filed by Katherine L. Caito. (McGuire, Vickie) (Entered: 01/21/2020) |
| 01/27/2020 | 58 | JUDGMENT in favor of Citibank, N.A. against Katherine L. Caito(Barletta, Barbara) (Entered: 01/27/2020) |
| 01/27/2020 | 59 | Supplemental Record on Appeal transmitted to U.S. Court of Appeals for the First Circuit. 56 Notice of Appeal – Unrestricted Documents Sent: 58. (Barletta, Barbara) (Entered: 01/27/2020) |

10

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE ASSETS
TRUST 2006-3, MORTGAGE BACKED
PASS-THROUGH CERTIFICATES SERIES
2006-3,

       Plaintiff,

v.                                                      C.A. No. 1:18-cv-00427-JJM

KATHERINE L. CAITO,

       Defendant,

v.

INTERNAL REVENUE SERVICE,

       Interested Party.

## FIRST AMENDED VERIFIED COMPLAINT
## FOR JUDICIAL FORECLOSURE

### I. INTRODUCTION

    Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3,

Mortgage Backed Pass-Through Certificates Series 2006-3 ("Citibank, as Trustee"), brings this

First Amended Complaint as a matter of course to foreclose a mortgage that Defendant,

Katherine L. Caito ("Defendant") granted to Mortgage Electronic Registration Systems, Inc.

("MERS"), as nominee for American Brokers Conduit and American Brokers Conduit's

successors and assigns (the "Mortgage"). The Mortgage was executed June 6, 2006, recorded in

the Land Evidence Records for the Town of Westerly on June 12, 2006 at Book 1541, Page 252

(the "Mortgage"), and encumbers the property located at 16 Yosemite Valley Road, Westerly,

       302381117v2 1010069

Rhode Island (the "Property"). Defendant defaulted on her obligations under the terms of the Mortgage and the promissory note it secures and has failed to cure that default as of the filing of this First Amended Complaint. Pursuant to R.I. Gen. Laws § 34-27-1, Citibank, as Trustee, seeks entry of judgment from this Court to foreclose on the Mortgage by holding a public auction and sale of the Property.

## II. PARTIES

1.      Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3, is a corporation organized under the laws of the State of New York.

2.      On information and belief, Defendant, Katherine L. Caito, is an individual and resident of the State of Rhode Island.

3.      On information and belief, Interested Party, Internal Revenue Service, is a government agency with a last known usual place of business at 380 Westminster Street, Providence, Rhode Island.

## III. JURISDICTION AND VENUE

4.      This Court has original jurisdiction over this action in accordance with 28 U.S.C. § 1332 because the parties to this suit are diverse and because both the mortgage loan debt and the value of the property exceed $75,000.00, exclusive of interest and costs.

5.      Citibank, as Trustee's claims for judicial foreclosure and declaratory judgment are appropriate in this District pursuant to 28 U.S.C. § 1391(b) as the Property and the events at issue that result in foreclosure are located and/or occurred in this District.

6.      The subject Property is located at 16 Yosemite Valley Road, Westerly, Rhode Island.

## IV. FACTUAL ALLEGATIONS

7.      Citibank, as Trustee adopts and restates the allegations in Paragraphs 1 through 6 of its First Amended Complaint.

8.      On June 6, 2006, Defendant executed a promissory note (the "Note") through which she promised to repay, with interest, the principal sum of $4,500,000.00 to American Brokers Conduit. (Note, *Exhibit A.*)

9.      To secure her repayment obligations under the Note, Petitioner mortgaged, granted and conveyed the Property via the Mortgage to Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for American Brokers Conduit and American Brokers Conduit's successors and assigns. (Mortgage, *Exhibit B.*) The Mortgage was recorded in the Land Evidence Records for the Town of Westerly on June 12, 2006 at Book 1541, Page 252

10.     On August 27, 2012, MERS, as nominee, assigned its interest in the Mortgage to Citibank, as Trustee, via an Assignment of Mortgage or Deed of Trust (the "Assignment"). (Assignment, *Exhibit C.*) The Assignment was recorded in the Land Evidence Records for the Town of Westerly on October 9, 2012 at Book 1932, Page 724. (Mortgage Assignment, *Exhibit C.*)

11.     The Mortgage provides that its covenants and agreements shall bind and benefit the successors and assigns of American Brokers Conduit. (Mortgage, *Exhibit B*, at ¶ 13.)

12.     In or about October 2012, Defendant defaulted on her repayment obligations under the Note and the Mortgage.

13.     On May 11, 2018, Citibank, as Trustee, through its mortgage loan servicer, Ocwen Loan Servicing, LLC ("Ocwen"), issued a notice of default to the Borrower on May 11,

302381117v2 1010069

1

2018 under the terms and in compliance with the Mortgage, including but not limited to, Paragraph 22. (Notice of Default, *Exhibit D.*)

14.    As of the date of commencement of this action, Defendant has not reinstated the Mortgage as provided under the terms of the Mortgage, including Paragraph 19. (Mortgage, *Exhibit B.*)

15.    The amount Defendant must pay in order to cure the default under the Note and Mortgage and to reinstate the loan as of May 11, 2018 is $ 2,201,915.26, exclusive of attorney fees and costs incurred in bringing the instant action.

16.    As of the date of commencement of this action, Defendant has not cured the default in response to the May 11, 2018 notice.

17.    Since the May 11, 2018 notice of default was mailed to Defendant, more than thirty days have passed, and specifically, the June 17, 2018 deadline for Defendant to cure her default has expired.

18.    Defendant's total indebtedness under the terms of the Note and Mortgage through July 20, 2018 is $5,998,086.95 (Payoff Quote, *Exhibit E.*)

19.    In addition, in accordance with Paragraphs 9, 14 and 22 of the Mortgage, Citibank, as Trustee is entitled to a full recovery of all attorney's fees, expenses and costs incurred in defending and protecting its interest in the Property, protecting its rights under the Mortgage, and collecting all expenses incurred in pursuing the remedies provided in Paragraph 22, including but not limited, the reasonable attorneys' fees and costs with respect to this judicial foreclosure action.

20.    The Internal Revenue Service is, upon information and belief, a junior lienholder of a Federal Tax Lien issued against Defendant on April 29, 2014 and recorded in the Property's

chain of title on May 5, 2014 in the Land Evidence Records for the Town of Westerly at Book 2014, Page 7454.

## COUNT I – JUDICIAL FORECLOSURE

21.    Citibank, as Trustee incorporates by reference its responses to Paragraphs 1 through 20 of the First Amended Complaint.

22.    Defendant has failed to pay the required principal and interest payments on the debt evidenced by the Note and secured by the Mortgage.

23.    Defendant has failed to cure her default at any time following the notice of default issued in strict compliance with Paragraph 22 of the Mortgage.

24.    Defendant's default on the Note breached the uniform covenants of the Mortgage, which permits Citibank, as Trustee to thereafter accelerate the loan to maturity and demand full repayment.

25.    Under the terms of Paragraph 22 of the Mortgage, following acceleration, Citibank, as Trustee is contractually permitted to foreclose Defendant's right to redeem the Property.

WHEREFORE, Citibank, as Trustee requests the following relief:

25.    An order from the Court accelerating the mortgage loan debt in accordance with the terms of Paragraphs 19 and 22 of the Mortgage;

26.    An order from the Court authorizing Citibank, as Trustee to notice and conduct a foreclosure sale of the Property under Court oversight;

27.    An order and judgment of this Court foreclosing the Mortgage and Defendant Katherine L. Caito's right of redemption;

302381117v2 1010069

1

28.　An award of attorney's fees, costs, and expenses in pursuit of foreclosure and in accordance with the terms of the Mortgage; and

29.　Such other and further equitable relief as the Court deems may be required.

Respectfully submitted,

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE
ASSETS TRUST 2006-3, MORTGAGE
BACKED PASS-THROUGH
CERTIFICATES SERIES 2006-3,

By Its Attorneys,

/s/ Ethan Z. Tieger

Samuel C. Bodurtha, Bar No. 7075
Ethan Z. Tieger, Bar No. 9308
HINSHAW & CULBERTSON LLP
321 South Main Street, Suite 301
Providence, RI 02903
Telephone: (401) 751-0842
Facsimile: (401) 751-0072
sbodurtha@hinshawlaw.com
etieger@hinshawlaw.com

Dated:　September 4, 2018

302381117v2 1010069

1

## VERIFICATION

I, Crystal Kearse, the duly-authorized representative of the current holder of the subject mortgage, hereby certify that I have read the foregoing First Amended Verified Complaint for Judicial Foreclosure and know the contents thereof and the allegations contained in the First Amended Verified Complaint for Judicial Foreclosure are true and correct based on my knowledge and information.

Name

Crystal Kearse
Senior Loan Analyst

Title

STATE OF FLORIDA
COUNTY OF DUVAL

In Jacksonville, Florida, on the 31ST day of August 2018, before me personally appeared the above named Crystal Kearse, to me known and known by me to be the Senior Loan Analyst for Ocwen Financial Corporation, whose indirect subsidiary is Ocwen Loan Servicer, servicer for Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3; and she/he acknowledged said instrument, by her/him executed, to be her/his free act and deed in said capacity and the free act and deed of Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3.

[Notary Seal]

CHRISTINA RIDDER
Notary Public - State of Florida
Commission # GG074395
My Comm. Expires Feb 24, 2021
Bonded through National Notary Assn.

Notary Public

My commission expires: _____

7

17

3023811 17v2 1010069

# EXHIBIT A

## ADJUSTABLE RATE NOTE

### (12-MTA Index – Payment and Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125.000%__ OF THE ORIGINAL AMOUNT (OR $ __5,625,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| June 6, 2006 | Cranston | Rhode Island |
|---|---|---|
| | (City) | (State) |

__16 Yosemite Valley Road, Westerly, RI  02891__

(Property Address)

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ __4,500,000.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __American Brokers Conduit__
_____ . I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

### 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. I will pay interest at a yearly rate of __1.750__ % until __June 30, 2006__ , and the initial monthly payment provided for in Section 3(B) of this Note will be based on this rate (the "Initial Rate"). Commencing __July 1, 2006__ , I will pay interest at a yearly rate of __7.782__ % (the "Subsequent Rate"). Thereafter, the interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the interest rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, unless otherwise specified "payment" refers to the Principal and interest payment only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __the 1st__ of each month beginning on __August 1, 2006__ . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __July 1, 2036__ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at __PO Box 660029, Dallas, TX  75266-0029__ , or at a different place if required by the Note Holder.

Page 1 of 6

AHM-2030N(MULT) (0106)

Doc # 944746/Image: 944746.prn

App#

**(B) Amount of My Initial Monthly Payments**

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __16,075.96__ , unless adjusted at an earlier time under Section 4(H) of this Note.

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may further change on the __1st__ day of __August, 2006__ , and on that day every month thereafter. Each such date on which my interest rate could change is called a "Change Date."

**(B) The Index**

On each Change Date, my interest rate will be based on an index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as the 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding _____ __Three and One Half__ percentage points __3.500__ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than __Nine and 950 Thousandths__ _____ percentage points __9.950__ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing __September 1, 2006__ _____ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate that will become effective one month prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of

my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

### (F) Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amounts of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument.

### (G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the unpaid Principal I owe in full on the Maturity Date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

### (H) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to ___125.000%___ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that ___125.000%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the Maturity Date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

### (I) Required Full Monthly Payment

On the ___Zero___ anniversary of the due date of the first monthly payment, and on that same day every ___Zero___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

### (J) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### (K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

Doc # 944748/Image: 944746.prn          Page 3 of 6     App#█████          AHM-2030N(MULT) (0106)

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in an amount permitted and otherwise in accordance with Applicable Law in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of _____15_____ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _5.000_% of my overdue payment of Principal and interest. I will pay this late charge promptly but only once for each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given to Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8.  GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

### Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates

Doc # 944750/Image:  944750.prn          Page 5 of 6          App#          AHM-2030N(MULT) (0106)

23

the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)       _____ (Seal)
Katherine L Gaito         -Borrower                                 -Borrower

_____ (Seal)       _____ (Seal)
                          -Borrower                                 -Borrower

_____ (Seal)       _____ (Seal)
                          -Borrower                                 -Borrower

PAY TO THE ORDER OF

WITHOUT RECOURSE    (Seal)       _____ (Seal)
BY AMERICAN BROKERS CONDUIT  -Borrower                              -Borrower

DANIELLE STERLING
ASST. SECRETARY

Doc # 944751/Image: 944751.prn          Page 6 of 6       App#           AHM-2030N(MULT) (0106)

24

## Prepayment Fee Note Addendum

This Note Addendum is made this 5th day of June, 2006 and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of American Brokers Conduit _____ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

**BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal before they are due. Any payment of principal, before it is due, is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment." A prepayment of the full amount of the unpaid principal is known as a "full prepayment."

If I make a full prepayment, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the ___FIRST___ anniversary of the date of the Note, the Prepayment Fee shall be equal to ___Two___ percent ( 2.000 %) of the unpaid principal balance. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

To the extent permitted by Applicable Law, the Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at any time without penalty accrued but unpaid interest that has been added to principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

MULTISTATE PREPAY NOTE RIDER                                      AHM-2012P(Multi) (0605)
KY, LA, MI, MS, MO, NC, RI, VA
MTA 1204

Doc # 943777/ Image: 943777.prn   Ap

**NOTICE TO THE BORROWER**
**Do not sign this Note Addendum before you read it. This Note Addendum provides for the payment of a Prepayment Fee if you wish to repay the loan prior to the date provided for repayment in the Note.**

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)     _____ (Seal)
Katherine L Carto             -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                              -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                              -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                              -Borrower                                   -Borrower

MULTISTATE PREPAY NOTE RIDER                          AHM-2018P(Mult) (0835)
KY,LA,MI, MS,MO,NC, RI,VA
MTA 12/04

Page 3 of 3

Doc # 943778/ Image: 943778.prn  App# ████████

# EXHIBIT B

Return To:
American Brokers Conduit
520 Broadhollow Road
Melville, NY 11747

RECEIVED FOR RECORD
WESTERLY R.I.

Jun 12, 2006 at 11:35:54A

BOOK 1541 PAGE 252
DOC #: 00003845

Prepared By:
Sherry Johnson
300 Bedford Street
Entrance D
Manchester, NH
03101

*AH0065C*

*1313784*

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE

MIN ████████████████████

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated June 6, 2006 together with all Riders to this document.
**(B) "Borrower"** is Katherine L Caito

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel (888) 679-MERS.

DOC #:322411                    APPL #: ████████████

**RHODE ISLAND** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**

-6A(RI) (0005)        Form 3040 1/01
Page 1 of 15    VMP31 9905.02    Initials: _____

VMP MORTGAGE FORMS - (800)521-7291

28

26

(D) **"Lender"** is American Brokers Conduit

Lender is a Corporation
organized and existing under the laws of State of New York
Lender's address is 538 Broadhollow Road, Melville, NY 11747

(E) **"Note"** means the promissory note signed by Borrower and dated June 6, 2006
The Note states that Borrower owes Lender Four Million Five Hundred Thousand and
No/100                                                                                      Dollars
(U.S. $ 4,500,000.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than      July 1, 2036  .
(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | Prepayment Rider |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS, (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the following described property located in the County                                    of Washington                                    :

      [Type of Recording Jurisdiction]                            [Name of Recording Jurisdiction]

SEE ATTACHED LEGAL DESCRIPTION

Parcel ID Number: Map 173 Lot 11                 which currently has the address of
16 Yosemite Valley Road                                          [Street]
Westerly                      [City] , Rhode Island    02891       [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

DOC  #:322413                      APPL #                                    Initials:                Form 3040  1/01

VMP -6A(RI) (0005)                        Page 3 of 15

BOOK 1541 PAGE 255

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

DOC  #:322414          APPL #          Initials: _LLC_          Form 3040  1/01

 -6A(RI) (0005)          Page 4 of 15

31

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

DOC #:322215    APPL #: ███████████    Initials: _____

VMP®-6A(RI) (0005)    Page 5 of 15    Form 3040 1/01

32

BOOK 1541 PAGE 257

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

DOC #:322416                APPL #▮▮▮▮▮▮    Initials: ___

-6A(RI) (0005)                    Page 6 of 15                    Form 3040  1/01

33

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its

DOC #:322417

APPL 

Page 7 of 15

Initials: _____

Form 3040  1/01

-6A(RI) (0005)

34

any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but

DOC #:322420                    APPL #                    Initials: _KLL_        Form 3040  1/01

-6A(RI) (0005)                              Page 10 of 15

such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

A

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

BOOK 1541 PAGE 264

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Outstanding Automatic Orders in Domestic Relations Cases.** Borrower hereby represents and warrants to Lender that either (a) there is no outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against any Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation or (b) there is an outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against a Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation, and the other party that is subject to such order has consented to, or the court which issued the automatic order has issued another order authorizing, such Borrower's execution of the Note and this Security Instrument.

**25. Homestead Estate.** If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees that such homestead estate is waived to the extent of this Security Instrument and the amount due under the Note and to the extent of all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Furthermore, Borrower hereby waives the benefits of any homestead or similar laws or regulations that may otherwise be applicable from time to time.

DOC #:322423                    APPL ▮▮▮▮▮▮▮▮              Initials: _____        Form 3040  1/01
.6A(RI) (0005)                           Page 13 of 15

38

BOOK 1541 PAGE 265

**26. Loan Fees.** Borrower has paid the following brokerage fees, loan fees, points, finder's fees, origination fees or similar charges in connection with the loans secured by this Security Instrument:

| | | |
|---|---|---|
| Origination - Discount Fees (points) | $ | |
| Application Fees | $ | 995.00 |
| Closing Preparation Fees | $ | 900.00 |
| | $ | |
| | $ | |

As provided in Rhode Island General Laws Section 34-23-6, none of these fees will be refunded in the event the loan is prepaid in whole or in part.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                        Katherine L Caito        -Borrower

_____        _____ (Seal)
                                                                 -Borrower

_____ (Seal)        _____ (Seal)
                -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                -Borrower                                        -Borrower

* Signs as "Borrower" solely for the purpose of waiving homestead rights.

DOC #:322424            APPL #: ▮▮▮▮▮▮▮▮

Form 3040  1/01

-SA(RI) (0005)            Page 14 of 15

39

BOOK 1541 PAGE 266

**STATE OF RHODE ISLAND,**                                      Kent        **County ss:**

On this   6th   day of   June, 2006        , in   Cranston
in said County, before me personally appeared   Katherine L Caito


each and all to me known and known to me to be the person(s) executing the foregoing instrument and
acknowledged said execution to be his/her/their free act and deed.


Notary Public        John S. DiBona
My Commission Expires:   06/21/09


DOC #:322425                        APPL ▮▮▮▮▮

                                                              Initials: _KLC_        Form 3040  1/01
-6A(RI) (0005)                      Page 15 of 15

40

BOOK 1541 PAGE 267

## EXHIBIT "A"

### PARCEL I

That certain tract or parcel of land, together with a dwelling thereon, located on the westerly side of Yosemite Valley Road in the Town of Westerly, County of Washington, and State of Rhode Island, bounded and described as follows, to wit:

Lot No. 2 as shown and delineated on plat entitled "Land of The Marist Fathers of Boston, Inc., Watch Hill, Westerly, Rhode Island, to conveyed to George W. Page, Jr., Scale: 1" = 80'. Date: November 8, 1982. Guerriere & Halnon, Inc., Engineering and Land Surveying, 205 East Central Street, Franklin, Mass., Nov. 12, 1982: Lot Lines between Lots 5 and 6 Revised - Note Added: 12-2-1982 and 12-31-82" which said plat is on file in the office of the Town Clerk of said Westerly and copy in Envelope 257 and by reference is made a part hereof.

### PARCEL II

That certain tract or parcel of land locate in the Town of Westerly, County of Washington and State of Rhode Island, and bounded and described as follows:

Beginning at an iron pin at the northeasterly corner of the parcel herein conveyed, said iron pin also being the northeasterly corner of lot number 1 as shown on that plan entitled "Land of The Marist Fathers of Boston, Inc." Watch Hill, Westerly, RI, to be conveyed to George W. Page, Jr., Scale 1" = 80', date November 8, 1982", which is recorded in the Records of Land Evidence of the Town of Westerly Envelope #257; thence in a southerly direction on a bearing of S 13° -41' -24" E bounded easterly by land now or formerly of Katherine L. Caito a distance of 150.00 feet, to a point, said Caito land being Lot #2 on said Marist Fathers plan; thence in a westerly direction at a bearing of S 76° -18' -36" W a distance of 45.00 feet, to a point; thence in a southerly direction at a bearing of S 19° -38' =53" W a distance of 29.00 feet, to a point; thence in a westerly direction at a bearing of N 78° -40' -45" W a distance of 10.00 feet, to a point; thence in a northerly direction in a line parallel to the first course at a bearing of N 13° -41' -24" W a distance of 245.79 feet to a point at land now or formerly of James Curley being Lot #3 of said Marist Father Subdivision. The last four courses being bounded westerly and southerly by land now or formerly of Joseph F. Parise, Jr. and Lois D. Parise. Thence in a southeasterly direction at a bearing of S 56° -24' -58" E bounded northerly by said Curley land a distance of 103.17 feet to the point and place of beginning.

The above described parcel is delineated as "Land to be conveyed to Katherine L. Caito" on that plan entitled "Plan Showing Portion of Property of Joseph F. Parise Jr. & Lois D. Parise, Also Being a Portion of Lot #1 of Marist Father Subdivision, Cherenzia & Associates, Ltd., Scale: 1' = 40", June 6, 1989."

Subject to restrictions and easement of record.

41

BOOK 1561 PAGE 268

### Prepayment Rider

This Prepayment Rider is made this 6th day of June, 2006 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to American Brokers Conduit _____ (the "Lender" or "Noteholder").

of the same date and covering the Property described in the Security Instrument and located at;

16 Yosemite Valley Road  Westerly, RI 02891
[Property Address]

**PREPAYMENT COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

I have the right to make payments of principal before they are due. Any payment of principal, before it is due, is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment." A prepayment of the full amount of the unpaid principal is known as a "full prepayment."

If I make a full prepayment, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the FIRST _____ anniversary of the date after the execution of the Security Instrument, the Prepayment Fee shall be equal to Two percent ( 2.000 %) of the unpaid principal balance. Thereafter, prepayment shall be permitted without any Prepayment Fee.

To the extent permitted by Applicable Law, the Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at any time without penalty accrued but unpaid interest that has been added to principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of

MULTISTATE PREPAY SECURITY RIDER        Page 1 of 2        AHM-2018SC(Multi) (0805)
KY,LA,MI, MS,MO,NC, RI,VA        Doc # 943779/ Image: 943779 prn  Appl
MTA 12/04

42

the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

BOOK 13791 PAGE 269

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Katherine L Caito          -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                    -Borrower

MULTISTATE PREPAY SECURITY RIDER          Page 2 of 2          AHM-2018S(Mult) (0805)
KY,LA,MI, MS,MO,NC, RI,VA          Doc # 943780/Image: 943780 prn    App
MTA 12/04

43

## ADJUSTABLE RATE RIDER

### (12-MTA Index - Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this __6th__ day of __June, 2006__, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to _____ __American Brokers Conduit__

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

__16 Yosemite Valley Road, Westerly, RI   02891__

(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125.000%__ OF THE ORIGINAL AMOUNT (OR $ __5,625,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER.   A BALLOON PAYMENT MAY BE DUE AT MATURITY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

Interest will be charged on unpaid Principal until the full amount has been paid.  I will pay interest at a yearly rate of __1.750__ % until __June 30, 2006__, and the initial monthly payment provided for in the Note will be based on this rate. Commencing __July 1, 2006__ I will pay interest at a yearly rate of __7.782__ %.  Thereafter, the interest rate I will pay may change in accordance with Section 4 of the Note.

AHM2029R(MULT) (0106)

Doc # 944735/Image: 944735.prn  App#

44

BOOK 1541 PAGE 271

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may further change on the _____1st_____ day of _____August, 2006_____, and on that day every month thereafter. Each such date on which my interest rate could change is called a "Change Date."

### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding _____Three and One Half_____ percentage points _____3.500_____ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than _____9.950_____ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

### (E) Payment Change Dates

Effective every year commencing _____September 1st, 2006_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate that will become effective one month prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly

Page 2 of 5                                          AHM2029R(MULT) (0106)

45

Doc # 944736/Image: 944736.prn    App#

BOOK 1541 PAGE 272

payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

### (F) Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument.

### (G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the unpaid Principal I owe in full on the maturity date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

### (H) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to _____125.000%_____ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that _____125.000%_____ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

### (I) Required Full Monthly Payment

On the _____Zero_____ anniversary of the due date of the first monthly payment, and on that same day every _____Zero_____ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

### (J) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

### (K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note

Page 3 of 5                                                                                    AHM2029R(MULT) (0106)



Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

AHM2029R(MULT) (0106)

Doc # 944738/Image: 944738.prn  App#

BOOK 1541 PAGE 274

_Katherine L Carto_ (Seal)
Katherine L Carto          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Page 5 of 5                    AHM2029R(MULT) (0106)

Doc # 944739/Image: 944739.prn   App#

# EXHIBIT C

# RHODE ISLAND

PREPARED BY SECURITY CONNECTIONS
WHEN RECORDED MAIL TO:
SECURITY CONNECTIONS INC.
240 TECHNOLOGY DRIVE
IDAHO FALLS, ID 83401
PH:(209)528-9895
ATT: TERRILL NIELSON

TOWN OF *WESTERLY*
Loan.No ███████████ [P26]

Pool.No
███████████

Space above for recorder's use

Assignment-Inherv.-Recorded

# ASSIGNMENT OF MORTGAGE OR DEED OF TRUST

FOR VALUE RECEIVED, *MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE
FOR AMERICAN BROKERS CONDUIT ITS SUCCESSORS AND ASSIGNS,*

located at *P.O. BOX 2026, FLINT, MI 48501-2026*
does hereby grant, assign, transfer and set over unto *Citibank, N.A., as
Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage-Backed
Pass-Through Certificates Series 2006-3*

located at *1525 S. Beltline Rd.  Coppell, TX 75019*                its successors
and assigns a certain Mortgage or Deed of Trust dated    *JUNE 6, 2006*
executed by *KATHERINE L CAITO*                          as Grantor(s),
and recorded in Volume *1541*        Page No. *252*        Instrument No. *00003845*
of the Mortgage or Deed of Trust records in the office of the Town Clerk in the
Town of *WESTERLY*          State of Rhode Island on the *12th* day of *JUNE 2006*
Time of recording *11:35:54A*
Property Address: *16 YOSEMITE VALLEY RD WESTERLY, RI 02891*

███████████
Loan No.

(NMRI.RI)
C=s.260.0013
P=S.002.00070.82

MIN ███████████
J=sms000011241.s.09023

Page 1 of 2

MERS PHONE: 1-888-679-6377

50

50

Loan.No █████████ **[P26]**

BOOK  1932 PAGE  725

TOGETHER with all rights accrued or to accrue to said MORTGAGE OR DEED OF TRUST.

DATED AUGUST 27, 2012 _____ .

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

Witness, _TYLEE JENSEN_

_SARAH HIX_
_ASSISTANT SECRETARY_

Witness, _CRISTINA HUITRON_

STATE OF _IDAHO_          )
                          ) ss
COUNTY OF _BONNEVILLE_    )

On _AUGUST 27, 2012_ _____ , before me, the undersigned, a Notary Public in and for said County and State, personally appeared _SARAH HIX_ known to me to be the person who executed the within instrument as the _ASSISTANT SECRETARY_ _____ , and known to me to be the person who executed the within instrument as the _____ of the Corporation that executed the within instrument and acknowledged to me that the Corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors. WITNESS my hand and official seal.

_Emmett Green_
EMMETT GREEN   (COMMISSION EXP. 05-31-18)
NOTARY PUBLIC

EMMETT GREEN
NOTARY PUBLIC
STATE OF IDAHO

(NMRI.RI.2)
C=s.260.0013        MIN ████████ MERS PHONE: 1-888-679-6377
P=s.002.00070.82    J=am804Ol12ai.s.09023

TOWN CLERK
Security Connections

51

# EXHIBIT D

Ocwen Loan Servicing, LLC                    1661 Worthington Road, Suite 100
www.ocwen.com                                         West Palm Beach, FL 33409
Helping Homeowners Is What We Do!®              Toll Free: 800.746.2936

05/11/2018                                                                                    VIA First Class Mail

                                                                              Loan Number ███████

Katherine L Caito
16 Yosemite Valley Rd
Westerly, RI 02891-5622

                                                         Property Address: 16 Yosemite Valley Rd
                                                                          Westerly, RI 02891-5622

## NOTICE OF DEFAULT

### AVISO IMPORTANTE PARA PERSONAS QUE HABLAN ESPAÑOL:

Esta notificación es de suma importancia. Puede afectar su derecho a continuar viviendo en su casa. Si no entiende su contenido, obtenga una traducción inmediatamente o contáctenos ya que tenemos representantes que hablan español y están disponibles para asistir.

### SPECIAL NOTICE IN THE EVENT YOU HAVE FILED BANKRUPTCY

If you have received an Order of Discharge in a Chapter 7 case filed under the Bankruptcy Code of the United States, this notice is not intended as an attempt to collect any debt from you personally. If you have received an Order of Discharge in a Chapter 11, 12 or 13 bankruptcy case, this notice is not an attempt to collect a pre-petition debt pursuant to a completed and confirmed Bankruptcy Plan. If the foregoing applies to you, this notice is sent to you only as a preliminary step to an "In Rem" foreclosure on the Mortgage against the above-referenced "Property." Provisions may be contained within the Mortgage/Deed of Trust that requires notice prior to foreclosure. As such, this is not an attempt to assert that you have any personal liability for this debt contrary to any entered Bankruptcy Order of Discharge.

In addition, if you have recently filed a petition under the Bankruptcy Code, this notice has been sent to you because we have not been notified of your bankruptcy case. If the foregoing applies to you, it is **IMPORTANT** that you or your bankruptcy attorney contact us immediately and provide us with the following information: date and jurisdiction of your filing, your case number and the bankruptcy chapter number under which you have filed.

---

NMLS #  1852                                                                        DEMAND05BKDC

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

Mortgage payments on the above referenced account are past due, which has caused a default under the terms of the Mortgage or Deed of Trust (hereinafter, "Security Instrument"). As of 05/11/2018, the following amounts are past due:

| | |
|---|---|
| Principal and Interest | $1,755,311.72 |
| Interest Arrearage | $0.00 |
| Escrow | $419,235.00 |
| Late Charges | $21,282.05 |
| Insufficient Funds Charges | $0.00 |
| Fees / Expenses | $6,086.49 |
| Suspense Balance (CREDIT) | $0.00 |
| Interest Reserve Balance (CREDIT) | $0.00 |
| TOTAL DUE | $2,201,915.26 |

In order to cure the default, payment for the entire total amount past due, plus any amount(s) becoming due in the interim, must be received on or before 06/17/2018, at the address listed on page four of this notice. Payment must be received via MoneyGram, bank check, money order or certified funds. Please be aware, after acceleration of the debt, there may be expenses and attorney's fees and costs incurred by us to enforce the terms of the Security Instrument or mortgage agreement, in addition to the overdue amount on the mortgage account. Any payment to reinstate the Mortgage after acceleration must therefore include an amount sufficient to cover such expenses and fees incurred. Payments received that are less than the amount required to reinstate the Mortgage will be returned, and will not stop any foreclosure proceedings already begun on the Property.
**PRIOR TO SUBMITTING A PAYMENT, PLEASE CALL US TO VERIFY THE EXACT AMOUNT PAST DUE ON THE ACCOUNT.**

Failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the Security Instrument and sale of the Property. Upon acceleration, the total obligation will be immediately due and payable without further demand. In foreclosure proceedings, we are entitled to collect the total arrearage in addition to any expenses of foreclosure, including but not limited to reasonable attorney's fees and costs. A customer has the right to reinstate the account after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense to acceleration and sale.

If the default is not cured on or before the date specified above, Ocwen Loan Servicing LLC ("Ocwen"), at its option, may require immediate payment in full of all sums secured by the Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Ocwen shall be entitled to collect all expenses incurred in pursuing the remedies provided under applicable law, including, but not limited to, reasonable attorneys' fees and costs of title evidence. If Ocwen invokes the STATUTORY POWER OF SALE, Ocwen shall mail a copy of a notice of sale to the customer and to other persons in a manner prescribed by applicable law.

DEMAND05BKDC

NMLS # 1852

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Page 2 of 4

Ocwen Loan Servicing, LLC
www.ocwen.com
Helping Homeowners is What We Do!®

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

We will work with bankruptcy lawyers, foreclosure defense lawyers, housing counselors, and other authorized representatives of our customers. However, we will only release information once written authorization has been obtained, as required by law.

In addition, a U.S. Department of Housing and Urban Development ("HUD") counseling agency may be able to provide assistance. To locate the HUD-approved counseling agency, call the HUD Housing Counseling Service at 800.569.4287 or consult HUD's website at www.HUD.gov.

**Attention Servicemembers and Dependents:** Servicemembers on "active duty" or "active service," or a spouse or dependent of such a service member, may be entitled to certain legal protections under the federal Servicemembers Civil Relief Act (50 U.S.C. App. §§ 501-597b) ("SCRA") regarding the service member's interest rate and foreclosure protections. SCRA and certain state laws provide important protections for you. If you are currently in the military service, or have been within the last twelve (12) months, please notify OCWEN immediately. Servicemembers and dependents with questions about SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer. A military legal assistance office locator for all branches of the Armed Forces is available at http://legalassistance.law.af.mil/content/locator.php. Military OneSource is the U.S. Department of Defense's information resource. If you are listed as entitled to legal protections under SCRA, please go to www.militaryonesource.mil/legal or call 800.342.9647 (toll free from the United States) to find out more information. Dialing instructions for areas outside the United States are provided on the website. Homeowner counseling is also available at HUD-certified housing counselors (http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm). You can also contact us toll-free at 800.746.2936.

If the mortgage account cannot be brought current, we should be contacted immediately to discuss possible alternatives to foreclosure. We want to help remedy the delinquent status of this account and would like to discuss alternatives that might be available. While our primary objective is the collection of past due amounts on the account, we want to work to find the best available alternative to bring the account current.

Please visit our website at www.ocwencustomers.com where the account can be reviewed and financial information entered.

For any questions or concerns, we can be reached toll-free at 800.746.2936. We are available Monday through Friday 8 am to 9 pm and Saturday 8 am to 5 pm ET.

Daniel Robbins has been assigned as your relationship manager and will be your designated representative for resolution inquiries and submission of documents.

Sincerely,
Loan Servicing
Toll Free Phone: 800.746.2936

**ADDRESS WRITTEN CORRESPONDENCE TO :**
Ocwen Loan Servicing, LLC
Attention: Research Department
P.O. Box 24736
West Palm Beach, FL 33416-4736

NMLS # 1852

DEMANDOSBKDC
This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.

Page 3 of 4

Ocwen Loan Servicing, LLC

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

www.ocwen.com
*Helping Homeowners Is What We Do!®*

## PAYMENT REMITTANCE INFORMATION
### (Always include the account number ▓▓▓▓▓ with any payment)

### Certified Payment Methods

| Western Union | MoneyGram |
|---|---|
| **Code City:** OCWEN<br>**State:** Florida<br>**Reference:** Account Number ▓▓▓▓<br>**Agent Locator:** 800.225.5227 | **Receiver Code:** 2355<br>**Payable to:** Ocwen Loan Servicing, LLC<br>**City, State:** Orlando, Florida<br>**Reference:** Account Number ▓<br>**Agent Locator:** 800.926.9400 |

| Mail a Money Order/Certified Check | Bank Wire |
|---|---|
| **For Regular Mail:**<br>Ocwen Loan Servicing, LLC<br>P.O. Box 660264<br>Dallas, TX 75266-0264<br>**For Overnight/Certified Mail:**<br>Ocwen Loan Servicing, LLC<br>Box # 660264<br>1010 W. Mockingbird Lane, Suite 100<br>Dallas, TX 75247 | **Bank:** Wells Fargo Bank, NA<br>**Ocwen Bank ABA Routing Number:** 121000248<br>**Ocwen Bank Account Number:** ▓▓▓▓<br>**Account Name:** Ocwen Loan Servicing, LLC<br>**Reference:** Account Number ▓▓▓▓<br>Property Address and Customer Name<br>**Email Wire Details to:**<br>Transferfunds@ocwen.com |

NMLS # 1852                                                      DEMAND05BKDC
*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Page 4 of 4

# EXHIBIT E

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

06/21/2018

Account Number: ▮▮▮▮▮▮

Renee Barker

**Property Address:**
16 Yosemite Valley Rd, Westerly, RI 02891-5622
**Requestor Email Address:** Tara.LoVerso@ocwen.com

**Borrower(s) Name:** Katherine L Caito

# PAYOFF QUOTE
## VALID THROUGH 07/20/2018

Dear Requester,



### Why We Are Sending This Letter

A payoff quote was requested for account number: ▮▮▮▮▮▮

The total amount due is **$5,998,086.95**, which will be valid through 07/20/2018



### What Needs To Be Done

1. **Scheduled payments should still be made on time**, until the account is paid off, to avoid late charges and payments being reported as late to the credit bureaus.
2. Refer to the following pages for a detailed breakdown of this quote and for payment instructions.
3. **Payoff funds should be sent in one of the forms of certified funds listed here:** Wire Transfer, Cashier's Check, Certified Bank Check, Title Company Check, Money Order, Attorney's Escrow Check, MoneyGram or Western Union. **Funds not remitted in one of these forms will be returned**, and the payoff will not be processed.



### What We Will Do

Upon receipt of payoff funds, we will verify all amounts due and contact the issuer of the funds in the event of any discrepancies.

After the payoff funds have been applied and the account has been reconciled, any overpayment of funds will be returned to the remitter through regular mail within 20 days of the receipt of the funds.

**For any questions regarding this payoff quote**, the Customer Care Center may be contacted at 800.746.2936, Monday through Friday 8 am to 9 pm and Saturday 8 am to 5 pm ET.

Sincerely,
*Loan Servicing*

---

NMLS # 1852
*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

PAYOFFE

secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

DOC #:322418                    APPL #██████         Initials: _JLC_         Form 3040 1/01
██-6A(RI) (0005)                    Page 8 of 16

59

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or

DOC #:322419  APPL:       Initials: _____ Form 3040 1/01

-6A(RI) (0005)  Page 9 of 15

60



Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

See below for a breakdown of the total amount required to pay off the above-referenced account on or before 07/20/2018, as well as complete payoff instructions.

**Important Note:** If there is an escrow account associated with the mortgage for property taxes and insurance, we may need to pay the tax and insurance bills before this payoff quote expires on 07/20/2018. Any additional disbursements made on behalf of the mortgage will be added to the amounts due on payoff.

| Description | Amount Due |
|---|---|
| Principal | $4,622,474.40 |
| Interest | $1,137,733.19 |
| Escrow Advance | $210,438.82 |
| Property Inspection | $14.50 |
| Property Inspection Fee | $580.00 |
| Title Report Fee | $282.00 |
| Property Valuation | $328.00 |
| FC Thru Title Searches | $520.00 |
| FC Thru Complaint | $125.00 |
| FC Thru Judgment | $556.25 |
| Additional/Hourly/Court Appearance | $50.00 |
| Demand Letter | $9.53 |
| Skip Trace/Search | $16.06 |
| Service of Process | $89.48 |
| Legal Filing Service | $640.00 |
| Sale Publication | $1,918.64 |
| Selling Officer/Sheriff Cancel Fee | $965.00 |
| Certified Mail Cost | $6.53 |
| Satisfaction Cost | $57.50 |
| Late Charges | $21,282.05 |

| | |
|---|---|
| **Total Amount Due** | **$5,998,086.95** |

| | |
|---|---|
| Next Due Date | 05/01/2012 |
| Quoted Date | 06/21/2018 |
| Payoff Quote Expiration Date | 07/20/2018 |
| Grace Period End Date | 06/16/2018 |
| Original Principal Balance | $4,500,000.00 |

Given below is a breakdown of the interest that is shown above in the amount of $1,137,733.19 due on or before 07/20/2018. Please note that interest is generally charged in arrears. On a normal amortizing loan, the current month's payment will include the interest charges for the previous month. The unpaid principal balance is not the payoff amount.

---

PAYOFFE

NMLS # 1852

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

61



## Ocwen Loan Servicing, LLC

www.ocwen.com
Helping Homeowners Is What We Do!®

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

| From | To | Interest Amount | Interest Rate | Principal Bal. | Daily Per Diem | # Days |
|------|-----|-----------------|---------------|----------------|----------------|--------|
| 04/01/12 | 04/30/12 | $14,090.84 | 3.65800% | $4,622,474.40 | $469.69476000 | 30 |
| 05/01/12 | 05/31/12 | $14,067.73 | 3.65200% | $4,622,474.40 | $468.92434700 | 30 |
| 06/01/12 | 06/30/12 | $14,048.47 | 3.64700% | $4,622,474.40 | $468.28233700 | 30 |
| 07/01/12 | 07/31/12 | $14,048.47 | 3.64700% | $4,622,474.40 | $468.28233700 | 30 |
| 08/01/12 | 08/31/12 | $14,048.47 | 3.64700% | $4,622,474.40 | $468.28233700 | 30 |
| 09/01/12 | 09/30/12 | $14,048.47 | 3.64700% | $4,622,474.40 | $468.28233700 | 30 |
| 10/01/12 | 10/31/12 | $14,071.58 | 3.65500% | $4,622,474.40 | $469.05275000 | 30 |
| 11/01/12 | 11/30/12 | $14,098.55 | 3.66000% | $4,622,474.40 | $469.95156400 | 30 |
| 12/01/12 | 12/31/12 | $14,121.66 | 3.66600% | $4,622,474.40 | $470.72197600 | 30 |
| 01/01/13 | 01/31/13 | $14,144.77 | 3.67200% | $4,622,474.40 | $471.49238900 | 30 |
| 02/01/13 | 02/28/13 | $14,156.33 | 3.67500% | $4,622,474.40 | $471.87759500 | 30 |
| 03/01/13 | 03/31/13 | $14,164.03 | 3.67700% | $4,622,474.40 | $472.13439900 | 30 |
| 04/01/13 | 04/30/13 | $14,164.03 | 3.67700% | $4,622,474.40 | $472.13439900 | 30 |
| 05/01/13 | 05/31/13 | $14,152.48 | 3.67400% | $4,622,474.40 | $471.74919300 | 30 |
| 06/01/13 | 06/30/13 | $14,133.22 | 3.66900% | $4,622,474.40 | $471.10718300 | 30 |
| 07/01/13 | 07/31/13 | $14,110.10 | 3.66300% | $4,622,474.40 | $470.33677000 | 30 |
| 08/01/13 | 08/31/13 | $14,094.69 | 3.65900% | $4,622,474.40 | $469.82316200 | 30 |
| 09/01/13 | 09/30/13 | $14,071.58 | 3.65300% | $4,622,474.40 | $469.05275000 | 30 |
| 10/01/13 | 10/31/13 | $14,056.17 | 3.64900% | $4,622,474.40 | $468.53914100 | 30 |
| 11/01/13 | 11/30/13 | $14,036.91 | 3.64400% | $4,622,474.40 | $467.89713100 | 30 |
| 12/01/13 | 12/31/13 | $14,017.65 | 3.63900% | $4,622,474.40 | $467.25512100 | 30 |
| 01/01/14 | 01/31/14 | $13,998.39 | 3.63400% | $4,622,474.40 | $466.61311000 | 30 |
| 02/01/14 | 02/28/14 | $13,990.69 | 3.63200% | $4,622,474.40 | $466.35630600 | 30 |
| 03/01/14 | 03/31/14 | $13,979.13 | 3.62900% | $4,622,474.40 | $465.97110000 | 30 |
| 04/01/14 | 04/30/14 | $13,967.58 | 3.62600% | $4,622,474.40 | $465.58589400 | 30 |
| 05/01/14 | 05/31/14 | $13,959.87 | 3.62400% | $4,622,474.40 | $465.20068800 | 30 |
| 06/01/14 | 06/30/14 | $13,956.02 | 3.62300% | $4,622,474.40 | $465.07228500 | 30 |
| 07/01/14 | 07/31/14 | $13,952.17 | 3.62200% | $4,622,474.40 | $464.55867700 | 30 |
| 08/01/14 | 08/31/14 | $13,936.76 | 3.61800% | $4,622,474.40 | $464.43027500 | 30 |
| 09/01/14 | 09/30/14 | $13,932.91 | 3.61700% | $4,622,474.40 | $464.30187300 | 30 |
| 10/01/14 | 10/31/14 | $13,929.06 | 3.61600% | $4,622,474.40 | $464.17347100 | 30 |
| 11/01/14 | 11/30/14 | $13,925.20 | 3.61500% | $4,622,474.40 | $463.91666700 | 30 |
| 12/01/14 | 12/31/14 | $13,917.50 | 3.61300% | $4,622,474.40 | $464.04506900 | 30 |
| 01/01/15 | 01/31/15 | $13,921.35 | 3.61400% | $4,622,474.40 | $464.94388300 | 30 |
| 02/01/15 | 02/28/15 | $13,948.32 | 3.62100% | $4,622,474.40 | $465.71429600 | 30 |
| 03/01/15 | 03/31/15 | $13,971.43 | 3.62700% | $4,622,474.40 | $466.86991400 | 30 |
| 04/01/15 | 04/30/15 | $14,006.10 | 3.63600% | $4,622,474.40 | $468.15393500 | 30 |
| 05/01/15 | 05/31/15 | $14,044.62 | 3.64600% | $4,622,474.40 | | PAYOFFE |

NMLS # 1852
This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.

## Ocwen Loan Servicing, LLC

www.ocwen.com
*Helping Homeowners Is What We Do!*®

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

| From | To | Interest Amount | Interest Rate | Principal Bal. | Daily Per Diem | # Days |
|------|-----|-----------------|---------------|----------------|----------------|--------|
| 06/01/15 | 06/30/15 | $14,083.14 | 3.65600% | $4,622,474.40 | $469.43795600 | 30 |
| 07/01/15 | 07/31/15 | $14,125.51 | 3.66700% | $4,622,474.40 | $470.85037800 | 30 |
| 08/01/15 | 08/31/15 | $14,183.29 | 3.68200% | $4,622,474.40 | $472.77640900 | 30 |
| 09/01/15 | 09/30/15 | $14,244.93 | 3.69800% | $4,622,474.40 | $474.83084300 | 30 |
| 10/01/15 | 10/31/15 | $14,333.52 | 3.72100% | $4,622,474.40 | $477.78409000 | 30 |
| 11/01/15 | 11/30/15 | $14,414.42 | 3.74200% | $4,622,474.40 | $480.48053300 | 30 |
| 12/01/15 | 12/31/15 | $14,468.34 | 3.75600% | $4,622,474.40 | $482.27816200 | 30 |
| 01/01/16 | 01/31/16 | $14,580.05 | 3.78500% | $4,622,474.40 | $486.00182200 | 30 |
| 02/01/16 | 02/29/16 | $14,722.58 | 3.82200% | $4,622,474.40 | $490.75269900 | 30 |
| 03/01/16 | 03/31/16 | $14,830.44 | 3.85000% | $4,622,474.40 | $494.34795700 | 30 |
| 04/01/16 | 04/30/16 | $14,930.59 | 3.87600% | $4,622,474.40 | $497.68641000 | 30 |
| 05/01/16 | 05/31/16 | $15,061.56 | 3.91000% | $4,622,474.40 | $502.05208100 | 30 |
| 06/01/16 | 06/30/16 | $15,165.57 | 3.93700% | $4,622,474.40 | $505.51893600 | 30 |
| 07/01/16 | 07/31/16 | $15,281.13 | 3.96700% | $4,622,474.40 | $509.37099800 | 30 |
| 08/01/16 | 08/31/16 | $15,365.88 | 3.98900% | $4,622,474.40 | $512.19584400 | 30 |
| 09/01/16 | 09/30/16 | $15,435.21 | 4.00700% | $4,622,474.40 | $514.50708100 | 30 |
| 10/01/16 | 10/31/16 | $15,492.99 | 4.02200% | $4,622,474.40 | $516.43311200 | 30 |
| 11/01/16 | 11/30/16 | $15,566.18 | 4.04100% | $4,622,474.40 | $518.87275100 | 30 |
| 12/01/16 | 12/31/16 | $15,693.30 | 4.07400% | $4,622,474.40 | $523.11002000 | 30 |
| 01/01/17 | 01/31/17 | $15,778.05 | 4.09600% | $4,622,474.40 | $525.93486500 | 30 |
| 02/01/17 | 02/28/17 | $15,847.38 | 4.11400% | $4,622,474.40 | $528.24610200 | 30 |
| 03/01/17 | 03/31/17 | $15,939.83 | 4.13800% | $4,622,474.40 | $531.32775200 | 30 |
| 04/01/17 | 04/30/17 | $16,032.28 | 4.16200% | $4,622,474.40 | $534.40940100 | 30 |
| 05/01/17 | 05/31/17 | $16,147.84 | 4.19200% | $4,622,474.40 | $538.26146300 | 30 |
| 06/01/17 | 06/30/17 | $16,301.93 | 4.23200% | $4,622,474.40 | $543.39754600 | 30 |
| 07/01/17 | 07/31/17 | $16,471.42 | 4.27600% | $4,622,474.40 | $549.04723700 | 30 |
| 08/01/17 | 08/31/17 | $16,679.43 | 4.33000% | $4,622,474.40 | $555.98094900 | 30 |
| 09/01/17 | 09/30/17 | $16,906.70 | 4.38900% | $4,622,474.40 | $563.55667100 | 30 |
| 10/01/17 | 10/31/17 | $17,118.56 | 4.44400% | $4,622,474.40 | $570.61878400 | 30 |
| 11/01/17 | 11/30/17 | $17,341.98 | 4.50200% | $4,622,474.40 | $578.06610400 | 30 |
| 12/01/17 | 12/31/17 | $17,576.96 | 4.56300% | $4,622,474.40 | $585.89863000 | 30 |
| 01/01/18 | 01/31/18 | $17,842.75 | 4.63200% | $4,622,474.40 | $594.75837300 | 30 |
| 02/01/18 | 02/28/18 | $18,108.54 | 4.70100% | $4,622,474.40 | $603.61811500 | 30 |
| 03/01/18 | 03/31/18 | $18,420.56 | 4.78200% | $4,622,474.40 | $614.01868300 | 30 |
| 04/01/18 | 04/30/18 | $18,786.51 | 4.87700% | $4,622,474.40 | $626.21687900 | 30 |
| 05/01/18 | 05/31/18 | $19,121.64 | 4.96400% | $4,622,474.40 | $637.38785900 | 30 |
| 06/01/18 | 06/30/18 | $19,479.88 | 5.05700% | $4,622,474.40 | $649.32925100 | 30 |
| 07/01/18 | 07/19/18 | $12,569.02 | 5.15200% | $4,622,474.40 | $661.52744700 | 19 |

PAYOFFE

NMLS # 1852

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*



**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

PAYOFFE

NMLS # 1852

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.



Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

---

## PAYOFF REQUIREMENTS AND CONDITIONS

**Certified funds are required for payoff.** Payoff funds must be provided via certified funds such as: Wire Transfer, Cashier's Check, Certified Bank Check, Title Company Check, Money Order, Attorney's Escrow Check, MoneyGram or Western Union. Non-certified payments will not be accepted, and the payoff will not be processed.

### HOW TO SUBMIT PAYOFF FUNDS

- Wire transfers are preferred. Wire transfer is the fastest, safest and most convenient payment option. Because this is the fastest option, it may also save money on per-diem interest.

- To make a wire transfer, provide the information listed under payment methods to the remitting bank.

- Be sure to always include the borrower's name, property address and account number on any remittance. If there is an inability to wire transfer funds, the payment should be sent in certified funds by overnight mail as shown below.

### PAYMENT METHODS:

| Bank: | Wells Fargo Bank, NA |
|---|---|
| OCWEN Bank ABA Routing Number: | 121000248 |
| OCWEN Bank Account Number: | ▇▇▇▇▇▇ |
| Account Name: | OCWEN Loan Servicing, LLC |
| Reference: | OCWEN Customer Account Loan # ▇▇▇▇▇ Property Address, and Borrower's Name |
| Email: | Wire details to: Transferfunds@ocwen.com |

Mail Certified Funds Check to:
OCWEN Loan Servicing, LLC
Attn: Cashiering / Payoff Department
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Reference: OCWEN Account Number ▇▇▇▇

\*All checks/money orders should be made payable to: OCWEN Loan Servicing, LLC. **The mortgage account number, borrower's name and property address should be included on the front of any check or money order.**

| Code City: OCWEN |
|---|
| State: Florida |
| Reference: OCWEN Account Number ▇▇▇▇ |
| Agent Locator: 800.225.5227 |

Receiver Code: 2355
Payable to: OCWEN Loan Servicing, LLC
City, State: Orlando, Florida
Reference: OCWEN Account Number ▇▇▇▇
Agent locator: 800.926.9400

\*\*Western Union and MoneyGram may charge a fee for this service. Contact Western Union or MoneyGram for any payment or transaction limitations.

**This payoff amount is subject to change.** To the extent permitted by law, we reserve the right to correct any portion of this statement at any time.

---

PAYOFFE

NMLS # 1852

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*



**OCWEN Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

- All balances are subject to change as a result of any transactions, the assessment of any fees, or any costs being incurred with respect to the account, which occur prior to the application of payoff funds. If the account is referred to foreclosure, becomes subject to a bankruptcy proceeding, if it was not already, or has any other valid fees or costs assessed to it prior to the Payoff Quote Expiration Date, this payoff quote is deemed invalid, and a new payoff quote will be provided.

- Similarly, if any payments applied to this account within the prior thirty (30) days of the date of this payoff quote are reversed for any reason, including but not limited to, insufficient funds or a stop payment being placed on a check, this payoff quote is deemed invalid, and a new payoff quote must be obtained from us to reflect the correct amount due and owing. Subsequent payoff quotes will reflect the full amount due and are subject to change for the reasons referenced above.

**Overpayment or underpayment of payoff amount.** Upon receipt of payoff funds, we will verify all amounts due and contact the issuer of the funds in the event of any discrepancies. The payoff amount does not include any applicable positive escrow balance. After the payoff funds have been applied, and the account has been reconciled, any overpayment of funds will be returned to the issuer through regular mail within 20 days of the date the funds are received. Escrow account overages will be disbursed within 20 days. Please be aware to the extent permitted by law, if the payoff funds received are less than the total amount necessary to pay the account in full, then any escrow funds remaining after payment of insurance and taxes due may be applied to the mortgage at payoff. If the desire is not to have any remaining escrow surplus funds applied to the loan at payoff, we must be notified at least 5 days prior to submitting the payoff funds. This notification may be emailed to payoffs@ocwen.com or faxed to 407.737.6118. In the event of an underpayment of the required stated payoff funds, if the escrow funds are insufficient to pay the account in full, we will return the funds and continue to accrue interest on the loan.

**Monthly payments due before payoff must still be paid by due date.** Issuance of this statement does not suspend the contractual requirement to make mortgage payments when due. If payoff funds are received after the expiration of the grace period, if such a period is applicable to this mortgage account, a late charge may be due. All late charges will be paid prior to the application of any payoff funds and preparation of the satisfaction of the Mortgage/Deed of Trust.

**Escrow disbursements will proceed until payoff funds are received.** Issuing this payoff statement will not stop future escrow disbursements. Property taxes or insurance may be paid after this quote is issued. If such disbursements create escrow advances and change the amount due to satisfy the mortgage, this payoff quote will be deemed invalid, and a new payoff quote must be obtained from us to reflect the correct amount due and owing. Subsequent payoff quotes will reflect the full amount due and are subject to change as referenced above.

**Past due fees still apply.** If the account is past due, collection expenses and legal fees may be accruing.

**Per diem interest may change.** If this is an adjustable rate mortgage, the per diem interest may change prior to payoff and the new per diem interest will be applicable for the payoff as well.

**The security instrument (Deed of Trust or Mortgage) will be released after payoff.** Upon receipt of the entire payoff amount, we will execute a release and discharge of the Deed of Trust/Mortgage and, if necessary, will file a withdrawal in connection with any legal action that may have been taken with regard to this mortgage account.

**Prepayment penalty waiver may be allowed.** If the terms of the mortgage documents allow for waiver of the prepayment penalty in certain circumstances, OCWEN must be provided with the requisite documentation to demonstrate waiver of a prepayment penalty in accordance with the terms of the mortgage documents. Such documentation must be provided to the Payoff Department within sixty (60) days following the date that the payoff was made. This documentation may be emailed to payoffs@ocwen.com or faxed to 407.737.6118. Unless otherwise prohibited by law, no prepayment penalty will be waived unless and until we are notified of the qualifying event.

PAYOFFE

NMLS # 1852

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the account is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Ocwen Loan Servicing, LLC

OCWEN

www.ocwen.com
*Helping Homeowners Is What We Do!*®

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

**Please verify the Social Security Number on file** for tax reporting. Please visit our website at www.ocwencustomers.com to verify the Social Security Number on file for the purposes of year-end tax reporting, if applicable.

**For questions** regarding this payoff quote, please contact our Customer Care Center at 800.746.2936  We are available Monday through Friday 8 am to 9 pm and Saturday 8 am to 5 pm ET

Sincerely,
*Loan Servicing*

PAYOFFE
NMLS # 1852
*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS
TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH
CERTIFICATES SERIES 2006-3**

**VS**                    **C.A. NO:1:18-cv-427-JJM**

**KATHERINE L. CAITO
INTERNAL REVENUE SERVICE**

## ANSWER OF DEFENDANT, KATHERINE L. CAITO

INTRODUCTION    Denied

1.    Denied

2.    Admit

3.    Admit

4.    Admit

5.    Denied

6.    Admit

7.    Denied

8.    Admit that a Note was executed. Denied as to the remainder.

9.    Admit that a mortgage was executed. Denied as to the remainder.

10.   Denied.

11.   Denied

12.    Denied

13.    Denied

14.    Denied as no default notice was sent.

15.    Denied

16.    Denied

17.    Denied

18.    Denied

19.    Denied

20.    Denied

21.    Denied

22.    Denied

23.    Denied

24.    Denied

25.    Denied

26.    Denied.

27.    Denied

28.    Denied

29.    Denied

**First Affirmative Defense**

Plaintiff's complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense

The Plaintiff has no interest in the note or the mortgage.

### Third Affirmative Defense

Plaintiff was not the real party in interest on the date this action was commenced and is not shown to be authorized to bring this action.

### Fourth Affirmative Defense

Plaintiff has charged and/or collected payments from Defendants for attorney fees, legal fees, foreclosure costs, late charges, property inspection fees, title search expenses, filing fees, broker price opinions, appraisal fees, and other charges and advances, and predatory lending fees and charges that are not authorized by or in conformity with the terms of the subject note and mortgage Plaintiff wrongfully added and continues to unilaterally add these illegal charges to the balance Plaintiff claims is due and owing under the subject note and mortgage.

### Fifth Affirmative Defense

The promissory note was never endorsed and negotiated pursuant of the provisions of the Uniform Commercial Code.

### Sixth Affirmative Defense

Plaintiff did not accelerate the mortgage pursuant to the terms of the mortgage, prior to the filing of this action.

### Seventh Defense

The provisions of paragraph 22 of the mortgage were not complied with before any alleged acceleration of the loan was declared. The Defendant was not provided a default notice pursuant to the terms of the mortgage.

70    3

### Eighth Affirmative Defense

Plaintiff has failed to provide an original endorsed promissory note and mortgage as to file a foreclosure suit.

### Ninth Affirmative Defense

The Plaintiff's complaint was not verified with a person with any personal knowledge or information regarding the matters that the Plaintiff purported to assert. The allegations asserted as true were not sworn to under oath.

### Tenth Affirmative Defense

There is no trust with the name of American Home Mortgage Trust 2006-3, Mortgage Backed Pass-through Certificates Series 2006-3.

### Eleventh Affirmative Defense

Any purported Default Letter was not mailed by an agent of the Plaintiff.

Wherefore Defendant demands Judgment plus attorney fees and costs.

KATHERINE L. CAITO

By her attorney,

November 30, 2018

/s/ John B. Ennis
John B. Ennis, Esq. #2135
1200 Reservoir Avenue
Cranston, RI 02920
401-943-9230
jbelaw75@gmail.com

Defendants demands a Trial by Jury

714

CERTIFICATION

I hereby certify that I emailed a copy of the above Answer to the following electronically, on this 30th day of November, 2018:

Samuel Bodurtha
Ethan Z. Tieger

/s/ John B. Ennis

CERTIFICATION

I hereby certify that I emailed a copy of the above Answer to the following electronically, on this 30th day of November, 2018:

Samuel Bodurtha
Ethan Z. Tieger

/s/ John B. Ennis

73 5

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE ASSETS
TRUST 2006-3, MORTGAGE BACKED
PASS-THROUGH CERTIFICATES SERIES
2006-3,

    Plaintiff,

v.                                                         C.A. No. 1:18-cv-00427-JJM

KATHERINE L. CAITO,

    Defendant,

v.

INTERNAL REVENUE SERVICE,

    Interested Party.

## PLAINTIFF CITIBANK, N.A., AS TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF ITS FIRST AMENDED VERIFIED COMPLAINT FOR JUDICIAL FORECLOSURE

Pursuant to Fed. R. Civ. P. 56, DRI LR 7, and DRI LR 56, Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3 ("Citibank, as Trustee"), moves for entry of summary judgment on Count I of its First Amended Verified Complaint for Judicial Foreclosure.

In support of its Motion for Summary Judgment, Citibank, as Trustee submits the accompanying Memorandum of Law, Statement of Undisputed Facts, and supporting affidavit of Ocwen Loan Servicing, LLC.

WHEREFORE, Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3P1, respectfully

303537739v1 1010069

7

requests that this Court enter judgment in its favor on Counts I of its First Amended Verified

Complaint for Judicial Foreclosure, enter an order authorizing Citibank, as Trustee to notice and

conduct a foreclosure sale of the Property under Court oversight, and award any further relief

this Court deems necessary and proper.

Respectfully submitted,

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE
ASSETS TRUST 2006-3, MORTGAGE
BACKED PASS-THROUGH
CERTIFICATES SERIES 2006-3,

By Its Attorneys,

/s/ Ethan Z. Tieger
Samuel C. Bodurtha, Bar No. 7075
Ethan Z. Tieger, Bar No. 9308
HINSHAW & CULBERTSON LLP
56 Exchange Terrace
Providence, RI 02903
Telephone: (401) 751-0842
Facsimile: (401) 751-0072
sbodurtha@hinshawlaw.com
etieger@hinshawlaw.com

Dated:    May 15, 2019

## LOCAL RULE 7(C) STATEMENT

In accordance with DRI LR 7(c), Plaintiff, Citibank, N.A., as Trustee for American
Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-
3, requests a hearing and oral argument on its Motion for Summary Judgment and estimates that
one hour will be required.

/s/ Ethan Z. Tieger
Ethan Z. Tieger

2

303537739v1 1010069

## CERTIFICATE OF SERVICE

I, Ethan Z. Tieger, hereby certify that the documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on May 15, 2019.

/s/ *Ethan Z. Tieger*
Ethan Z. Tieger

303537739v1 1010069

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE ASSETS
TRUST 2006-3, MORTGAGE BACKED
PASS-THROUGH CERTIFICATES SERIES
2006-3,

       Plaintiff,

v.                                                              C.A. No. 1:18-cv-00427-JJM

KATHERINE L. CAITO,

       Defendant,

v.

INTERNAL REVENUE SERVICE,

       Interested Party.

## AFFIDAVIT OF SONY PRUDENT OF OCWEN LOAN SERVICING, LLC IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    I, Sony Prudent, hereby declare and state as follows:

    1.    I am a Senior Loan Analyst for Ocwen Financial Corporation, whose indirect subsidiary is Ocwen Loan Servicing, LLC ("Ocwen"), and I am authorized to make this affidavit on behalf of Ocwen. Ocwen is the loan servicer for the subject mortgage loan on behalf of Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3 ("Citibank, as Trustee").

    2.    I am over the age of 18 and competent to testify as to the matters contained in this affidavit. I have access to the business records of Ocwen, including the business records for and relating to the loan at issue in this litigation. I make this affidavit based upon my review of those

records relating to the loan and from my own personal knowledge of how they are kept and maintained. The loan records are maintained by Ocwen in the course of its regularly conducted business activities and are made at or near the time of the event, by or from information transmitted by a person with knowledge. It is the regular practice to keep such records in the ordinary course of a regularly conducted business activity. Ocwen's records that relate to the loan that I reviewed and relied upon for the statements made in this Affidavit include images of the note, Ocwen's electronic servicing system and images of correspondence.

3. I have reviewed Ocwen's records with respect to mortgage loan number ending 2929 for the borrower and Defendant, Katherine L. Caito (the "Borrower").

4. Borrower executed a promissory note on June 6, 2006, in the original principal amount of $4,500,000.00 (the "Note") in favor of American Brokers Conduit. To secure repayment of the Note, Borrower granted a mortgage on property located at 16 Yosemite Valley Road, Westerly, Rhode Island (the "Property") to Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for American Broker's Conduit (the "Mortgage").

5. Ocwen has not received any payments from the Borrower since April 2012. As a result of her failure to meet her payment obligations under the Note and Mortgage, Borrower defaulted on the subject mortgage loan, with the mortgage account currently due for May 2012.

6. On or about August 27, 2012, MERS, as nominee for American Brokers Conduit executed an assignment of the Mortgage to Citibank, as Trustee via an Assignment of Mortgage or Deed of Trust recorded in the Land Evidence Records for the Town of Westerly on October 9, 2012 at Book 1932, Page 724 (the "Assignment"). The Assignment conveyed MERS' legal interest in the Mortgage to Citibank, as Trustee.

2

303694645V2 1010069

97

7.    In September 2016, a Confidential Settlement and Release Agreement was entered into by and between the Borrower and Citibank, as Trustee to resolve and settle litigation previously commenced by the Borrower in 2013 and 2016. To preserve confidentiality, a copy of the Confidential Settlement and Release Agreement is not attached as an exhibit to this Affidavit. This Confidential Settlement and Release Agreement, among other terms, included a release by the Borrower of all known and unknown claims as to Citibank, as Trustee. In addition, the Confidential Settlement and Release Agreement provided, *inter alia*, for the following:

> **Acknowledgment of Debt:** Borrower [i.e. Caito] acknowledges and confirms that the Investor [i.e. Citibank, as Trustee] is the current mortgagee and Note holder, and that certain debt incurred by her on the June 6, 2006 note to American Brokers Conduit is owed to Investor. Borrower acknowledges the validity of the Assignment of Mortgage from American Brokers Conduit to Investor and the validity of the debt to the Investor, and hereby waives here right to challenge the validity of the Assignment and debt.

8.    Prior to the initiation of the pending judicial foreclosure action, Ocwen mailed Borrower notice of her default on the Note and Mortgage and right to cure to the Property address on May 11, 2018 (the "Notice of Default").

9.    Borrower failed to cure her default by June 17, 2018, as was required in the Notice of Default to avoid acceleration and sale. Borrower has not reinstated the Mortgage following her receipt of the Notice of Default. Following the Borrower's failure to cure her default, judicial foreclosure proceedings were then commenced to proceed to a foreclosure auction of the Property.

10.    According to Ocwen's records, as of May 14, 2019, approximately $4,622,474.40 is due and owing in principal, $1,350,190.85 is due and owing in interest, and $210,438.82 is due and owing in escrow payments on the Borrower's mortgage loan.

11.    Since Borrower's default on the Mortgage in May 2012, additional costs, fees and expenses have been incurred on Borrower's mortgage loan and applied to the unpaid balance.

3

303694645V2 1010069

Attached hereto as *Exhibit A* is a true and accurate copy of the Payment Reconciliation History on the Mortgage, itemizing all costs, fees and expenses applied to the account. All costs, fees, and expenses are necessary and proper and were incurred in compliance with the terms of the Note and Mortgage.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

4

303694645V2 1010069

99

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT. EXECUTED ON ___May 15___, 2019.

Ocwen Loan Servicing, LLC

BY: Sony Present
TITLE: Senior Loan Analyst

5

81

303694645V2 1010069

100

82

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT. EXECUTED ON ___May 15___, 2019.

Ocwen Loan Servicing, LLC

BY: Sony Present
TITLE: Senior Loan Analyst

5

83

303694645V2 1010069

100

## CERTIFICATE OF SERVICE

I, Ethan Z. Tieger, hereby certify that the documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on May 15, 2019.

/s/ *Ethan Z. Tieger*
Ethan Z. Tieger

6

303694645V2 1010069

# EXHIBIT A

Case 1:18-cv-00427-JJM-LDA   Document 21-4   Filed 05/15/19   Page 2 of 3   PageID 7/1

Payment Reconciliation History

INVESTOR#: 4009   POOL#: 1   DATE PAYMENT DUE: 05/01/2012   INTEREST RATE: 3.65000

MAIL: 1200 Kenemraef Ave
Clinton RI 02920-1012

PRINCIPAL BAL: 4,622,474.40   ESCROW BAL: -710,438.82

| Check#/<br>Ref #<br>Number | Date<br>Payment<br>Received | Date<br>Payment<br>Due | Date<br>Assessed/<br>Transaction<br>Date | Description | Amount<br>Applied/<br>Assessed | Principal<br>Application | Interest<br>Application | Escrow<br>Application | Optional<br>Products | Late<br>Charges | Other/Misc<br>Description | Suspense<br>Application | Principal<br>Balance | Escrow<br>Balance | Suspense<br>Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*(Table contents illegible due to image quality and rotation.)*

Payment Reconciliation History

| Date Assessed/ Transaction Date | Description | Amount Applied/ Assessed | Principal Application | Interest Application | Escrow Application | Optional Products | Late Charges | Fees/ Other (see description) | Suspense Application | Principal Balance | Escrow Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/07/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 09/08/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 10/10/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 11/13/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 12/12/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 01/11/2018 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02/14/2018 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02/27/2018 | Service of Process | -10.84 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.84 | 0.00 | 0.00 | 0.00 | 0.00 |
| 03/06/2018 | Property Valuation | -110.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -110.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 03/23/2018 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 04/18/2018 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 05/08/2018 | Skip Trace/Search | -5.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -5.46 | 0.00 | 0.00 | 0.00 | 0.00 |
| 05/08/2018 | Service of Process | -22.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -22.10 | 0.00 | 0.00 | 0.00 | 0.00 |
| 06/20/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 07/26/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 08/20/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 09/26/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 10/22/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 12/03/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 01/04/2019 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02/06/2019 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 03/07/2019 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 04/26/2019 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Ending Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -21,282.0% | -6,231.49 | 0.00 | 0.00 | 0.00 | 0.00 |

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME
MORTGAGE ASSETS TRUST 2006-3, MORTGAGE BACKED PASS-
THROUGH CERTIFICATES SERIES 2006-3

VS

C.A. NO:1:18-cv-427-JJM

KATHERINE L. CAITO
INTERNAL REVENUE SERVICE

AFFIDAVIT OF KATHERINE CAITO

I, Katherine Caito, hereby declare and state as follows:

1.    I am the defendant in this case.

2.    Since I obtained this mortgage loan, I have never sent or provided any lender
or mortgagee or loan servicer a mortgage payment check with insufficient funds to
pay the mortgage, which was returned unpaid.

3.    I was never advised by any lender or mortgagee or loan servicer that a check
had been returned for nonpayment and that as a result all payments had to be paid
by (a) cash;(b) money order;(c) certified check, bank check, treasurer's check,
provided any such check is drawn upon and institution whose deposits are insured
by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

4.    The letter from Ocwen Loan Servicing, LLC dated May 11, 2018 contained

1

inaccurate amounts of fees and charges in the amount of $6086.49.

5.    The affidavit for Summary Judgment contains a purported affidavit of a person named Sony Prudent, which contains an Exhibit A.

6.    This Exhibit A contains a purported loan history, which suggests that as of May 11, 2018, the total of fees and expenses was $6086.49. Exhibit A indicates that after May 11, 2018, ten charges of $14.50 each were added to the charges.

7.    I have reviewed Exhibit A and can state with certainty that certain of these charges are not accurate or were not actually incurred and were not reasonable and necessary.

8.    From origination of the mortgage loan, I never received a default letter from any loan servicer which provided me a specific date to cure any default and which was deposited in the United States mail at least thirty days before the date which was specified for the cure date.

9.    I never received a default notice consistent with the terms of paragraph 22 or paragraph 19 of the mortgage.

10.    Thus all the charges for foreclosure and foreclosure related charges were not accurate charges contained within the $6086.49 fees and expenses of the May 11, 2018 letter. These charges which resulted in the $6086.49 being inaccurate were the following:

2

| 11-14-16 | FC thru Judgment | $556.25 |
| 4-1-16 | Selling Office/Sheriff Cancel fee | $425.00 |
| 3-8-16 | Sale Publication | $1203.76 |
| 2-22-16 | Selling Officer/Sheriff Cancel Fee | $425.00 |
| 2-1-16 | FC Thru complaint | $125.00 |
| 2-1-16 | Selling Officer/Sheriff Cancel Fee | $425.00 |
| 2-1-16 | Sale Publication | $714.88 |
| 7-23-13 | FC thru Title search | $520.00 |

11.   These total fees totaled $4394.90.

12.   I never received a default letter pursuant to the terms of the mortgage which would have allowed any exercise of the statutory power of sale.

13.   At no time was a sheriff ever hired to sell my home.

14.   At no time was there a Selling Officer or any other official hired to sell my home.

15.   At no time was a judicial foreclosure commenced in 2013-2016, which could result in a Judgment being entered.

16.   The purported default letter included three fees for service of process, specifically the following:

| 5-8-15 | Service of process | $22.10 |

3

| 2-7-18 | Service of Process | $10.84 |
|--------|--------------------|--------|
| 2-22-16 | Service of Process | $56.54 |

17.    The purported default letter also included a fee for additional hour court appearance of $50.00 on 2-22-16.

18.    There was no Court appearance for an attorney to be paid an extra hourly fee on February 22. 2016 and where there was never any servicer of process on me.

19.    I was never served process by Ocwen or any other entity.

20.    The purported default letter included three skip trace fees, specifically the following:

| 5-8-18 | Skip Trace fee | $5.46 |
|--------|---------------|-------|
| 2-22-16 | Skip Trace fee | $5.30 |
| 7-23-13 | Skip Trace fee | $5.30 |

21.    However I have always lived at my home at 16 Yosesmite Valley Road, Westerly, RI, 02891 and there was no reason to search for my address, as Ocwen knew that I was living in the house.

22.    The total fees of $6086.49 also included property inspection fees for the period from April, 2013 to May 2018 in the amount of $458.74 for 37 separate charges.

23.    At all times Ocwen was aware that I was living in the property and that I had

4

92

145

an attorney. I paid the taxes for the property from 2016 through 2018.

24.   Ocwen knew that the property was not abandoned.

25.   At no time did any person come into my house to inspect the condition of the house.

26.   Ocwen's compute system automatically orders property inspection fees when a loan is in arrears.

27.   As a result of improper charges referenced herein, the purported default notice contains inaccurate charges included in the $6086.49 charges for fees and expenses.

28.   Thus I was not provided an accurate default letter pursuant to the terms of the mortgage.

29.   After May 11, 2018, I was never mailed a Notice of Acceleration of the mortgage loan from Ocwen, Citibank or any person or entity acting on their behalf.

30.   I have, through my attorney, mailed Ocwen Requests for Information which requested verification that these charges were actually paid by Ocwen.

31.   No proof of payment was ever provided regarding these charges.

I declare under the pain and penalty of perjury that the foregoing is true and correct.

5

May 15, 2019

KATHERINE CAITO

# EXHIBIT 1

# KORDE & ASSOCIATES, P.C.

Counselors at Law
321 Billerica Road, Suite 210
Chelmsford, Massachusetts 01824-4100
Attorneys Licensed in MA, NH, NY and RI

Certified Article Number

9414 7266 9904 2070 0522 74

SENDERS RECORD

**\*Korde & Associates, PC is moving. As of June 27, 2016, our new address will be:**
**900 Chelmsford Street, Suite 3102, Lowell, Massachusetts 01851**

June 3, 2016

FIRST CLASS & CERTIFIED MAIL

Altagracia Camarena
c/o John Ennis Esq.
1200 Reservoir Avenue
Cranston, RI 02920

RE:  NOTICE OF DEFAULT AND MORTGAGEE'S RIGHT TO FORECLOSE
Property Address:  142-144 Unit Street, Providence, RI 02909
Our File No. 14-014672

Dear Sir/Madam:

THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Please be advised that this firm has been retained by Ocwen Loan Servicing, LLC as servicer for U.S. Bank National Association, as Trustee for MASTR Adjustable Rate Mortgages Trust 2007-1 Mortgage Pass-Through Certificates, Series 2007-1 (the "Mortgagee") to commence foreclosure proceedings on the above-entitled premises for breach of the covenants of the mortgage of Altagracia Camarena to Mortgage Electronic Registration Systems, Inc. acting solely as nominee for Dream House Mortgage Corporation dated October 13, 2006 in the original principal amount of $279,000.00 in book 8345 at page 2 which mortgage secures a Note of Altagracia Camarena to Dream House Mortgage Corporation of same date and original principal amount.

Specifically, the aforesaid Note and Mortgage are in default as payments of principal and/or interest have not been made in accordance with the terms and conditions of the Note and Mortgage. Your loan is in default for the April 1, 2013 payment and all the payments due each month thereafter, as provided in said Note. The amount required to cure the default as of the date of this letter is $81,201.15. DEMAND is hereby made against you to cure this default by July 3, 2016. In order to cure this default, you must pay the total amount of $81,201.15 in addition to other amounts that become due from the date of this letter through the date you pay (the "arrearage"). On the day that you intend to pay, please contact this office to request the full amount owed on your account as the amount due on the day you pay may be greater than stated above, due to interest, late charges and other charges or credits that may vary from day to day, or may be assessed after the date of this letter. The necessary amount must be received in certified funds.

You are advised that unless the arrearage is received by the Mortgagee, c/o Korde & Associates, P.C., 321 Billerica Road, Suite 210, Chelmsford, MA 01824-4100 by July 3, 2016, the Mortgagee may accelerate the payment of all sums secured by the aforesaid mortgage and may exercise all rights as set forth under the power of sale contained in said mortgage, including a foreclosure sale of the mortgaged premises. Please be advised that you have the right to reinstate after acceleration and you have the right to bring a court action to assert the non-existence of a default or any other defense which you have to the acceleration and the sale of the mortgaged premises.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt is valid. If, within the thirty-day period, you notify this office in writing that the debt, or any portion thereof, is disputed, we will obtain verification of the debt and mail a copy of such verification to you. If requested within 30 days of receipt of this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

If you (1) did not execute the Promissory Note relating to this mortgage; (2) are in bankruptcy; or (3) have been discharged in bankruptcy, this letter is for informational purposes only and is not intended as an attempt to collect a debt or an act to collect, assess or recover all or any portion of the debt from you personally.

Please give this your immediate attention.

Very truly yours,

Shana L. Costa
SLC/dv

Telephone (978) 256-1500    Fax (978) 256-7615
Hours of Operation 8:30am - 5:30pm EST, Monday thru Friday
Website: www.kordeassoc.com

14-014672 / FC01

99

149

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH CERTIFICATES SERIES 2006-3**

### VS                    C.A. NO:1:18-cv-427-JJM

**KATHERINE L. CAITO
INTERNAL REVENUE SERVICE**

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, by her attorney, pursuant to DRI LR56(a) sugbmits the following Statement of Undisputed facts in support of her Motion for Summary Judgment

1.    Paragraph 22 of Defendant's mortgage states in part:

**Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of**

the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.

2.    Lender did not provide such a notice.(Pl's Exhibit D)

3.    The notice provided to Defendant made no reference to the Lender nor Citibank as Trustee. (Pl's Exhibit D)

4.    The May 11, 2018 notice  did not accurately state the amount of the arrearage on the mortgage. (Pl's Exhibit 1) Defendant's affidavit in support of Motion for Summary Judgment.

5.    The May 11, 2018 notice did not advise the Defendant that she could reinstate after acceleration only until five days before the sale. (Pl's Exhibit D).

6.    The May 11, 2018 notice did not specify a particular date at least thirty days after the date the notice was deposited in the United States mail to cure the arrearage. (Pl's Exhibit D).

7.    The May 11, 2018 notice required that the arrearage be paid by certified funds. (Pl's Exhibit D).

8.   The mortgage did not require that any arrearage be paid by certified funds. (Pl's Exhibit B).

9.   The Defendant has have never sent or provided any lender or mortgagee or loan servicer a mortgage payment check with insufficient funds to pay the mortgage, which was returned unpaid. (Defendant's Affidavit)

10.   The Defendant was never advised by any lender or mortgagee or loan servicer that a check had been returned for nonpayment and that as a result all payments had to be paid by (a) cash;(b) money order;(c) certified check, bank check, treasurer's check, provided any such check is drawn upon and institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer. (Defendant's Affidavit).

KATHERINE L. CAITO

By her Attorney

May 15, 2019

/s/ John B. Ennis
John B. Ennis, Esq. #2135
1200 Reservoir Avenue
Cranston, RI 02920
401-943-9230
Jbelaw75@gmail.com

## CERTIFICATION

I hereby certify that I emailed a copy of the above Statement of Undisputed Facts to the following electronically on this 15th day of May, 2019:

Samuel Bodurtha
Ethan Z. Tieger

/s/ John B. Ennis

153

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE ASSETS
TRUST 2006-3, MORTGAGE BACKED
PASS-THROUGH CERTIFICATES SERIES
2006-3,

        Plaintiff,

v.

KATHERINE L. CAITO,

        Defendant,

v.

INTERNAL REVENUE SERVICE,

        Interested Party.

C.A. No. 1:18-cv-00427-JJM

## PLAINTIFF CITIBANK, N.A., AS TRUSTEE'S RESPONSE TO DEFENDANT KATHERINE L. CAITO'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF HER SUMMARY JUDGMENT MOTION

Pursuant to Fed. R. Civ. P. 56 and DRI LR 56, Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3 ("Citibank, as Trustee"), responds to Defendant Katherine L. Caito's ("Defendant") Statement of Undisputed Facts as follows:

1.    Paragraph 22 of Defendant's mortgage states in part:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to

303995455V1 1010069

reinstate after acceleration and the right to bring court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.

**RESPONSE: CitiBank, as Trustee does not dispute this fact.**

2.      Lender did not provide such a notice.

**RESPONSE: This statement is immaterial to adjudication of CitiBank as Trustee's authority to foreclose because Ocwen Loan Servicing, LLC ("Ocwen") issued the Notice of Default to Defendant by Power of Attorney for CitiBank, as Trustee. *See Exhibit A* to CitiBank, as Trustee's Memorandum of Law in Response to Defendant's Summary Judgment Motion. *See also 252 Wolfrock Rd. Realty Redemption Co. v. Wells Fargo Bank N.A.*, C.A. No. 16-126M, 2016 U.S. Dist. LEXIS 9191 at \*3-\*4 (D.R.I. July 11, 2016); *Breggia v. Mortg. Elec. Regis. Sys., Inc.*, 102 A.3d 636, 641 (R.I. 2014); and *Ingram v. Mortg. Elec. Regis. Sys., Inc.*, 94 A.3d 523, 529 (R.I. 2014).**

3.      The notice provided to Defendant made no reference to the Lender nor CitiBank as Trustee.

**RESPONSE: For the reasons stated in response to Defendant's Statement of Undisputed Fact No. 2, this statement is immaterial.**

4.      The May 11, 2018 notice did not accurately state the amount of the arrearage on the mortgage.

**RESPONSE: Denied. *See Exhibit A* to Affidavit of Sony Prudent, Doc. No. 31-4 at pp. 2-3.**

5.      The May 11, 2018 notice did not advise the Defendant that she could reinstatement after acceleration only until five days before the sale.

**RESPONSE: This statement of fact is immaterial to adjudication of CitiBank, as Trustee's authority to foreclose because Paragraph 22 does not require this disclosure. *Martins v. Fed. Hous. Fin. Agency*, 214 F.Supp.3d 163, 169-70 (D.R.I. 2916).**

6.      The May 11, 2018 notice did not specify a particular date at least thirty days after the notice was deposited in the United States mail to cure the arrearage.

**RESPONSE: This statement is immaterial to the extent Defendant refers to the date the Notice of Default of was "deposited in the United States mail" because Paragraph 22 of Defendant's Mortgage requires "a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured." *See Mortgage, Exhibit B* to Amended Complaint.**

7.      The May 11, 2018 notice required that the arrearage be paid by certified funds.

**RESPONSE: This statement is immaterial to adjudication of CitiBank, as Trustee's authority to foreclose because no part of the Mortgage prohibits the Lender from**

2

303995455V1 1010069

demanding payment in certified funds as part of the Defendant's action required to cure the default.

8.    The mortgage did not require that any arrearage be paid by certified funds.

**RESPONSE: This statement is immaterial to adjudication of CitiBank, as Trustee's authority to foreclose because no part of the Mortgage prohibits the Lender from demanding payment in certified funds as part of the Defendant's action required to cure the default.**

9.    The Defendant has never sent or provided any lender or mortgage or loan servicer a mortgage payment check with insufficient funds to pay the mortgage, which was return unpaid.

**RESPONSE: This statement is immaterial to adjudication of CitiBank, as Trustee's authority to foreclose because CitiBank, as Trustee's demand for certified funds is not contingent upon returning an insufficient check to Defendant. Moreover, the Defendant has not made a mortgage loan payment since May of 2012. *See* CitiBank, as Trustee's Statement of Undisputed Fact No. 6, Doc. No. 21-2 at p. 2.**

10.    The Defendant was never advised by any lender or mortgagee or loan servicer that a check had been returned for nonpayment and that as a result all payments had to be paid by (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, provided any such check is drawn upon and institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

**RESPONSE: This statement is immaterial to adjudication of CitiBank, as Trustee's authority to foreclose because CitiBank, as Trustee's demand for certified funds is not contingent upon return of check for non-payment. Moreover, the Defendant has not made a mortgage loan payment since May of 2012. *See* CitiBank, as Trustee's Statement of Undisputed Fact No. 6, Doc. No. 21-2 at p. 2. CitiBank, as Trustee advised the Defendant that cure of the default would require a payment made by certified funds. *See* Notice of Default, *Exhibit D* to Amended Complaint.**

303995455V1 1010069

1

Respectfully submitted,

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE
ASSETS TRUST 2006-3, MORTGAGE
BACKED PASS-THROUGH
CERTIFICATES SERIES 2006-3,

By Its Attorneys,


/s/ Samuel C. Bodurtha
Samuel C. Bodurtha, Bar No. 7075
Ethan Z. Tieger, Bar No. 9308
HINSHAW & CULBERTSON LLP
56 Exchange Terrace
Providence, RI 02903
Telephone: (401) 751-0842
Facsimile: (401) 751-0072
sbodurtha@hinshawlaw.com
etieger@hinshawlaw.com

Dated:    July 15, 2019


## CERTIFICATE OF SERVICE

I, Samuel C. Bodurtha, hereby certify that the documents filed through the ECF system
will be sent electronically to the registered participants as identified on the Notice of Electronic
Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on
July 15, 2019.

/s/ Samuel C. Bodurtha
Samuel C. Bodurtha

303995455V1 1010069

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE ASSETS
TRUST 2006-3, MORTGAGE BACKED
PASS-THROUGH CERTIFICATES SERIES
2006-3,

     Plaintiff,

v.                                     C.A. No. 1:18-cv-00427-JJM

KATHERINE L. CAITO,

     Defendant,

v.

INTERNAL REVENUE SERVICE,

     Interested Party.

## AFFIDAVIT OF SONY PRUDENT IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Sony Prudent, hereby declare and state as follows:

1.     I am a Senior Loan Analyst for Ocwen Financial Corporation, whose indirect subsidiary is PHH Mortgage Corporation ("PHH"). PHH is the loan servicer for the subject mortgage loan on behalf of Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3 ("Citibank, as Trustee").

2.     PHH merged with Ocwen Loan Servicing, LLC ("Ocwen") as of June 1, 2019. On or about June 4, 2019, PHH provided notice of service transfer to Defendant, Katherine L. Caito ("Defendant").

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

CITIBANK, N.A., AS TRUSTEE FOR
AMERICAN HOME MORTGAGE ASSETS
TRUST 2006-3, MORTGAGE BACKED
PASS-THROUGH CERTIFICATES SERIES
2006-3,

       Plaintiff,

v.                                                                  C.A. No. 1:18-cv-00427-JJM

KATHERINE L. CAITO,

       Defendant,

v.

INTERNAL REVENUE SERVICE,

       Interested Party.

## AFFIDAVIT OF SONY PRUDENT IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Sony Prudent, hereby declare and state as follows:

1.     I am a Senior Loan Analyst for Ocwen Financial Corporation, whose indirect subsidiary is PHH Mortgage Corporation ("PHH"). PHH is the loan servicer for the subject mortgage loan on behalf of Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3 ("Citibank, as Trustee").

2.     PHH merged with Ocwen Loan Servicing, LLC ("Ocwen") as of June 1, 2019. On or about June 4, 2019, PHH provided notice of service transfer to Defendant, Katherine L. Caito ("Defendant").

3.       I am over the age of 18 and competent to testify as to the matters contained in this affidavit. I have access to the business records of PHH, including the business records relating to the loan at issue in this litigation. I make this affidavit based upon my review of those records relating to the loan and from my own personal knowledge of how they are kept and maintained. The loan records are maintained by PHH in the course of its regularly conducted business activities and are made at or near the time of the event, by or from information transmitted by a person with knowledge. It is the regular practice to keep such records in the ordinary course of a regularly conducted business activity. The loan records include the records of Ocwen, which have been integrated into PHH's records. PHH's records that relate to the loan that I reviewed and relied upon for the statements made in this Affidavit include Powers of Attorney provided by CitiBank, as Trustee to Ocwen.

4.       I have reviewed PHH's records with respect to mortgage loan number ending 2929 for the borrower and Defendant.

5.       Attached to CitiBank, as Trustee's Memorandum of Law in Response to the Defendant's Motion for Summary Judgment as *Exhibit A* is a true and accurate copy of an April 11, 2017 Limited Power of Attorney through which Citibank, N.A., solely in its capacity as trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3, appointed Ocwen as its true and lawful attorney-in-fact.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON _July 12_, 2019.

PHH Mortgage Corporation, successor by merger to
Ocwen Loan Servicing, LLC

BY: Sony Prudent
TITLE: Senior Loan Analyst

16

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME
MORTGAGE ASSETS
TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH
CERTIFICATES SERIES 2006-3**

**VS**                    **C.A. NO:1:18-cv-427-JJM**

**KATHERINE L. CAITO
INTERNAL REVENUE SERVICE**

## MOTION TO STRIKE AFFIDAVIT OF SONY PRUDENT AND EXHIBIT A

### MOTION TO STRIKE AFFIDAVIT OF SONY PRUDENT

Defendant, by her attorney, moves    that this Court strike the Affidavit of

Sony Prudent, pursuant to FRCP 56(c)(4) as not admissible and not made on

personal knowledge and due to the fact that the affiant is not competent to testify

on the matters stated. In support of this Motion, the Defendant attaches the

affidavit of the Defendant and the attached Memorandum of Law and the

Mortgage Modification Agreement recorded in the Land Evidence Records of the

Town of Westerly.

KATHERINE CAITO

July 15, 2019                    By her Attorney

/s/ John B. Ennis
JOHN B. ENNIS, ESQ. #2135

1

1200 Reservoir Avenue
Cranston, Rhode Island 02920
(401) 943-9230
jbelaw75@gmail.com

# CERTIFICATION OF SERVICE

I hereby certify that I emailed a copy of this Motion to Strike to Samuel Bodurtha and Ethan Tieger on July 15, 2019.

/s/ John B. Ennis, Esq.

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH CERTIFICATES SERIES 2006-3**

**VS**                    **C.A. NO:1:18-cv-427-JJM**

**KATHERINE L. CAITO**
**INTERNAL REVENUE SERVICE**

## AFFIDAVIT OF KATHERINE CAITO

I, Katherine Caito, hereby declare and state as follows:

1.     I am the defendant in this case.

2.     Since I owned this property, I have never sent or provided any lender or mortgagee or loan servicer a mortgage payment check with insufficient funds to pay the mortgage, which was returned unpaid.

3.     I was never advised by any lender or mortgagee or loan servicer that a check had been returned for nonpayment and that as a result all payments had to be paid by (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, provided any such check is drawn upon and institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

4.     The letter from Ocwen Loan Servicing, LLC dated May 11, 2018 contained inaccurate amounts of fees and charges in the  amount of $6086.49.

1

5.     The affidavit for Summary Judgment contains a purported affidavit of a person named Sony Prudent, which contains an Exhibit A.

6.     This Exhibit A contains a purported loan history, which suggests that as of May 11, 2018, the total of fees and expenses was $6086.49. Exhibit A indicates that after May 11, 2018, ten charges of $14.50 each were added to the charges.

7.     I have reviewed Exhibit A and can state with certainty that certain of these charges are not accurate or were not actually incurred and were not reasonable and necessary.

8.     From origination of the mortgage loan, I never received a default letter from any loan servicer which provided me a specific date to cure any default and which was deposited in the United States mail at least thirty days before the date which was specified for the cure date.

9.     I never received a default notice consistent with the terms of paragraph 22 or paragraph 19 of the mortgage.

10.    Thus all the charges for foreclosure and foreclosure related charges were not accurate charges contained within the $6086.49 fees and expenses of the May 11, 2018 letter. These charges which resulted in the $6086.49 being inaccurate were the following:

11-14-16     FC thru Judgment                              $556.25

2

117

185

| 4-1-16 | Selling Office/Sheriff Cancel fee | $425.00 |
| 3-8-16 | Sale Publication | $1203.76 |
| 2-22-16 | Selling Officer/Sheriff Cancel Fee | $425.00 |
| 2-1-16 | FC Thru complaint | $125.00 |
| 2-1-16 | Selling Officer/Sheriff Cancel Fee | $425.00 |
| 2-1-16 | Sale Publication | $714.88 |
| 7-23-13 | FC thru Title search | $520.00 |

11.   These total fees totaled $4394.90.

12.   I never received a default letter pursuant to the terms of the mortgage which would have allowed any exercise of the statutory power of sale.

13.   At no time was a sheriff ever hired to sell my home.

14.   At no time was there a Selling Officer or any other official hired to sell my home.

15.   At no time was a judicial foreclosure commenced in 2013-2016, which could result in a Judgment being entered.

16.   The purported default letter included three fees for service of process, specifically the following:

| 5-8-15 | Service of process | $22.10 |
| 2-7-18 | Service of Process | $10.84 |

3

| 2-22-16 | Service of Process | $56.54 |
|---------|--------------------|--------|

17.    The purported default letter also included a fee for additional hour court appearance of $50.00 on 2-22-16.

18.    There was no Court appearance for an attorney to be paid an extra hourly fee on February 22, 2016 and where there was never any servicer of process on me.

19.    I was never served process by Ocwen or any other entity.

20.    The purported default letter included three skip trace fees, specifically the following:

| 5-8-18 | Skip Trace fee | $5.46 |
|--------|----------------|-------|
| 2-22-16 | Skip Trace fee | $5.30 |
| 7-23-13 | Skip Trace fee | $5.30 |

21.    However I have always lived at my home at 16 Yosesmite Valley Road, Westerly, RI, 02891 and there was no reason to search for my address, as Ocwen knew that I was living in the house.

22.    The total fees of $6086.49 also included property inspection fees for the period from April, 2013 to May 2018 in the amount of $458.74 for 37 separate charges.

23.    At all times Ocwen was aware that I was living in the property and that I had an attorney. I paid the taxes for the property from 2016 through 2018.

4

Ocwen Loan Servicing, LLC would be effective on March 1, 2013.

34.    The last page of Exhibit A-1 contained a payment coupon from , which indicated on that effective February 13, 2013 no amount was past due on my mortgage.

35.    Plaintiff's Exhibit B, which was attached to the complaint was recorded on June 6, 2006 in the Land Evidence Records of the Town of Westerly. This document  contained a different Adjustable Rate Mortgage rider than the one contained in the loan modification. This adjustable rate rider on my mortgage contained  a different adjustable rate on than my loan was processed for based on the disclosures for this loan. The recorded mortgage indicates that my mortgage adjustable rate would be calculated at 3.5%  in percentage points to be added to the Current Index. However on June 6, 2006, I signed a modification agreement which provided for the accurate rate, which was 3.125% in percentage points to be added to the Current Index. The rate was lowered when American Home Mortgage, drafted a Mortgage Modification Agreement, which  was signed by me and by American Home Mortgage, the original loan servicer. This document was recorded in the Land Evidence Records of the Town of Westerly  on October 23, 2006 in Book 1581 Page 329.  A genuine and  authentic copy of is attached as Exhibit A-4.

6

36. Based on my original principal balance of $4,500,000.00, the change in the calculation of the interest rate by reducing the percentage which was added to the Current Index equaled .375% from origination of the mortgage loan until the present.

37. Since August 1, 2006, the interest rate on my mortgage has been calculated at the Current Index plus 3.5%. The last rate change from Ocwen is attached as Exhibit A-5. This exhibit is a genuine and authentic copy of the Mortgage Interest Rate and Monthly Payment change mailed to me, through my attorney By Ocwen.

38. Due to my mortgage being a negative amortization mortgage, the principal balance of the mortgage increased to an amount greater than $4,500,000.00. However based on a simple calculation of .375% for each year from the date of the first mortgage payment acccruaral of interest on July 1, 2016, there have been thirteen years of inaccurate interest calculation of my mortgage in the minimum amount of $16,875.00 per year. As a result, the amount charged for interest over thirteen years exceeds $219,375.00 at the current time. The Plaintiff's affidavit makes no mention of the fact that my mortgage and note was modified by American Home Mortgage.

39. The purported May 11, 2018 default notice mailed to me inaccurately stated

7

based on the incorrect percentage added to the Current Index contrary to the terms of the modified mortgage and note.

40.    I entered into a Settlement Agreement with Ocwen Loan Servicing, LLC. Plaintiff's attorney insisted that a nonexistent entity, named American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3 also be a party to this agreement and that I agree to release that entity, which claimed that it was the investor.  The amount of the obligation due to the owner of the note and the mortgage was not resolved by that agreement.  I did not acknowledge the actual amount of the debt of this obligation in this settlement agreement. The purpose of the agreement was to facilitate the Receivership.  I made an agreement with Ocwen and an entity, which the records of the Securities and Exchange Commission indicates does not exist under that name.

41.    This entity did not sign the agreement and no person from Citibank signed this agreement.

41.    The mortgage assignment was dated August 27, 2012.

42.    I was not advised pursuant to the provisions of the Truth in Lending Act that the mortgage loan had been sold, within thirty days of August 27, 2012.

43.    Korde & Associates, P.C. claimed to mail me a  purported Notice of Default, dated October 30, 2015.  A copy of this letter is attached as Exhibit A-2.

8

44.    However this letter did not comply with the terms of my mortgage since it was deposited in the United States mail on October 31, 2015 at 12:23 AM.

45.    Exhibit A-3 is the USPS tracking record for the mailing of this letter, which indicates that this letter was not deposited into the United States mail until October 31, 2015.

46.    This letter was only provided me 29 days to cure the purported default from the date that it was deposited into the United States mail.

47.    Despite this defect, Korde & Associates, P.C. sought to exercise the statutory power of sale and incurred legal fees and costs, which were charged to my mortgage loan account and were included in the $6086.49 of legal fees and costs included in the amount of the default letter mailed to me.

I    I declare under the pain and penalty of perjury that the foregoing is true and correct.

July 15, 2019

*Katherine Caito*

KATHERINE CAITO

Subscribed and sworn to before me this 15th day of July, 2019.

NOTARY PUBLIC

9

VANESSA LYN BLUM
Notary Public, State of Rhode Island
My Commission Expires Oct. 20, 2020

191

# EXHIBIT A-1

**homeward**
RESIDENTIAL

February 13, 2013

8-764-79764-0042940-008-01-001-000-000-000

KATHERINE L CAITO
16 YOSEMITE VALLEY RD
WESTERLY RI 02891-5622

OCWEN LOAN #:        7140182929
HOMEWARD LOAN #:    0031197908
PROPERTY ADDRESS:   16 YOSEMITE VALLEY RD
                    WESTERLY RI 02891

## NOTICE OF SERVICING TRANSFER (RESPA) and
## WELCOME TO OCWEN LOAN SERVICING, LLC

Dear Borrower(s):

Effective 03/01/2013, Homeward Residential, Inc. (Homeward Residential) will transfer the servicing of your account to Ocwen Loan Servicing, LLC (Ocwen). The transfer of the servicing of your account does not affect any term or condition of your financing agreement, other than terms directly related to the servicing of your account. Your loan number will change, and the new loan number is noted above.

Should you have questions relating to the transfer of servicing or need information regarding your account prior to 03/01/2013, please contact Homeward Residential's Customer Care Department at (877) 304-3100.

New Servicing Contact Information:
As of 03/01/2013, Ocwen's Customer Care Center will assist you with questions regarding the transfer of servicing or any other questions relating to your account. You may reach Ocwen's Customer Care Center at (800) 746-2936 Monday through Friday 8:00 am ET to 9:00 pm ET, Saturday 8:00 am ET to 5:00 pm ET or Sunday 9:00 am ET to 9:00 pm ET. Information concerning Ocwen and your mortgage loan may also be found online at www.ocwen.com. You can also obtain information using Ocwen's Automated Telephone System or by speaking with a Customer Care Center Representative. Please be sure to have your loan number available when you call.

As of 03/01/2013, all written inquiries should be sent to Ocwen at the following address. Please be sure to indicate your loan number on all correspondence to ensure prompt response to your inquiry.

> Ocwen Loan Servicing, LLC
> Attn: Customer Service Department
> P.O. Box 24738
> West Palm Beach, FL 33416-4738

Making Payments:
The date that Homeward will stop accepting payments is 2/28/2013. The date that Ocwen will start accepting payments from you is 03/01/2013. Please make all checks payable to Ocwen and send all payments due on or after 03/01/2013 to the following address. If you use a Bill Pay Service, you will also need to inform them of this new payment address.

For Western Union Quick Collect users, you can find the location nearest you by calling (800) 238-5772 or visiting www.westernunion.com and clicking "Find a Location". At the location, please pay to name "OCWEN" and provide the loan number.

PAYMENTS                          OVERNIGHT EXPRESS ADDRESS
Ocwen Loan Servicing, LLC         Ocwen Loan Servicing, LLC
P.O. Box 6440                     Attn: Cashiering
Carol Stream, IL 60197-6440       1661 Worthington Road, Suite 100
                                  West Palm Beach, FL 33409

If you are currently enrolled in Homeward Residential's Automated Clearing House (ACH) or the Equity Accelerator Program and your monthly payments are automatically withdrawn from your bank account, the service will continue with Ocwen. Please note, the first draft at Ocwen may be delayed. For your convenience, we have included a temporary payment coupon at the end of this letter.

Ocwen NMLS#: 1852
Homeward Residential NMLS#: 3984



# NOTICE OF SERVICING TRANSFER (RESPA)
## Page 2

**Taxes and Insurance:**

If you are currently responsible for payment of your real estate taxes and/or homeowners insurance, you will continue to be responsible for payment of these items after your account transfers to Ocwen. To ensure our records accurately reflect your insurance carrier and taxing authority, you may receive a letter of verification from Ocwen shortly after the transfer.

Additionally, it is important to contact your insurance agency to ensure that (i) Ocwen receives proof of hazard insurance (with flood and/or windstorm coverage, as applicable) on your property and (ii) Ocwen is named as the beneficiary in the Mortgagee Clause of your policy. If your mortgage payment includes escrow for taxes or insurance, please take the necessary steps to have all future bills forwarded to:

| INSURANCE | PROPERTY TAXES |
|---|---|
| Ocwen Loan Servicing, LLC | Ocwen Loan Servicing, LLC |
| ISAOA | Attn: Tax Department |
| P.O. Box 6723 | P.O. Box 24665 |
| Springfield, OH 45501-6723 | West Palm Beach, FL 33416-4665 |
| E-mail: updateinsurance@ocwen.com | Customer Care Center: (800) 746-2936 |
| Insurance Center: (866) 825-9265 | |
| Insurance Center Fax: (888) 882-1816 | |

**Year-end Interest Statement (IRS Form 1098):**

By January 31 of each year, you will be mailed an Annual Tax and Interest Statement from each company that has serviced your loan during the prior year. Each statement will contain IRS reporting information for the time your loan was serviced by each company.

**Optional Insurance:**

The transfer of servicing rights may affect the terms of, or the continued availability of, mortgage life, disability insurance, or any other type of optional insurance. Not everyone has this type of insurance, but if you do, please be advised that it may not transfer to Ocwen Loan Servicing, LLC. However, to verify if Ocwen is able to offer any of these services, please call our Customer Care Center at (800) 746-2936 during the business hours indicated above or contact an independent insurance agent for alternate coverage options.

Except in limited circumstances, the law requires that your present Servicer send you this notice at least fifteen (15) days before the effective date of transfer. Your new Servicer must also send you this notice no later than fifteen (15) days after this effective date. In this case, all necessary information is combined in this one notice.

You are advised of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 USC 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old Servicer before its due date may not be treated by the new loan Servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 USC 2605) gives your certain consumer rights. If you should need to send a "qualified written request" to your loan Servicer concerning the servicing of your loan, your Servicer must provide you with a written acknowledgement within five (5) business days of receipt of your request. A "qualified written request" is defined as a written correspondence, other than notice in a payment coupon or other payment medium supplied by the Servicer, which includes your name and loan number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to:

| If to Homeward Residential, Inc.: | If to Ocwen: |
|---|---|
| Homeward Residential, Inc. | Ocwen Loan Servicing, LLC |
| Attn: Research Department | Attn: Research Department |
| P.O. Box 630467 | P.O. Box 24736 |
| Irving, TX 75063-0467 | West Palm Beach, FL 33416-4736 |

Not later than thirty (30) business days after receiving your request, your Servicer must make appropriate corrections to your account and provide you with a written clarification regarding any dispute, or in some circumstances, a notice of a fifteen (15) business day extension. During this period, your Servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the Servicer from initiating foreclosure if proper grounds exist under the mortgage documents. A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.



## NOTICE OF SERVICING TRANSFER (RESPA)
### Page 2

Taxes and Insurance:

If you are currently responsible for payment of your real estate taxes and/or homeowners insurance, you will continue to be responsible for payment of these items after your account transfers to Ocwen. To ensure our records accurately reflect your insurance carrier and taxing authority, you may receive a letter of verification from Ocwen shortly after the transfer.

Additionally, it is important to contact your insurance agency to ensure that (i) Ocwen receives proof of hazard insurance (with flood and/or windstorm coverage, as applicable) on your property and (ii) Ocwen is named as the beneficiary in the Mortgagee Clause of your policy. If your mortgage payment includes escrow for taxes or insurance, please take the necessary steps to have all future bills forwarded to:

| INSURANCE | PROPERTY TAXES |
|---|---|
| Ocwen Loan Servicing, LLC | Ocwen Loan Servicing, LLC |
| ISAOA | Attn: Tax Department |
| P.O. Box 6723 | P.O. Box 24665 |
| Springfield, OH 45501-6723 | West Palm Beach, FL 33416-4665 |
| E-mail: updateinsurance@ocwen.com | Customer Care Center: (800) 746-2936 |
| Insurance Center: (866) 825-9265 | |
| Insurance Center Fax: (888) 882-1816 | |

Year-end Interest Statement (IRS Form 1098):

By January 31 of each year, you will be mailed an Annual Tax and Interest Statement from each company that has serviced your loan during the prior year. Each statement will contain IRS reporting information for the time your loan was serviced by each company.

Optional Insurance:

The transfer of servicing rights may affect the terms of, or the continued availability of, mortgage life, disability insurance, or any other type of optional insurance. Not everyone has this type of insurance, but if you do, please be advised that it may not transfer to Ocwen Loan Servicing, LLC. However, to verify if Ocwen is able to offer any of these services, please call our Customer Care Center at (800) 746-2936 during the business hours indicated above or contact an independent insurance agent for alternate coverage options.

Except in limited circumstances, the law requires that your present Servicer send you this notice at least fifteen (15) days before the effective date of transfer. Your new Servicer must also send you this notice no later than fifteen (15) days after this effective date. In this case, all necessary information is combined in this one notice.

You are advised of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 USC 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old Servicer before its due date may not be treated by the new loan Servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 USC 2605) gives your certain consumer rights. If you should need to send a "qualified written request" to your loan Servicer concerning the servicing of your loan, your Servicer must provide you with a written acknowledgement within five (5) business days of receipt of your request. A "qualified written request" is defined as a written correspondence, other than notice in a payment coupon or other payment medium supplied by the Servicer, which includes your name and loan number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to:

| If to Homeward Residential, Inc.: | If to Ocwen: |
|---|---|
| Homeward Residential, Inc. | Ocwen Loan Servicing, LLC |
| Attn: Research Department | Attn: Research Department |
| P.O. Box 630467 | P.O. Box 24736 |
| Irving, TX 75063-0467 | West Palm Beach, FL 33416-4736 |

Not later than thirty (30) business days after receiving your request, your Servicer must make appropriate corrections to your account and provide you with a written clarification regarding any dispute, or in some circumstances, a notice of a fifteen (15) business day extension. During this period, your Servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the Servicer from initiating foreclosure if proper grounds exist under the mortgage documents. A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

195



## NOTICE OF SERVICING TRANSFER (RESPA)
*Page 3*

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where Servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated. Please retain this information with your financing agreement documentation. We look forward to working with you and providing you with the highest quality customer care service.

### IMPORTANT DISCLOSURES

**Disclaimer Regarding Mandatory Arbitration Provisions:** If your account documents require you to submit disputes regarding your account to arbitration for resolution, such requirement is waived and will not be enforced against you. Such waiver, however, does not affect any rights you may have to require arbitration of disputes regarding your account.

**Credit Reporting:** You are hereby notified that we may report information about your account to credit reporting agencies. Late payments, missed payments, or other defaults on your account may also be reflected on your credit report.

**Properties in California:** The state Rosenthal Fair Debt Collection Practices Act and the Federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 am or after 9 pm. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason that you may not receive personals calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may not contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at (877) FTC-HELP or www.ftc.gov.

**Properties in Colorado:** For information about the Colorado Fair Debt Collection Practices Act, see www.ago.state.co.us/cab.htm. A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer. A written request to cease communication will not prohibit the debt collector or collection agency form taking any other action authorized by law to collect the debt.

**Properties in Hawaii:** Ocwen Loan Servicing, LLC is licensed by the Commissioner of Financial Institutions in Hawaii. Complaints about the servicer may be submitted to the Commissioner.

**Properties in Maryland:** The Maryland Consumer Protection Act require us to disclose that if Ocwen fails to give written notice of this transfer or fails to make timely payments of taxes or insurance premiums (assuming the borrower has paid an amount to cover these costs) and Ocwen has received the tax bill or notice, Ocwen may face liability for any economic damages incurred by the borrower.

**Properties in Minnesota:** Borrowers on loans secured by property in Minnesota can direct complaints and questions to the Ocwen Loan Servicing, LLC. Customer Care Department at 1-800-746-2936 between 8:00 a.m. and 9:00 p.m. ET, Monday through Friday, from 8:00 a.m. to 9:00 p.m. ET on Saturday, or from 9:00 a.m. to 9:00 p.m. ET on Sunday or in writing to: P.O. Box 24738, West Palm Beach, FL 33416.4738. Each written complaint or question will be responded to within 15 days.

**Properties in New York:** Ocwen Loan Servicing, LLC. is registered with the Superintendent of the New York State Banking Department. The borrower may file complaints about Ocwen Loan Servicing, LLC with or obtain further information from the New York State Banking Department by calling the Department's Consumer Help Unit at 1-877- BANK-NYS or by visiting the Department's website at www.banking.state.ny.us.

**Properties in North Carolina:** Ocwen Loan Servicing, LLC is licensed by the North Carolina Commissioner of Banks (North Carolina Permit No. 3946 ) and complaints about Ocwen Loan Servicing, LLC may be submitted to the Commissioner.

**Properties in Texas:** The State of Texas requires us to inform you that a registrant shall provide to the borrower of each residential mortgage loan the following notice not later than the 30th day after the registrant commences servicing the loan: Complaints regarding the servicing of your mortgage should be sent to the Department of Savings and Mortgage Lending, 2601 N. Lamar, Suite 201, Austin, Texas 78705. Complaint Forms and Instructions may be downloaded and printed from the Departments website located at http://www.sml.state.tx.us or obtained from the Department upon request by mail at the address above, by telephone at its Toll-free Consumer Hotline at (877) 276-5550, by fax at (512) 475-1360, or by email at SMLinfo @SML.STATE.TX.US.

**Ocwen Loan Servicing, LLC is a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.**

**Prior Servicer is a debt collector attempting to collect a debt and any information obtained will be used for that purpose. If you are not obligated on the debt or if the debt has been discharged in a bankruptcy proceeding, this is for informational purposes only and is not an attempt to assess or collect the debt from you personally.**

**Attention Service members and Dependents:** The federal Service members Civil Relief Act and certain state laws provide important protections for you, including prohibiting foreclosure under most circumstances during and nine months after the service member's military or other service. Prior Servicer will not foreclose on the property of a service member or his or her dependent during that time, unless pursuant either to a court order or a service member's written waiver agreement.

128

HELPING HOMEOWNERS IS WHAT WE DO! ™
WWW.OCWEN.COM



## Welcome to Ocwen!
## Important Information

Welcome to Ocwen Loan Servicing, LLC (Ocwen). We have attached frequently asked questions, as it is natural that you may have a few questions about this change and what it will mean. Please rest assured that we value your business and look forward to assisting you in the future as HELPING HOMEOWNERS IS WHAT WE DO!™

**Frequently Asked Questions:**

**What if I made a payment to my Prior Servicer, but it has not posted yet?**
> Your Prior Servicer will forward your payment to us within 15 business days. It may take a few days for us to receive and apply the payments, but this will not negatively impact your account or your credit report. To check on the status of your account, you may go to www.ocwen.com.

**How can I get information about my account?**
> You can access Ocwen's website and/or automated telephone system which will provide you with information regarding your account 24-hours a day. These systems have been designed to provide you with the most frequently requested services or information. They may include, but are not limited to, options to obtain payment histories, a payoff or reinstatement quote, status of your credit reporting, payment options, status of tax and insurance payments, financial hardship options and frequently asked questions (FAQ). Website: www.ocwen.com. Telephone Number: (800) 746-2936.

**If my account is past due and I have not made a payment arrangement with Homeward Residential, how can I make payment arrangements or get assistance due to financial difficulties?**
> We offer a number of specialized programs designed to fit your unique financial situation. Please go to www.ocwen.com, click on Mortgage Customers and then log in with your User ID and Password. If you need to create a User ID and Password, select the New Customers icon. Once you log in, select the Financial Difficulties icon. This will allow you to download an application package.

**If I cannot resolve my issue online, what number do I call and what are the hours?**
> Ocwen's toll free number is (800) 746-2936. In order to accommodate borrowers' busy schedules, we are open late at night and very early in the morning. Our hours are Monday through Friday 8:00 am to 9:00 pm, Saturday 8:00 am to 5:00 pm, and Sunday 9:00 am to 9:00 pm, all Eastern Standard Time.

**If my account is current, where do I send my payments?**
> Our payment processing address is:
> Ocwen Loan Servicing, LLC
> P.O. Box 6440
> Carol Stream, IL 60197-6440

**I am currently on a trial modification plan and still have payments remaining before it becomes a final/permanent modification. What do I do?**
> You should continue making monthly payments as required in the modification plan. Your Prior Servicer will be providing Ocwen the status of your modification. Please allow us 30 days to review and process your information. It is not necessary to call for a status prior to 30 days as the agent will not have any additional information to provide to you.

**I am currently on a trial plan for my mortgage modification, and I have made all of my trial payments. When can I expect my final/permanent modification?**
> Your Prior Servicer will be providing Ocwen with the status of your modification. You should continue to make your payment each month. Our goal is to review your loan as soon as possible and provide your final modification agreement to you. Please allow up to 30 days from the date of the transfer for Ocwen to obtain and process your application documentation.

197

HELPING HOMEOWNERS IS WHAT WE DO! ™
WWW.OCWEN.COM

# Welcome to Ocwen!
## Important Information

Welcome to Ocwen Loan Servicing, LLC (Ocwen). We have attached frequently asked questions, as it is natural that you may have a few questions about this change and what it will mean. Please rest assured that we value your business and look forward to assisting you in the future as HELPING HOMEOWNERS IS WHAT WE DO! ™

**Frequently Asked Questions:**

**What if I made a payment to my Prior Servicer, but it has not posted yet?**
Your Prior Servicer will forward your payment to us within 15 business days. It may take a few days for us to receive and apply the payments, but this will not negatively impact your account or your credit report. To check on the status of your account, you may go to www.ocwen.com.

**How can I get information about my account?**
You can access Ocwen's website and/or automated telephone system which will provide you with information regarding your account 24-hours a day. These systems have been designed to provide you with the most frequently requested services or information. They may include, but are not limited to, options to obtain payment histories, a payoff or reinstatement quote, status of your credit reporting, payment options, status of tax and insurance payments, financial hardship options and frequently asked questions (FAQ). Website: www.ocwen.com. Telephone Number: (800) 746-2936.

**If my account is past due and I have not made a payment arrangement with Homeward Residential, how can I make payment arrangements or get assistance due to financial difficulties?**
We offer a number of specialized programs designed to fit your unique financial situation. Please go to www.ocwen.com, click on Mortgage Customers and then log in with your User ID and Password. If you need to create a User ID and Password, select the New Customers icon. Once you log in, select the Financial Difficulties icon. This will allow you to download an application package.

**If I cannot resolve my issue online, what number do I call and what are the hours?**
Ocwen's toll free number is (800) 746-2936. In order to accommodate borrowers' busy schedules, we are open late at night and very early in the morning. Our hours are Monday through Friday 8:00 am to 9:00 pm, Saturday 8:00 am to 5:00 pm, and Sunday 9:00 am to 9:00 pm, all Eastern Standard Time.

**If my account is current, where do I send my payments?**
Our payment processing address is:
Ocwen Loan Servicing, LLC
P.O. Box 6440
Carol Stream, IL 60197-6440

**I am currently on a trial modification plan and still have payments remaining before it becomes a final/permanent modification. What do I do?**
You should continue making monthly payments as required in the modification plan. Your Prior Servicer will be providing Ocwen the status of your modification. Please allow us 30 days to review and process your information. It is not necessary to call for a status prior to 30 days as the agent will not have any additional information to provide to you.

**I am currently on a trial plan for my mortgage modification, and I have made all of my trial payments. When can I expect my final/permanent modification?**
Your Prior Servicer will be providing Ocwen with the status of your modification. You should continue to make your payment each month. Our goal is to review your loan as soon as possible and provide your final modification agreement to you. Please allow up to 30 days from the date of the transfer for Ocwen to obtain and process your application documentation.

130

198

**I received a notice from my Prior Servicer that I was denied for the Making Home Affordable Program. I am still having financial difficulty; what can I do?**
   We may still be able to help you. We offer a number of specialized programs designed to fit your situation. Please go to www.ocwen.com for more information and download an application for assistance.

**I received a notice from my Prior Servicer that they were missing documents for my modification but I have not sent them yet; do I send these documents to Ocwen now?**
   Yes, please send the documents to Ocwen via e-mail at mod@ocwen.com or fax the documents to (407) 737-6174. Your Prior Servicer will be providing Ocwen with the status of your modification (trial plan or initial application), copies of your initial application and information identifying the missing documentation. Please allow up to 30 days from the date you send the documentation for Ocwen to process your documentation.

**I have a Short Sale or Deed-in-Lieu application pending with my Prior Servicer, do I have to resend all the documentation to Ocwen now and reapply?**
   Your Prior Servicer will be providing Ocwen with the status of your pending resolution. If you have a pending foreclosure sale date or closing scheduled in the next 60 days, to expedite processing, please resend the documentation by fax to (407) 737-5071. If you do not have a foreclosure sale or scheduled closing in the next 60 days, your Prior Servicer will be providing Ocwen the status of your pending resolution. Ocwen will be contacting you with a final approval or denial. Please allow Ocwen up to 30 days to process your Short Sale or Deed-in-Lieu application.

**I received approval from my Prior Servicer for a Short Sale or Deed-in-Lieu; will this approval be honored by Ocwen?**
   Yes, it will be honored as long as you meet the original requirements or contingencies for approval provided by your Prior Servicer. With respect to Short Sales, please note that the original expiration date of your Prior Servicer's approval (the "good through" date) still applies and if it has expired, the approval is no longer valid. Your Prior Servicer will be providing these approval requirements to Ocwen.

**I received approval from my Prior Servicer for a Short Sale or Deed-in-Lieu, but the approval is going to expire shortly (or just expired) and my closing is after this day. What do I do?**
   You should fax your original approval documents and an updated net sheet or HUD1 with the new projected closing date to (407) 737-5071. With respect to Short Sales, please note the original expiration date of your Prior Servicer's approval (the "good through" date) still applies. Please note, if there is a Foreclosure Sale scheduled on your account, we will not postpone the foreclosure sale.

*Please Detach below and include with your monthly payment.*

00024233074  4444444881  000007140182929  50  023079114

KATHERINE L CAITO

| Payment Coupon | Account Number: 7140182929 |
| --- | --- |

☐ Check box if your contact information has changed, update on the back



Note: If your loan is current, any excess funds will first be applied to outstanding amounts due and then additional principal.
If this payment is made via automatic drafting, this statement is for informational purposes only.

| AMOUNT DUE | $ |
| --- | --- |
| Additional Principal: | $ |
| Additional Escrow: | $ |
| Other: (Please Specify) | $ |
| Total Enclosed: | $ |

OCWEN
PO BOX 6440
CAROL STREAM IL 60197-6440

199

# EXHIBIT A-2

# KORDE & ASSOCIATES, P.C.

Counselors at Law
321 Billerica Road, Suite 210
Chelmsford, Massachusetts  01824-4100
Attorneys Licensed in MA, NH, NY and RI

Certified Article Number

9414 7266 9904 8053 7875 40

SENDERS RECORD

October 30, 2015                                                FIRST CLASS & CERTIFIED MAIL

Katherine L. Caito
16 Yosemite Valley Road
Westerly, RI 02891

     RE: NOTICE OF DEFAULT
     Property Address:  16 Yosemite Valley Road, Westerly, RI 02891
     Our File No. 13-010942

Dear Sir/Madam:

THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Please be advised that this firm has been retained by Ocwen Loan Servicing, LLC as servicer for Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage-Backed Pass-Through Certificates Series 2006-3 (the "Mortgagee") to commence foreclosure proceedings on the above-entitled premises for breach of the covenants of the mortgage of Katherine L. Caito to Mortgage Electronic Registration Systems, Inc, acting solely as nominee for American Brokers Conduit, dated June 6, 2006 in the original principal amount of $4,600,000.00 recorded in Book 1541 at Page 252 in the Records of Land Evidence in the Town of Westerly, RI, which mortgage secures a Note of Katherine L. Caito to American Brokers Conduit of same date and original principal amount.

Specifically, the aforesaid Note and Mortgage are in default as payments of principal and/or interest have not been made in accordance with the terms and conditions of the Note and Mortgage.  Your loan is in default for the May 1, 2012 payment and all the payments due each month thereafter, as provided in said Note.  The amount required to cure the default as of the date of this letter is $1,209,323.60.  DEMAND is hereby made against you to cure this default by November 29, 2015.  In order to cure this default, you must pay the total amount of $1,209,323.60 in addition to other amounts that become due from the date of this letter through the date you pay (the "arrearage").  On the day that you intend to pay, please contact this office to request the full amount owed on your account as the amount due on the day you pay may be greater than stated above, due to interest, late charges and other charges or credits that may vary from day to day, or may be assessed after the date of this letter.  The necessary amount must be received in certified funds

You are advised that unless the arrearage is received by the Mortgagee, c/o Korde & Associates, P.C., 321 Billerica Road, Suite 210, Chelmsford, MA 01824-4100 by November 29, 2015, the Mortgagee may accelerate the payment of all sums secured by the aforesaid mortgage and may exercise all rights as set forth under the power of sale contained in said mortgage, including a foreclosure sale of the mortgaged premises.  Please be advised that you have the right to reinstate after acceleration and you have the right to bring a court action to assert the non-existence of a default or any other defense which you have to the acceleration and the sale of the mortgaged premises.

Unless you notify this office within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume this debt is valid.  If, within the thirty-day period, you notify this office in writing that the debt, or any portion thereof, is disputed, we will obtain verification of the debt and mail a copy of such verification to you.  If requested within 30 days of receipt of this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

If you (1) did not execute the Promissory Note relating to this mortgage; (2) are in bankruptcy; or (3) have been discharged in bankruptcy, this letter is for informational purposes only and is not intended as an attempt to collect a debt or an act to collect, assess or recover all or any portion of the debt from you personally.

Please give this your immediate attention.

Very truly yours,

Shana Costa
SC/ac

Telephone (978) 256-1500     Fax (978) 256-7615
Website: www.kordeassoc.com

13-010942 / FC01

# EXHIBIT A-3

**There's an easier way to keep track of your mail and packages.**

Now, you can digitally preview your mail and automatically track packages from a secure, online dashboard. Sign up for Informed Delivery® to:

- View grayscale images of the exterior, address side of letter-sized mailpieces scheduled to arrive soon*
- Track the delivery status of packages without entering a tracking number
- Schedule a package to be redelivered if you missed a delivery
- Set up email and/or text notifications to track the delivery status of your package(s)

And more!

Sign Up

(https://reg.usps.com/entreg/RegistrationAction_input?
app=UspsTools&appURL=https%3A%2F%2Ftools.usps.com%2Fgo%2FTrackConfirmAction%21input

* Images are only provided for letter-sized mailpieces that are processed through USPS® automated equipment.

(https://www.usps.com/)

**HELPFUL LINKS**

Contact Us
(https://www.usps.com/help/welcome.htm)
Site Index (https://www.usps.com/globals/site-index.htm)
FAQs (http://faq.usps.com/)

**ON ABOUT.USPS.COM**

About USPS Home (http://about.usps.com/)
Newsroom
(http://about.usps.com/news/welcome.htm)
USPS Service Updates
(http://about.usps.com/news/service-alerts/welcome.htm)
Forms & Publications
(http://about.usps.com/forms-publications/welcome.htm)
Government Services
(https://www.usps.com/gov-services/gov-services.htm)
Careers
(http://about.usps.com/careers/welcome.htm)

**OTHER USPS SITES**

Business Customer Gateway
(https://gateway.usps.com/)
Postal Inspectors
(https://postalinspectors.uspis.gov/)
Inspector General (http://www.uspsoig.gov/)
Postal Explorer (http://pe.usps.gov/)
National Postal Museum
(http://www.postalmuseum.si.edu/)
Resources for Developers
(https://www.usps.com/webtools/welcome.htm)

**LEGAL INFORMATION**

Privacy Policy (http://about.usps.com/who-we-are/privacy-policy/privacy-policy-highlights.htm)
Terms of Use
(http://about.usps.com/termsofuse.htm)
FOIA (http://about.usps.com/who-we-are/foia/welcome.htm)
No FEAR Act EEO Data
(http://about.usps.com/who-we-are/no-fear-act/welcome.htm)

Copyright © 2017 USPS. All Rights Reserved.

https://tools.usps.com/go/TrackConfirmAction?tLabels=9414726699042053727540

# USPS Tracking® Results

Track Another Package +

Remove ✕

Tracking Number: 9414726699042053727540

Delivered

Expected Delivery On: Monday, November 2, 2015 ⓘ

See Available Actions

## Product & Tracking Information

Postal Product:
First-Class Mail®

Features:
Certified Mail™
Return Receipt

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| November 2, 2015, 2:09 pm | Delivered | WESTERLY, RI 02891 |

Your item was delivered at 2:09 pm on November 2, 2015 in WESTERLY, RI 02891.

| | | |
|---|---|---|
| November 2, 2015, 8:42 am | Out for Delivery | WESTERLY, RI 02891 |
| November 2, 2015, 8:08 am | Arrived at Unit | WESTERLY, RI 02891 |
| November 1, 2015, 6:16 am | Departed USPS Regional Facility | PROVIDENCE RI DISTRIBUTION CENTER |
| October 31, 2015, 7:45 am | Arrived at USPS Regional Facility | PROVIDENCE RI DISTRIBUTION CENTER |
| October 31, 2015, 12:23 am | Arrived at USPS Regional Facility | BOSTON MA DISTRIBUTION CENTER |

See Less ∧

## Available Actions

See Less ∧

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

FAQs (http://faq.usps.com/?articleId=220900)

https://tools.usps.com/go/TrackConfirmAction?tLabels=9414726699042053727540


(https://www.facebook.com/USPS?rf=108501355848630)


(https://twitter.com/usps)

(http://www.pinterest.com/uspsstamps/)

(https://www.youtube.com/usps)

# EXHIBIT A-4

RECEIVED FOR RECORD
WESTERLY R.I.

Oct 23,2006 at 09:16:15A

. BOOK  1581 PAGE  329
DOC #: 00006909

RECORDING REQUESTED BY
AND RETURN TO:

American Home Mortgage
520 Broadhollow Road
Melville, NY 11747
Attn.: Final Documents Dept.

A.P.N.:# Map 173 Lot 11
Loan No # 0001313784

(Space above This Line for Recorder's Use)

## MORTGAGE MODIFICATION AGREEMENT

THIS AGREEMENT made on ___June 6, 2006___ , by and between ___American Brokers Conduit___ , herein designated as the BENEFICIARY, and

___Katherine L Caito___

herein designated as BORROWERS.

WHEREAS, BENEFICIARY is the holder of a certain Promissory Note executed by BORROWERS in the total amount of $ _4,500,000.00_ dated _June 6, 2006_ which Note is secured by the Deed of Trust dated _June 6, 2006_ , recorded in the Office of the County Recorder of _Washington *_ in Book _1541_ on Page _252_ on _6-12-06_ , of Official Records of said County, legally described as follows:  * _Town of Westerly *_

As described on said Deed of Trust and referred to herein.

Which has the property address of: _16 Yosemite Valley Road_
_Westerly  02891_

NOW THEREFORE, for value received, the parties hereto do modify the above referenced Note and Deed of Trust as follows:   1. Record the correct Arm Rider that should have been recorded with original Deed of Trust.
Nothing herein contained shall in any manner whatsoever alter, amend, modify or change any other terms or conditions of the above referenced Note and Deed of Trust except as to the Modification described above, nor shall any of the rights of the BENEFICIARY thereunder be specifically prejudiced by reason of the Modification; all rights of the BENEFICIARY shall be and shall remain in full force and effect as though this Modification had been originally specified in the original Note and Deed of Trust.

Doc # 945676; Image: 945676.prn  App# 0001313784

BOOK 1581 PAGE 330

BORROWER:

_Katherine L Caito_
Katherine L Caito

BORROWER:

_____

BORROWER:

_____

BORROWER:

_____

BORROWER:

_____

AMERICAN HOME MORTGAGE

By: _____
ANDREW VALENTINE
Sr. VICE PRESIDENT

Doc # 945677: Image: 945677.prn App# 0001313784

208

BOOK 1581 PAGE 331

## NOTARY ACKNOWLEDGMENT

STATE OF *Rhode Isl* )
                                    )   SS.
COUNTY OF *Providence* )

On this _____ day of _____, 2006, before me, the undersigned personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person (s) whose name (s) are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity (ies), and that by their signature(s) on the instrument, the person(s) or the entity upon behalf of which the person(s) acted executed the instrument.


WITNESS my hand and official seal.


Signature _____        JOHN S. DIBONA
              (Notary's Name)                              Notary Public
                                                                 State of Rhode Island
                                                      My Commission Expires June 21, 2009


(This area for official notarial seal)
STATE OF NEW YORK)
                                    )   SS.
COUNTY OF SUFFOLK  )


On      day of          , 2006, before me, the undersigned personally appeared **ANDREW VALENTINE** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity (ies), and that by his signature on the instrument, the person(s) or the entity upon behalf of which the person(s) acted executed the instrument.


WITNESS my hand and official seal.


                                                        **JAMES SFIROUDIS**
                                                    **Notary Public, State of New York**
Signature _____              **No. 01SF6114650**
              (Notary's Name) *James Sfiroudis*     **Qualified in Queens County**
                                                 **Commission Expires Aug. 23, 2008**


(This area for official notarial seal)


Doc # 945678; Image: 945678.prn  App# 0001313784


141

209

BOOK  1581 PAGE  332

## ADJUSTABLE RATE RIDER

### (12-MTA Index - Payment and Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this ___6th___ day of ___June, 2006___, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to _____

___American Brokers Conduit___

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

___16 Yosemite Valley Road, Westerly, RI  02891___

(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN ___125.000%___ OF THE ORIGINAL AMOUNT (OR $ ___5,625,000.00___ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

Interest will be charged on unpaid Principal until the full amount has been paid. I will pay interest at a yearly rate of ___1.750___ % until ___June 30, 2006___, and the initial monthly payment provided for in the Note will be based on this rate. Commencing ___July 1, 2006___ I will pay interest at a yearly rate of ___7.782___ %. Thereafter, the interest rate I will pay may change in accordance with Section 4 of the Note.

Page 1 of 5

AHM2029R(MULT) (0106)

Doc # 944735/Image: 944735.prn  App# 0001113784

210

BOOK 1581 PAGE 333

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may further change on the _____1st_____ day of ___August, 2006___, and on that day every month thereafter. Each such date on which my interest rate could change is called a "Change Date."

### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Three and One Eighth_____ percentage points ___3.125_____ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than _____9.950__ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

### (E) Payment Change Dates

Effective every year commencing _____August 1st, 2007_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate that will become effective one month prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly

Page 2 of 5                                                    AHM2029R(MULT)(0106)

BOOK 1581 PAGE 334

payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

### (F) Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument.

### (G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated

### Amortization

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the unpaid Principal I owe in full on the maturity date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

### (H) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to _____125.000%_____ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that _____125.000%_____ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

### (I) Required Full Monthly Payment

On the _____Five_____ anniversary of the due date of the first monthly payment, and on that same day every _____Five_____ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

### (J) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

### (K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note

Page 3 of 5                                      AHM2029R(MULT) (0106)

Doc # 944737/Image: 944737.prn   App# 0001313784

212

Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

## B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.   As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.  If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if:  (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee;  (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.  Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

Page 4 of 5                          AHM2029R(MULT) (0106)

BOOK   1581 PAGE   336

_____Katherine L Caito_____ (Seal)
Katherine L Caito          -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

DONNA L. GIORDANO,MMC  TOWN CLERK
WESTERLY, RI RET: _American Home Mtg_

Page 5 of 5                    AHM2029R(MULT)(0106)

Doc # 944739/Image: 944739.prn  App# 0001313784

146

214

# EXHIBIT A-5



**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936



Account Number: 7140182929

7/14/2018

Katherine L Caito
16 Yosemite Valley Rd
Westerly, RI 02891-5622

Property Address:
16 Yosemite Valley Rd
Westerly, RI 02891-5622

### MORTGAGE INTEREST RATE AND MONTHLY PAYMENT WILL CHANGE ON 07/01/2018

Dear Customer(s),



**Why We Are Sending This Letter**

Under the terms of the Adjustable-Rate Mortgage (ARM), there is a 1 month period where the interest rate remains the same. **That period ends on 06/01/2018** and the interest rate and mortgage payment may change on that date.

It is important to note the interest rate may change every 1 months for the remaining mortgage term.



**What Needs To Be Done**

It is important to note the monthly payment may change on a separate date as a result of an increase or decrease in property taxes and insurance premiums.

Daniel Robbins has been assigned as the Relationship Manager and will be the designated representative for resolution inquiries and submission of documents.

For any questions, we can be reached toll-free **Monday through Friday 8 am to 8 pm ET at 800.746.2936 enter the requested information, then select option 2, then option 4, to speak with the assigned Relationship Manager.** If Daniel Robbins is not available, another dedicated member of our Home Retention Department will be available to answer any questions. Our Customer Care Center may also be contacted at 800.746.2936, Monday through Friday 8 am to 9 pm and Saturday 8 am to 5 pm ET.

Sincerely,
Loan Servicing

ARMBKOFL-DA

NMLS # 1852
This communication is from a debt collector attempting to collect a debt, any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property, it is not intended as an attempt to collect a debt from you personally.

216

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

## Changes to the Mortgage Interest Rate and Payments on 07/01/2018

| | | | |
|---|---|---|---|
| Interest Rate | 4.96400% | 5.05700% | 5.05700% |
| Principal | $8,826.50 | $7,291.56 | $10,898.30 |
| Interest | $15,983.54 | $16,245.79 | $16,245.79 |
| Escrow (Taxes and Insurance)* | $13,974.50 | $13,974.50 | $13,974.50 |
| Regular Monthly Payment | $38,784.54 | $39,511.85 | $41,118.59 |
| Optional Insurance | $0.00 | $0.00 | $0.00 |
| Escrow (Taxes and Insurance)* | $13,974.50 | $13,974.50 | $13,974.50 |
| Total monthly Payment | $38,784.54 | $39,511.85 (due 07/01/2018) | $41,118.59 (due 07/01/2018) |

**Interest Rate:** We calculated the interest rate by taking a published "index rate" and adding the "margin" under the Mortgage Agreement, the index rate is 1.55667% and the margin is 3.50000%. The 1 Year Treasury Bill Constant Maturity is published monthly in Federal Reserve. The calculated amount is rounded by 0.00100%.

**Future Limits on Interest Rate Changes:** The rate cannot go higher than 9.95000%, or lower than 3.50000% over the life of the loan.

**New Interest Rate and Monthly Payment:** The table above shows the new interest rate and new monthly payment. The new payment is based on the 1 Year Treasury Bill Constant Maturity, the margin, the account balance of $3,855,042.21, and the remaining Mortgage term of 217 months.

**Warning about Increase in The Account Balance:** The new payment covers only part of the interest and no principal, unless otherwise reflected in the chart above. Therefore, the unpaid interest will add to the balance on the account. In order to fully pay off the account by the end of the mortgage term at the new interest rate, $41,118.59 would have to be paid per month.

**Prepayment Penalty:** None

For contact information for counseling agencies or program, call the U.S. Department of Housing and Urban Development (HUD) : 800.569.4287 or visit www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm. For contact information for a state housing finance agency, contact the U.S. Consumer Financial Protection Bureau (CFPB) at http://www.consumerfinance.gov/mortgagehelp.

ARMBKOFI_DA

NMLS # 1852

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only, with regard to our secured lien on the above referenced property, it is not intended as an attempt to collect a debt from you personally.

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

OCWEN LOAN SERVICING, LLC

## CONSENT ORDER UNDER
## NEW YORK BANKING LAW § 44

WHEREAS, Ocwen Financial Corporation, the parent company of Ocwen Loan Servicing, LLC (collectively, "Ocwen"), is one of the largest mortgage loan servicers in the United States, servicing more than 40,000 residential home loan accounts in New York held largely by distressed homeowners;

WHEREAS, in the past two years, Ocwen has acquired several major servicers of home loans, including Litton Loan Servicing LP in 2011, as well as servicing rights from Saxon Mortgage Services, Inc. and JP Morgan Chase, Inc. in 2012, and has announced plans to further expand its servicing operations through the acquisition of additional mortgage servicing rights, including from Homeward Residential, Inc., formerly known as American Home Mortgage Servicing, Inc. ("AHMSI") and Residential Capital, LLC ("ResCAP");

WHEREAS, on September 1, 2011, in connection with Ocwen's acquisition of Litton and amid concerns regarding Ocwen's rapid growth and capacity to properly board a significant portfolio of distressed home loans, Ocwen and the New York State Department of Financial

Services (the "Department") (together, the "Parties") entered into an Agreement on Mortgage Servicing Practices (the "Agreement") which required Ocwen to: (1) establish and maintain sufficient capacity to properly board and manage its significant portfolio of distressed loans; (2) engage in sound document execution and retention practices to ensure that mortgage files were accurate, complete, and reliable; and (3) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third-party vendors;

WHEREAS, on December 15, 2011, the Agreement was amended to prevent Ocwen, among other things, from charging borrowers penalties, fees, costs and interest as a result of delays in court appearances caused by the closure of the law firm of Steven J. Baum, one of Ocwen's New York foreclosure counsel, following widespread allegations of improper foreclosure practices by the firm;

WHEREAS, on June 13, 2012, the Department conducted a targeted examination of Ocwen to assess its compliance with the Agreement and Part 419 of the Superintendent's Regulations, which govern business conduct rules for servicers;

WHEREAS, the examination preliminarily identified gaps in the servicing records of certain loans that the Department believes indicate non-compliance by Ocwen, including, in some instances: (1) failing to send borrowers a 90-day notice prior to commencing a foreclosure action as required under Real Property Actions and Proceedings Law ("RPAPL") § 1304; (2) commencing foreclosure actions on subprime loans without affirmatively alleging in the complaint that Ocwen has standing to bring the foreclosure action as required under RPAPL § 1302; and (3) commencing foreclosure actions without sufficient documentation of its standing to do so;

WHEREAS, the examination also preliminarily identified instances that the Department believes indicate non-compliance with the Agreement by Ocwen, including, in some instances: (1) failing to provide certain borrowers direct contact information for their designated loss mitigation staff or a single point of contact ("SPOC"); (2) pursuing foreclosure actions against certain borrowers who are seeking a loan modification (referred to in the Agreement as "dual tracking"); (3) failing to conduct an independent review of certain loan modification denials; (4) failing to demonstrate its adoption of policies and procedures to effectively track sanctioned third-party vendors, including local foreclosure counsel; (5) failing to demonstrate its implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and (6) failing to sufficiently document actions required to ensure that prior modification efforts are not rendered futile upon transfer of a servicing file to or from Ocwen;

WHEREAS, the Department has preliminary concerns that Ocwen's practices have, in some instances: (1) deprived certain struggling homeowners in New York of many opportunities, including to cure the delinquencies on their loans before a foreclosure action was commenced; and (2) failing to provide certain homeowners information on where to contact a housing counselor to assist in reaching a resolution with their lender;

WHEREAS, the Department believes the preliminary evidence of non-compliance warrants the appointment of an independent monitor to conduct a comprehensive review of Ocwen's mortgage servicing files and practices, to which Ocwen has consented;

NOW, THEREFORE, the Parties are willing to resolve the matters cited herein as follows:

## SETTLEMENT PROVISIONS

**Mortgage Servicing Practices Compliance Review:**

1.      Within twenty (20) days of executing the Consent Order, Ocwen will identify an independent on-site monitor acceptable to the Department (the "Compliance Monitor") who will report directly to the Department to conduct a comprehensive review (the "Compliance Review") of Ocwen's servicing operations, including its compliance program and operational policies and procedures.

2.      The Compliance Monitor will review and assess Ocwen's operations with respect to loans on 1-4 family residential property located in the State of New York, including any loans acquired during the term of the Compliance Monitor. Such review will, at a minimum, address the following:

   a. The adequacy of Ocwen's staffing levels for delinquent loans, loans in imminent risk of default and loans in default, including loans in foreclosure. The analysis should include the factors outlined in Paragraph 15 of the Agreement.

   b. The robustness of established policies and procedures governing loss mitigation programs and foreclosure alternatives, independent reviews of loan modifications, execution of documents, and dual tracking of defaulted loans.

   c. The fairness of servicing fees and foreclosure charges, including the elimination of penalties, fees, costs or interest associated with delays in court appearances as a direct result of the closing of the Steven J. Baum law firm and the substitution of counsel.

   d. The accuracy of borrower account information for all loans serviced or sub-serviced by Ocwen.

   e. Ocwen's compliance with state and federal law, including Part 419 of the Superintendent's Regulations and with the Agreement.

f.  Review by the Compliance Monitor of borrower complaints and recordings of customer service, including those of the Collections and Loss Mitigation Units, to assess the quality of information provided via telephone, as well as borrowers' satisfaction with complaints and customer service assistance, and Ocwen's ability to resolve borrower inquiries and complaints in a timely manner.

3.    Based on the Compliance Review, the Compliance Monitor will identify needed corrective measures to address identified weaknesses and deficiencies in Ocwen's servicing practices, make recommendations to the Superintendent, and oversee their implementation as approved by the Superintendent.  The Compliance Monitor will also periodically review and assess Ocwen's compliance with recommended corrective measures, as provided in paragraph 7 of this Order.

4.    Ocwen agrees to cooperate fully with the Compliance Monitor by, including but not limited to, providing the Compliance Monitor access to all relevant personnel and records necessary, including those at any overseas locations, to allow the Monitor to fulfill its duties. Any confidential customer and/or proprietary Ocwen information provided to the Monitor will remain the sole property of Ocwen and will be treated as confidential information, subject to reporting provisions outlined in this Order.

5.    The terms of the Compliance Monitor will extend for a period of twenty-four (24) months from the date of formal engagement.  Any dispute as to the scope of the Compliance Monitor's authority will be resolved by the Department in the exercise of its sole discretion after appropriate consultation with Ocwen and/or the Compliance Monitor.

6.    Within thirty (30) days of executing the Consent Order, Ocwen will submit to the Department for approval the proposed terms of the Compliance Monitor's engagement (the "Engagement Letter"). Ocwen will pay all reasonable and necessary costs of the Monitor.

7.    Within ninety (90) days of Ocwen's receipt of the Department's written approval of such terms, the Compliance Monitor will submit to the Parties a written report of findings, including, if necessary, any proposed corrective measures from the Compliance review (the "Compliance Review Report"). The Compliance Monitor will submit written monthly action progress reports ("Progress Reports") to the Parties. On a quarterly basis, beginning on June 20, 2013, the Monitor will issue a Progress Report covering the three-month period immediately preceding.

8.    Within sixty (60) days of the receipt of the Compliance Review report, Ocwen will submit to the Department for approval a written plan that is designed to improve and enhance Ocwen's servicing of mortgage loans on 1-4 family residential property located in New York State incorporating any corrective measures outlined in the Compliance Review Report (the "Action Plan"). The Action Plan will provide for any enhanced internal controls and updates and/or revisions to current policies, procedures and processes in order to ensure full compliance with all applicable provisions of the Agreement, Superintendent's Regulation Part 419, state and federal regulations governing the servicing of residential mortgage loans, and the requirements of this Consent Order. Upon receipt of written approval of the Action Plan by the Department, Ocwen will begin to implement the necessary changes.

**Breach of the Consent Order:**

9.    In the event that the Department believes Ocwen to be materially in breach of the Consent Order ("Breach"), the Department will provide written notice to Ocwen of the Breach

and Ocwen must, within ten (10) business days from the date of receipt of said notice, or on a later date if so determined in the sole discretion of the Department, appear before the Department to demonstrate that no Breach has occurred or, to the extent pertinent, that the Breach is not material or has been cured.

10. The Parties understand and agree that Ocwen's failure to make the required demonstration within the specified period is presumptive evidence of Ocwen's Breach. Upon a finding of Breach, the Department has all the remedies available to it under the New York Banking and Financial Services Laws and may use any and all evidence available to the Department for all ensuing hearings, notices, orders, and other remedies that may be available under New York Banking and Financial Services Laws.

**Waiver of Rights:**

11. The Parties further understand and agree that no provision of the Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order:**

12. It is further understood that the Consent Order is binding on the Department and Ocwen, as well as their successors and assigns that are within the supervision of the Department, but it specifically does not bind any federal or other state agencies or any law enforcement authorities.

13. During the period in which the Consent Order remains in effect, the approved Plans and Engagement Letter as referenced herein will not be amended or rescinded without the prior written approval of the Department, other than amendments necessary to comply with applicable laws and regulations.

14.     Within ten (10) days after the end of each quarter following the execution of the Consent Order, Ocwen will submit to the Department written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of the Consent Order and the results thereof.  The Department may, in writing, and in its discretion, discontinue the requirement for progress reports or modify the reporting schedule.

**Notices:**

15.     All communications regarding this order will be sent to:

Gaurav Vasisht
Executive Deputy Superintendent
Banking Division
New York State Department of Financial Services
One State Street
New York, NY 10004

Ronald M. Faris
Chief Executive Officer
Ocwen Financial Corporation
1661 Worthington Road
West Palm Beach, FL 33416

**Miscellaneous:**

16.     Each provision of the Consent Order will remain effective and enforceable for a period of 24 months from the date hereof unless stayed, modified, terminated or suspended in writing by both Parties.

17.     No promise, assurance, representation, or understanding other than those contained in the Consent Order have been made to induce any Party to agree to the provisions of the Consent Order.

18.     Nothing in this Consent Order shall preclude the Department from pursuing any examination, enforcement action or additional agreement with Ocwen relating to the subject of this Consent Order.

IN WITNESS WHEREOF, the Parties have caused this Consent Order to be executed as of this
5th day of _December_, 2012.


OCWEN FINANCIAL CORPORATION

By: _____
Ronald M. Faris
President and CEO

NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES

By: _____
Benjamin M. Lawsky
Superintendent

9
158

226

NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES

In the Matter of

OCWEN FINANCIAL CORPORATION,
OCWEN LOAN SERVICING, LLC

## CONSENT ORDER PURSUANT TO NEW YORK BANKING LAW § 44

The New York State Department of Financial Services (the "Department") and Ocwen

Financial Corporation, the parent company of Ocwen Loan Servicing, LLC (together, "Ocwen"),

(collectively, the "Parties") stipulate that:

WHEREAS, Ocwen Loan Servicing, LLC is a New York State-licensed mortgage banker

and an exempt mortgage loan servicer, pursuant to the New York Banking Law, and the

Department is responsible for its supervision and regulation in New York;

WHEREAS, on December 19, 2014, the Parties entered into a Consent Order (the "2014

Consent Order") which, among other things, required Ocwen to retain an independent operations

monitor (the "Operations Monitor") for a period of 24 months to review and assess the adequacy

and effectiveness of Ocwen's operations;

WHEREAS, under the 2014 Consent Order, the Department retained the right to extend

the term of the Operations Monitor for another twelve months if the Department determined that

Ocwen did not achieve certain benchmarks established by the Operations Monitor;

WHEREAS, the Operations Monitor was required to, among other things, review and

make recommendations for improving Ocwen's operations and to assist the company in building

a corporate governance structure that would help ensure ongoing compliance with legal and

regulatory obligations.

WHEREAS, Ocwen formally engaged the Operations Monitor on March 30, 2015;

WHEREAS, during the past two years, Ocwen has implemented certain of the reforms required by the 2014 Consent Order and the recommendations made by the Operations Monitor;

WHEREAS, among other things, Ocwen has expanded its Board of Directors by installing a number of independent directors, made improvements in enhancing its compliance and information technology infrastructure and, most significantly for the borrowers whose loan Ocwen services, the company has improved its borrower correspondence function to minimize the likelihood of providing inaccurate, misdated or otherwise contradictory and misleading information;

WHEREAS, notwithstanding these improvements, Ocwen is still in the process of implementing a number of reforms and recommendations, and has yet to demonstrate that its reforms are sustainable; and

WHEREAS, in the waning months of the Operations Monitor's initial 24-month term, Ocwen began to initiate a significant shift in certain aspects of its servicing operations and the Department has concerns about the company's ability to implement these changes and service loans without considerable regression of its compliance management systems, operational control environment and technology infrastructure.

NOW, THEREFORE, in recognition of both the progress the company has made and the Department's ongoing concerns about the safety and soundness of Ocwen's operations, the Department deems it prudent, and Ocwen agrees, to enter into this Consent Order.

## Settlement Provisions

**Operations Monitor**

11. By April 14, 2017, the Operations Monitor will issue a final report detailing all outstanding corrective measures that Ocwen must implement to address weaknesses and deficiencies in Ocwen's operations. The Operations Monitor's engagement shall terminate upon the submission of the final report.

12. Within thirty (30) days of receiving the Operations Monitor's final report, Ocwen will submit to the Department a detailed written plan to address the outstanding corrective measures and all of the items listed in paragraph 14 (the "Corrective Action Plan"). In the event that Ocwen disagrees with the necessity or scope of any of the outstanding corrective measures, or the operational deficiency to which they relate, Ocwen shall include in the Corrective Action Plan an explanation of its objections, alternative proposals that Ocwen believes will achieve the same objective or purpose as the corrective measures at issue, and an explanation as to why Ocwen's alternative proposals are preferable to achieving the necessary outcome.

13. The Parties shall seek to reach an agreement regarding any proposed modification to the outstanding corrective measures. If they are unable to agree on any modification of the proposed corrective measures, then Ocwen shall implement those corrective measures which the Department deems appropriate.

14. In addition to the outstanding corrective measures, Ocwen shall conduct an enterprise wide risk assessment and an information technology risk assessment within six months of the date of this Consent Order and provide the completed assessments to the Department.

15. Ocwen will report to the Department on its progress in addressing the Corrective Action Plan on a quarterly basis, starting with the end of the second calendar quarter of 2017.

22

16. In addition, the Department will conduct an examination of Ocwen on a date selected by the Department to assess Ocwen's implementation of the outstanding corrective measures and the safety and soundness of its servicing operations. Nothing in this paragraph shall impact the Department's authority to conduct examinations of Ocwen at any time.

17. The Department will not extend the term of the Operations Monitor an additional twelve months, as contemplated in paragraph 46 of the 2014 Consent Order; however, the Parties agree that the Department may, in its sole discretion, require Ocwen to retain an independent consultant that is acceptable to the Department to review and issue recommendations on Ocwen's servicing operations if the Department concludes, as a result of the examination provided for in paragraph 16, that Ocwen has materially failed to implement the Corrective Action Plan or otherwise finds that Ocwen's servicing operations are materially deficient.

**Senior Management**

18. Ocwen's Board of Directors will engage in an ongoing review of the performance of the company's senior management, focusing on senior management's oversight of ongoing or material changes to Ocwen's servicing operations, addressing the Corrective Action Plan, implementation of the 2017 information technology plan, and the company's adherence to the revised policies and procedures developed with the assistance of the Operations Monitor.

**Mortgage Servicing Rights ("MSRs")**

19. To assist the Department in determining whether to ease the restrictions on Ocwen's ability to acquire MSRs, the Department has scheduled an on-site examination of Ocwen. As part of this examination, the Department will assess whether Ocwen is currently able to service mortgage loans without experiencing the widespread servicing failings identified in the 2012 agreement between Ocwen and the Department and the 2014 Consent Order.

20. The Department will review the examination findings to determine whether to approve Ocwen's request to ease the restrictions on its ability to acquire new MSRs.

21. Ocwen acknowledges and understands that this Consent Order does not address any findings that may arise out of the scheduled examination. The Department and Ocwen will confer separately to address any newly identified findings.

**Breach of Consent Order**

22. In the event that the Department believes Ocwen to be in material breach of this Consent Order ("Breach"), the Department will provide written notice to Ocwen, and Ocwen must, within ten (10) business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no Breach has occurred or, to the extent pertinent, that the Breach has been cured.

23. The parties understand and agree that Ocwen's failure to make the required showing within the designated time period will be presumptive evidence of Ocwen's Breach. Upon a finding of Breach, the Department has all the remedies available to it under the New York Banking and Financial Services Laws and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

**Waiver of Rights**

24. Ocwen understands and agrees that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order**

25. This Consent Order is binding on the Department and Ocwen, as well as Ocwen's successors and assigns that are under the Department's supervisory authority. This Consent Order does not bind any federal or other state agency or any law enforcement authority.

26. Nothing in this Consent Order shall limit the Department's authority to examine or otherwise address any conduct.

**Notices**

27. All notices or communications regarding this Consent Order will be sent to:

For the Department:

Peter C. Dean
Executive Deputy Superintendent
Real Estate Finance Division
One State Street
New York, NY 10004

For Ocwen:

Timothy M. Hayes
Executive Vice President and General Counsel
Ocwen Financial Corporation
1661 Worthington Road #100
West Palm Beach, FL 33409

**Miscellaneous**

28. Each provision of this Consent Order will remain effective and enforceable until stayed, modified, suspended, or terminated by the Department.

29. No promise, assurance, representation, or understanding other than those contained in this Consent Order has been made to induce any party to agree to the provisions of the Consent Order.

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this 27th day of March 2017.

**OCWEN FINANCIAL CORPORATION**

By: _____
RONALD FARIS
President and Chief Executive Officer

**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES**

By: _____
MARIA T. VULLO
Superintendent of Financial Services

**OCWEN LOAN SERVICING, LLC**

By: _____
TIMOTHY M. HAYES
Executive Vice President

**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES**

By: _____
PETER C. DEAN
Executive Deputy Superintendent, Real Estate Finance Division

7

235

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
DEPARTMENT OF BUSINESS REGULATION
1511 PONTIAC AVENUE, BLDG 68/69
CRANSTON, RI 02920

IN THE MATTER OF:                                          :
                                                          :
OCWEN LOAN SERVICING, LLC                                  :        DBR NO.  17BK001
OCWEN MORTGAGE SERVICING, INC.                            :
HOMEWARD RESIDENTIAL, INC.                                :
OCWEN BUSINESS SOLUTIONS, INC.                            :
OCWEN FINANCIAL SOLUTIONS PRIVATE LIMITED                 :
                                                          :

## CONSENT ORDER

It is hereby agreed by and between the Rhode Island Department of Business Regulation and

the above-captioned Respondent Parties as follows:

I.    **AUTHORITY OF THE RHODE ISLAND DEPARTMENT OF BUSINESS
      REGULATION**

1.  The Rhode Island Department of Business Regulation ("Department") has jurisdiction over

    this matter pursuant to R.I. Gen. Laws §§ 19-14-1 *et seq.*, 19-14.1-1 *et seq.*, and 19-14.11-1 *et*

    *seq.*

2.  Effective July 1, 2015, "[n]o person shall engage within this state in the business

    of...[s]ervicing a loan, directly or indirectly, as a third-party loan servicer...without first

    obtaining a license or registration from the [Department] director or the director's designee."

    R.I. Gen. Laws § 19-14-2(a)(8).

3.  R.I. Gen. Laws § 19-14-7 authorizes the Department to investigate applicants and gives the

    Department discretion to approve or deny applications including on the basis of whether the

    "financial responsibility, experience, character, and general fitness of the applicant"

1

demonstrate that "the business will be operated honestly, fairly, and efficiently within the purposes of [Title 19]."

4. Pursuant to R.I. Gen. Laws § 19-14-23, the Department is authorized to investigate the loans and business and examine the books, accounts, papers, records, and files of licensed lenders transacting business in Rhode Island, to determine compliance with the provisions of Rhode Island law, and any rule, or regulation issued thereunder, and with any law, rule, or regulation applicable to the conduct of the licensed business.

5. R.I. Gen. Laws § 19-14-23(e) and (f), respectively, authorize the Department to issue a cease and desist order against financial services businesses operating without requisite licensure under Chapter 19-14 and to assess an administrative penalty against any person so ordered in an amount of up to $1,000 per violation.

## II.   RESPONDENT PARTIES

6. The Respondent Parties (also collectively referred to herein as "Respondents" or "Ocwen"), Ocwen Loan Servicing, LLC; Ocwen Mortgage Servicing, Inc.; Homeward Residential, Inc; Ocwen Business Solutions, Inc.; and Ocwen Financial Solutions Private Limited and/or their corporate parents are wholly-owned subsidiaries of Ocwen Financial Corporation ("OFC"), a Florida corporation with headquarters in West Palm Beach, Florida.

7. Respondent Ocwen Loan Servicing, LLC (NMLS ID # 1852) (hereinafter "OLS") is a Delaware limited liability corporation that was, at all relevant times herein, a wholly-owned subsidiary of Respondent Ocwen Mortgage Servicing, Inc. (NMLS #1089752) (hereinafter "OMS"), a U.S. Virgin Islands corporation with headquarters in St. Croix, US Virgin Islands.

2

8. Respondent OLS is (a) the holder of a Rhode Island Lender License and a Rhode Island Debt Collector Registration and (b) an applicant for a Rhode Island Third Party Loan Servicer License (01/21/2016 Date of Application).

9. Respondent OMS is (a) the holder of a Rhode Island Debt Collector Registration and (b) an applicant for a Rhode Island Third Party Loan Servicer License (01/08/2016 Date of Application).

10. Respondent Homeward Residential, Inc. (NMLS #3984) (hereinafter "HRI") is a Delaware corporation wholly owned by of Homeward Residential Holdings, Inc. (hereinafter "HRS").

11. Respondent HRI is (a) the holder of a Rhode Island Lender License and (b) an applicant for a Rhode Island Third Party Loan Servicer License (01/06/2016 Date of Application).

12. Respondent Ocwen Business Solutions, Inc., (NMLS #1283393) (hereinafter "OBS") is a Philippines corporation owned 99.99% by Ocwen Netherland, B.V. ("ON") in turn owned by Ocwen Luxembourg II S.a.r.l.

13. Respondent OBS is (a) an applicant for a Rhode Island Third Party Loan Servicer License (05/12/2016 Date of Application), and (b) an applicant for a Rhode Island Debt Collector Registration.

14. Respondent Ocwen Financial Solutions Private Limited (NMLS #15877) (hereinafter "OFSP") is an Indian corporation owned by Ocwen Asia Holdings Ltd I ("OAH") a Mauritius corporation in turn owned by Ocwen Luxembourg II S.a.r.l.

15. Respondent OFSP is (a) the holder of a Rhode Island Debt Collector Registration and (b) an applicant for both (i) a Rhode Island Lender License (8/23/16 Date of Application) and (ii) a Rhode Island Third Party Loan Servicer License (03/17/2016 Date of Application).

236

16. The pending Rhode Island Third Party Loan Servicer License Applications submitted by the Respondent Parties on the Dates of Application listed above (hereinafter referred to collectively herein as the "Third Party Servicer Applications") were denied pursuant to the Emergency Order issued by the Department as described in Paragraph 21 below.

## III.    FACTS AND TRAVEL

### A.    MULTI-STATE MORTGAGE COMMITTEE BACKGROUND

17. The compliance terms set forth in Exhibit A hereto entitled "Global Minimum Settlement Terms" are based on terms negotiated by the Multi-State Mortgage Committee ("MMC"), a representative body of state mortgage regulators appointed by the Conference of State Banking Supervisors ("CSBS") and the American Association of Residential Mortgage Regulators ("AARMR") to represent the examination interests of the combined states under the Nationwide Cooperative Protocol and Agreement for Mortgage Supervision, to which Rhode Island is a member.[1]

18. By way of a brief history and travel of this matter under the direction of the MMC, certain "Examining States" conducted a Multi-State Examination of Ocwen covering the period of January 1, 2013 to February 28, 2015 in order to determine Ocwen's compliance with applicable federal and state laws and regulations, financial condition, and control and supervision of the licensed mortgage servicing operations.

19. The Examining States alleged several violations of state and federal law, including, but not limited to: consumer escrow accounts that were unaudited and characterized by inaccurate, confusing and/or misleading escrow statements routinely sent to consumers, including

---

[1] Pursuant to R.I. Gen. Laws § 19-4-3(b), the Department is authorized to share with, and to receive from, CSBS and its affiliates and subsidiaries, documents, materials and other information, including confidential examination materials, subject to maintaining any required confidentiality.

4

numerous accounts where Ocwen failed to make timely disbursements to pay for taxes and insurance; ongoing unlicensed servicing activity by Ocwen subsidiaries in numerous jurisdictions; and Ocwen's significantly deteriorating financial condition. The Examining States further alleged that Ocwen failed to respond to requests for information in a timely manner, including failure to provide key financial documents and reconciliations of its financial statements to regulators.

20. To attempt to address the above issues, the state regulators, including Rhode Island, and Ocwen entered into a confidential Memorandum of Understanding (MOU) on December 7, 2016, which MOU required Ocwen to perform a comprehensive audit and reconciliation of all consumer escrow accounts though Ocwen was allowed to offer an alternative plan for the audit and reconciliation.

## B. RHODE ISLAND SPECIFIC FACTS AND TRAVEL

21. On April 20, 2017, the Department issued an Emergency Order to the Respondent Parties pursuant to R.I. Gen. Laws § 42-35-14(c).

22. The Emergency Order included the following findings, closely paraphrased:

   a. The protection of the public welfare and the integrity of the financial marketplace imperatively required emergency action pursuant to R.I. Gen. Laws § 42-35-14(c) in order to protect consumers from the harm caused by Respondents' irresponsibility, untrustworthiness, and disregard of statutory and regulatory mandates and to prevent further harm to persons who may be relying on Respondents to hold consumer funds and to effectuate future financial transactions.

   b. Respondents engaged in, were engaging in, or were about to engage in, acts or practices such that the Department was unable to conclude that Respondents have demonstrated the financial responsibility, experience, character, and general fitness to warrant the belief that the company will be operated honestly, fairly, soundly, efficiently and in the public interest in compliance with R.I. Gen. Laws § 19-14-7(b).

23. On the basis of the above findings, the Emergency Order made the following orders, quoted verbatim:

5

a. "Respondents shall immediately cease from acquiring new mortgage servicing rights and acquiring or originating new residential mortgages serviced by Respondents, which mortgage loans are secured by Rhode Island property, until Respondents can provide the Department with a reconcilement of its escrow accounts showing that consumer funds are appropriately collected, properly calculated, and disbursed accurately and timely."

b. "Respondents shall immediately cease acquiring mortgage servicing rights and acquiring or originating new residential mortgages serviced by Respondents, which mortgage loans are secured by Rhode Island property, until Respondents can show it is a going concern by providing a financial analysis that encompasses all of the liabilities it currently maintains, as well as liabilities it has knowledge it will incur in the course of its business."

c. "Respondents shall immediately cease and desist from any and all unlicensed activity in this State, including, without limitation, acting as a third party loan servicer."

24. On April 25, 2017, the Respondents filed a Complaint for Judicial Review of the Emergency Order in Providence County Superior Court (PC-2017-1862).

25. As of December 31, 2016, Respondents reported that they were servicing 6,422 loans secured by Rhode Island property, such loans having an aggregate unpaid principal balance of $1,045,511,167 as of such date.

## IV.    GLOBAL MINIMUM SETTLEMENT TERMS

26. Upon execution of this Consent Order, Respondent Parties will promptly take the actions described in Exhibit A, which is incorporated into this Consent Order and which consists of the "Global Minimum Settlement Terms" referenced in Paragraph 17 herein.

## V.    RHODE ISLAND THIRD PARTY SERVICER LICENSING TERMS

27. Subject to the condition precedent of the Respondents fulfilling any outstanding application requirements and subject to the continuing condition of the Respondents' compliance with the "Global Minimum Settlement Terms" outlined in Section IV above and with the remaining compliance terms in this Section V, the Department will vacate the denial of, reinstate and grant the Third Party Servicer Applications.

6

28. The Respondents acknowledge that the granting of the Rhode Island Third Party Servicer Applications in no way alters the restrictions in the Global Minimum Settlement Terms as to the scope of activities that can be conducted under the Third Party Loan Servicer Licenses.

29. The Respondents acknowledge that they must maintain any and all approved Third Party Loan Servicer Licenses in good standing, including timely renewal, in order to perform any third party mortgage loan servicing activity in Rhode Island.

30. By the deadline of November 1, 2017, Respondents shall provide the Department with the following information: (a) a list of all loans secured by Rhode Island property presently serviced by Respondents, including the date such loans were originated, (b) a list of all loans secured by Rhode Island property as to which Respondents are acting as a third party servicer (as defined in R.I. Gen. Laws § 19-14-1), including the date such loans were originated, and (c) a list of all pending acquisitions of servicing rights and applications for mortgage loans that would be secured by Rhode Island property that are in the pipeline.

## VI.    RHODE ISLAND GENERAL TERMS

31. This Consent Order is entered into for the purpose of resolving the issues raised in the Emergency Order without any admissions or denials, including no admission of the facts contained in this Consent Order, except for those facts deemed necessary to evidence the authority of the Department.

32. This Consent Order supersedes the prior Emergency Order in its entirety and any and all understandings associated therewith.

33. For the purposes of this Consent Order, and the requirements set forth in Exhibit A, the designated representative for the Department will be:

Sara Cabral
Supervisor of Examinations

7

Division of Banking
Department of Business Regulation
1511 Pontiac Avenue, Building 68
Cranston, RI 02920
sara.cabral@dbr.ri.gov

34. It is the responsibility of the Respondent Parties to assure that the Department's above designated representative is notified of any change to the Respondent Parties' designated contact for purposes of communications regarding this Consent Order, which as the time of execution has been identified as:

Michael Hollerich
Chief Compliance Officer
16675 Addison Road
Addison, Texas 75001
michael.hollerich@ocwen.com

## VII. RHODE ISLAND STANDARD CONSENT ORDER TERMS

35. <u>Waiver of Administrative Hearing.</u> By agreeing to resolve this matter through the execution of this Consent Order, Respondents knowingly and voluntarily waive any right to an administrative hearing regarding the Emergency Order and this Consent Order.

36. <u>Waiver of Superior Court Appeal.</u> By agreeing to resolve this matter through the execution of this Consent Order, Respondents knowingly and voluntarily waive any right to pursue an appeal to the Superior Court under the Rhode Island Administrative Procedures Act, R.I. Gen. Laws § 42-35-1 *et seq.* regarding the Emergency Order and this Consent Order. Accordingly, Respondents will take appropriate action for dismissal of case # PC-2017-1862.

37. <u>Enforcement.</u> If the Respondents fail to comply with any term or condition of this Consent Order within any applicable time period set forth herein, the Respondents will be in violation hereunder and the Department may take immediate and/or heightened enforcement or other action in accordance with applicable law. Provided Respondents comply with the terms of this

8

Consent Order, the Department will not seek additional penalties related to the allegations contained in the Consent Order or the findings of the escrow review described in Exhibit A, provided, however, nothing in the Consent Order prohibits the Department from taking administrative action on new issues discovered during the pendency of the Consent Order, or thereafter.

38. Compliance: Other Laws. Compliance with the terms of this Consent Order does not relieve the Respondents of any obligation to comply with other applicable laws or regulations administered by or through the Department or any other governmental agency.

39. Miscellaneous. This Consent Order shall be deemed entered into as of the date of execution by all parties. This Consent Order shall be binding upon Respondent's successors through a merger or sale of substantially all of Respondent's assets. This agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

SIGNATURES ON NEXT PAGE

## NOTICE PURSUANT TO R.I. GEN. LAWS § 42-35-12

**THIS ORDER CONSTITUTES A FINAL ACTION OF THE DEPARTMENT OF BUSINESS REGULATION PURSUANT TO RHODE ISLAND GENERAL LAWS TITLE 42, CHAPTER 35. FINAL AGENCY ACTIONS ARE GENERALLY APPEALABLE TO THE SUPERIOR COURT WITHIN THIRTY (30) DAYS OF THE DATE OF THE ACTION BY FILING A PETITION FOR REVIEW OF SAID COURT. HOWEVER, THE RESPONDENT IS HEREBY NOTIFIED THAT BY WAIVING ITS RIGHT TO A COMPLETE HEARING AND AGREEING TO THIS CONSENT ORDER, ANY SUCH RIGHT OF APPEAL HAS BEEN WAIVED.**

**For the Department:**

Signature _____    Date

Elizabeth K. Dwyer
Superintendent of Banking and Insurance
and Interim Director

For OLS, OFSPL, and OMS:

_____     9/28/2017
Signature                           Date

Timothy Hayes
Executive Vice President for OLS and OMS
Director for OFSPL

For Ocwen Business Solutions, Inc.:

_____
Signature

_____
Date    10/27/17

Patricia Ann L. Guilatco
President

For Homeward Residential, Inc.:

_____    9-28-17
Signature                   Date

Gregory G. O'Connor
President

## CERTIFICATION

I hereby certify that on this *29* day of *September*, 2017, a copy of the executed Consent Order was sent by first class mail postage prepaid and certified mail postage prepaid to:

Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, Florida 33409

And via email to:

Haydn J. Richards, Esq.
Bradley
hrichards@bradley.com

John B. Daukas, Esq.
Goodwin Procter LLP
jdaukas@goodwinlaw.com

Timothy Hayes, Esq.
General Counsel
Ocwen Loan Servicing, LLC
timothy.hayes@ocwen.com

And via email to the following persons at the Department of Business Regulation:

Jenna Algee, Esq.
Deputy Chief of Legal Services

Elizabeth K. Dwyer
Superintendent of Banking and Insurance, and Interim Director

Sara Paterson Cabral
Supervisor of Examinations, Division of Banking

Pamela Toro, Esq.
Chief of Legal Services

Sara Tindall-Woodman, Esq.
Legal Counsel

14

24

# Exhibit A

## Global Minimum Settlement Terms

I.  MORTGAGE SERVICING RIGHTS RESTRICTION.

a.  MORTGAGE SERVICING RIGHTS RESTRICTION. Except as set forth in paragraphs (b), (c) and (e) below, Ocwen Financial Corporation and its subsidiaries and affiliates (collectively, "Ocwen") shall not acquire any residential mortgage servicing rights (MSRs) until April 30, 2018.

b.  REALSERVICING RESTRICTION. Ocwen shall not board any new loans onto the REALServicing platform at any time. This restriction does not apply to loans that are (i) already serviced on the REALServicing platform, including those that are subsequently modified and/or refinanced or those that are subsequently converted to an arrangement whereby Ocwen acts as sub-servicer, or (ii) required to be repurchased by Homeward Residential, Inc. or Ocwen.

c.  NEW ORIGINATIONS. Ocwen may originate through broker, retail, or wholesale, or acquire through correspondent lender relationships, new residential mortgage loans, including, but not limited to, traditional mortgage loans, and reverse mortgages so long as they will not be boarded, even temporarily, to the REALServicing platform. Any such loans must, instead, be sub-serviced by an unaffiliated, licensed and/or exempt entity, although Ocwen may retain the associated MSRs. Until April 30, 2018, any growth through acquisition from correspondent relationships must be limited to no more than ten (10) percent per calendar year of the total number of loans held by Ocwen at prior calendar year end.

d.  NEW SERVICING PLATFORM. Ocwen shall develop a detailed Plan of Action and Milestones (POAM) for the transfer of all residential mortgages currently administered on the REALServicing platform to other servicing platform(s) that will enable Ocwen to comply with applicable mortgage servicing standards for its residential mortgage portfolios. The POAM shall include a timeline for accomplishing each milestone in the POAM in order to complete the transfer within a commercially reasonable time. The proposed POAM shall be submitted to the designated representative of the state regulator identified in the Consent Order ("State Regulator"). Ocwen shall provide to the designated representative quarterly updates on the POAM until the transfer of all residential mortgages has been completed.

e.  POTENTIAL MERGER OR ACQUISITION PROVISIONS. In the event that Ocwen chooses to merge with or acquire an unaffiliated company or its assets in order to effectuate a transfer of loans from the REALServicing platform, Ocwen must give the State Regulator thirty (30) days prior notice to the signing of any final agreement and the opportunity to object within thirty (30) days from such notice. If no objection is received, the provisions of paragraph (a) above shall not prohibit the transaction, including the related transfer of MSRs or mortgage loans between the companies, or limit the transfer of loans from the

REALServicing platform onto the merged or acquired company's alternate servicing platform. In the event that an unaffiliated company merges with or acquires Ocwen or Ocwen's assets, none of the above paragraphs within this Section I shall prohibit said transaction, including the related transfer of MSRs or mortgage loans between the companies, or limit the transfer of loans from the REALServicing platform onto the merging or acquiring company's alternate servicing system.

## II.     ESCROW REVIEW PROCESS.

a.   SCOPE OF ESCROW REVIEW. Ocwen will employ an independent third-party auditor ("Auditor") to review all escrow transactions on the REALServicing platform, in a representative sample of escrowed loans serviced by Ocwen in the signatory states between January 1, 2013 and June 30, 2017, as set forth in II.c. below.

b.   INDEPENDENT THIRD-PARTY AUDITOR. Ocwen has generated a request for proposal ("RFP") setting forth information about the Auditor's engagement and defining the specific escrow transactions to be reviewed. The states had an opportunity to review and object to the RFP. Ocwen will select the Auditor and notify the signatory states of the proposed Auditor. Ocwen will engage the Auditor within ten (10) days of notification to the signatory states unless the signatory states object to the Auditor. If the signatory states object, the parties will make a good faith effort to promptly resolve any objections, including potential engagement of a different entity as the Auditor.

c.   AUDIT PLAN. The Auditor's testing methodology shall be consistent with the RFP and shall be set forth in a plan ("Audit Plan") agreed to by Ocwen and the Auditor and not objected to by the signatory states. The Audit Plan will be submitted to the signatory states within sixty (60) days of the Auditor's engagement, unless otherwise agreed to by the parties, and the states must submit any objections within ten (10) days after submission. The Audit Plan must be completed by February 1, 2018, and the Auditor must begin testing by March 1, 2018. The Auditor may revise the Audit Plan to the extent revisions become necessary during its testing, provided it is consistent with the RFP and provided Ocwen agrees to the revision and the signatory states do not object to the revision.

d.   SAMPLING METHODOLOGY.

i.   REPRESENTATIVE REVIEW. The Auditor will review a random, statistically significant sample of escrowed loans. The population of escrowed loans is limited to those where the property is located in one of the signatory states. The statistically significant sample size shall be at a 95% confidence level, 5% expected margin of error, and 2% precision

17

250

level. The sample of loans will be allocated on a pro-rata basis amongst the signatory states based on the percentage share for each state, with every signatory state having at least five (5) loans reviewed. If any state has less than five (5) loans sampled as a result of the pro-rata allocation, additional loans shall be sampled to ensure that each state has at least five (5) loans reviewed, but without a commensurate increase for a signatory state not subject to the minimums described above.

ii. STRATIFIED REVIEW. The Auditor will review a statistically significant sample of each of the identified strata at a 95% confidence level, 5% expected margin of error, and 2% precision level.

1. The identified strata are divided into two categories: 1) "Pro-Rata Allocation Only" and "Pro-Rata Allocation Plus."

2. The Pro-Rata Allocation Only strata are:
   a. HOA foreclosures,
   b. second liens,
   c. loans with biweekly payments, and
   d. current loans with either positive or negative escrow balances greater than $10,000.

3. The Pro-Rata Allocation Plus strata are
   a. ARMs,
   b. loans 60+ days past due,
   c. HAMP modifications,
   d. Shared Appreciation modifications (SAM loans),
   e. non-HAMP modifications,
   f. bankruptcy,
   g. loans with PMI only,
   h. loans with flood insurance,
   i. condo master policy loans,
   j. loans with negative escrow balances when transferred,
   k. loans with negative escrow balances for 3+ consecutive months,
   l. loans with borrower complaints,
   m. loans with capitalized escrow, and
   n. loans with lender placed insurance.

4. For the Pro-Rata Allocation Only strata, the Auditor will ensure the strata testing population is allocated on a pro-rata basis amongst the signatory states based on the percentage of Ocwen's overall portfolio attributable to each state.

5. For the Pro-Rata Allocation Plus strata, the pro-rata allocation will

18

be adjusted, as necessary, to ensure the Auditor reviews at least five (5) escrowed loans per strata for each signatory state.

6. To the extent the Auditor increases the Pro-Rata Allocation Plus sample to meet the minimums described above, the overall population will also increase, without a commensurate increase in the Pro-Rata Allocation Plus for a signatory state not subject to the minimums described above.

e. TESTING METHODOLOGY. In accordance with the testing methodology provisions of the RFP, the Auditor will identify instances where Ocwen did not administer an escrow account for a sampled loan in compliance with laws governing escrow under the Real Estate Settlement Procedures Act, as implemented by Regulation X, the Truth in Lending Act, as implemented by Regulation Z, the Homeowners Protection Act, and R.I. Gen. Laws § 19-9-2 related to escrow ("Error"). For each Error found, the Auditor will, to the extent the information is reasonably accessible, set forth:
   i. the name of the borrower,
   ii. the state where the property is located,
   iii. the nature of the error,
   iv. the date of the Error,
   v. the date Ocwen first became aware of the Error,
   vi. how the Error came to Ocwen's attention (internal process, third-party notification, consumer complaint, regulatory agency, etc.),
   vii. an analysis of whether the error caused financial harm, including
      1. basis for determination, and
      2. the amount of any harm.
   viii. if the Error was remediated, and, if so, how and when it was remediated.
   ix. For any unidentified or unremediated Errors, the Auditor must provide information regarding why the Error was not identified and/or remediated. During the review, the Auditor will also determine if the Error caused any financial harm to the borrower.

f. CORRECTIVE ACTIONS. If the Auditor identifies Errors previously remediated by Ocwen, regardless of whether they resulted in financial harm as defined in the Audit Plan, the Auditor will confirm that the corrective actions were sufficient to: (1) remediate the Error, and remediate any other similarly impacted borrowers, and (2) prevent the Error from recurring. Ocwen will provide the state signatory representative with documentation of any corrective actions to address any previously remediated Errors. Should the Auditor determine that Ocwen did not fully remediate the Error(s) and/or that Ocwen has not taken sufficient corrective action to prevent the Error(s) form recurring, then Ocwen shall submit within 60 days of Escrow Report a corrective action plan (including remediation if applicable) to be approved by the state signatory representative. If the Auditor identifies a non-remediated Error, Ocwen shall submit within 60 days of Escrow Report a corrective

19

action plan to be approved by the state signatory representative that will remediate the Error, and remediate any other similarly impacted borrowers, including the provision of restitution to fully correct financial harm, and/or to prevent the Error from recurring. In the event Ocwen implements remediation to address a non-remediated Error, the Auditor will review a statistically valid sample of borrowers potentially impacted by each root cause to confirm the remediation efforts were successfully completed. In all instances, the Auditor will confirm that Ocwen's corrective action plans and remediation efforts are sufficient and no loan shall be boarded onto a new system pursuant to the POAM with a known, unremediated error.

g. ESCROW REPORT. The Auditor will generate a report setting forth the results of its audit ("Escrow Report"), pursuant to the timeframes agreed upon in the Audit Plan. The Escrow Report will identify any information that, in the Auditor's opinion, is relevant to its report. At a minimum, the Escrow Report will include the information described in Paragraphs II.(d)-II.(f) of this Agreement. The final report, and any drafts, shall be provided simultaneously to Ocwen and the signatory states. Ocwen shall have the right to submit written comments to the Auditor, which shall be appended to the final version of the Escrow Report.

III. COMPLAINT PLAN

a. No later than sixty (60) days after this Consent Order is issued by the State Regulator, Ocwen shall submit to the State Regulator for review and determination of non-objection a comprehensive consumer complaint resolution plan ("Complaint Plan") designed to ensure that the company will properly document, timely investigate and remediate consumer complaints as defined in 12 CFR 1024.35. The Complaint Plan shall include, at a minimum:

   i. robust, board-approved policies and procedures to ensure that all consumer complaints are documented and timely investigated, any errors found as a result of a complaint are remediated, and errors found that may impact other accounts are escalated for further investigation and/or remediation;

   ii. a formal internal review process to ensure all complaints are processed in accordance with the policies and procedures adopted under this Complaint Plan;

   iii. training on revised complaint procedures for all employees no later than 180 days from the date of this order;

   iv. a program establishing annual, mandatory complaint resolution training for employees who may receive any form of complaint from a consumer or are otherwise involved in the complaint resolution process; and

   v. detailed steps for addressing each action required by the Complaint Plan.

IV. FINANCIAL CONDITION.

20

25

a. ONE YEAR FINANCIAL CONDITION PLAN. Within thirty (30) business days, Ocwen will submit a written plan demonstrating how it will remain a going concern for a period of one (1) year from the Effective Date of this Order ("One-Year Financial Condition Plan"). The One-Year Financial Condition Plan, at a minimum, must take into account, in accordance with Generally Accepted Accounting Principles, all known and reasonably anticipated future liabilities including, but not limited to, costs of necessary audits and anticipated regulatory, law enforcement, or other litigation liabilities or costs exceeding one (1) million dollars arising from any final orders/judgments or settlements and must also demonstrate how Ocwen will comply with all applicable liquidity and capital requirements.

b. THREE YEAR FINANCIAL CONDITION PLAN. Ocwen previously submitted to the MMC a three (3) year financial condition plan ("Three-Year Financial Condition Plan"), which must be updated by Ocwen on or before September 30, 2017 and each signatory state shall receive a copy of the updated report.

c. ONGOING FINANCIAL CONDITION REPORTING. Ocwen will provide additional updates every six (6) months going forward for a period of three (3) years, unless a signatory state releases Ocwen from this requirement earlier. Ocwen shall notify each signatory state if and when any event occurs that could materially impact Ocwen's financial condition, including, but not limited to, any actual or anticipated liabilities or costs exceeding five (5) million dollars or if Ocwen drops below or projects to drop below any applicable liquidity or capital requirement, within ten (10) business days of the occurrence of any such event(s). Ocwen will submit the following reports with the One-Year Financial Condition Plan, and Ocwen will continue to submit these reports for a period of three (3) years and one (1) month from the Effective Date of this Agreement:

   i. Monthly financial statements that track actual earnings compared to forecasted earnings during the same time period, to be submitted to each signatory state for each month on or before the last day of the following month;

   ii. A monthly liquidity report that demonstrates daily liquidity tracking with forecasts on liquidity positions over thirty (30), sixty (60), and ninety (90) days, to be submitted to each signatory state on or before the fifteenth (15th) day of each month;

   iii. A monthly report documenting compliance with internal policies and procedures governing limits on exposure to market risk, including, but not limited to, interest rate risk, to be submitted to each signatory state for each month on or before the last day of the following month; and

   iv. A quarterly going concern analysis, which shall include covenant and capital reporting that tracks any and all financial or regulatory covenants Ocwen is obligated to comply with and whether Ocwen remains in compliance with those covenants, to be submitted to each signatory state forty-five (45) days after the end of each calendar quarter, with the exception of the last quarterly report for each calendar year, which shall be submitted

21

ninety (90) days after the end of such quarter.

d. ACKNOWLEDGEMENT OF RECEIPT. Each signatory state will designate a point of contact to whom Ocwen will submit the documents described in Section IV of this Agreement. Such person must acknowledge receipt of the documents within fifteen (15) calendar days of Ocwen's submission. In addition, the signatory states will identify any alleged deficiencies in the reports within sixty (60) calendar days of Ocwen's submission. The parties will make a good faith effort to promptly resolve any alleged deficiencies.

e. RELEVANT ENTITY. Ocwen will submit the documents described in Section IV of this Agreement for Ocwen Financial Corporation.

22

NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES

In the Matter of

OCWEN FINANCIAL CORPORATION,
OCWEN LOAN SERVICING, LLC

## CONSENT ORDER PURSUANT TO NEW YORK BANKING LAW § 44

The New York State Department of Financial Services (the "Department") and Ocwen

Financial Corporation, the parent company of Ocwen Loan Servicing, LLC (together, "Ocwen"),

(collectively, the "Parties") stipulate that:

**WHEREAS,** Ocwen is the fourth largest mortgage loan servicer and the largest servicer

of subprime loans in the United States, servicing an unpaid principal balance ("UPB") of

approximately $430 billion. In New York alone, Ocwen services nearly 130,000 residential

home loans with a total UPB of more than $30 billion.

**WHEREAS,** Ocwen is a New York State-licensed mortgage banker and mortgage loan

servicer, pursuant to the New York Banking Law, and the Department is responsible for its

supervision and regulation;

**WHEREAS,** in the last five years, Ocwen has acquired mortgage servicing rights

("MSRs") for hundreds of billions of dollars in UPB from several major servicers, including

Litton Loan Servicing LP ("Litton"), Saxon Mortgage Services, Inc. ("Saxon"), and Homeward

Residential Holdings, Inc. ("Homeward");

**WHEREAS,** in 2010 and 2011, the multistate examinations of Ocwen, Litton, and

Homeward identified numerous and significant violations of New York State laws and

regulations;

25

**WHEREAS,** on September 1, 2011, in connection with Ocwen's acquisition of Litton and amid concerns regarding Ocwen's rapid growth and capacity to properly acquire and service a significant portfolio of distressed home loans, Ocwen and the Department entered into an Agreement on Mortgage Servicing Practices (the "2011 Agreement"), which required Ocwen to adhere to certain servicing practices in the best interest of borrowers and investors;

**WHEREAS,** a June 2012 targeted examination of Ocwen revealed that Ocwen violated the 2011 Agreement;

**WHEREAS,** as a result of Ocwen's violation of the 2011 Agreement, Ocwen entered into a Consent Order with the Department on December 5, 2012, which required Ocwen to retain an independent compliance monitor (the "Compliance Monitor") for two years to conduct a comprehensive review of Ocwen's servicing operations;

**WHEREAS,** the Department and the Compliance Monitor identified numerous and significant additional violations of the 2011 Agreement, as well as New York State laws and regulations;

**NOW, THEREFORE,** to resolve this matter, the Parties agree to the following:

### Facts

1. Ocwen has grown more than ten-fold in the last several years. Beginning in 2009, Ocwen significantly expanded its servicing operations through the acquisition of several major servicers of home loans, as well as the acquisition of MSRs for hundreds of billions of dollars in UPB. From the end of 2009 to the end of 2013, Ocwen's servicing portfolio grew from 351,595 residential loans with an aggregate UPB of \$50 billion to 2,861,918 residential loans with an aggregate UPB of \$464.7 billion.

2.      In 2010 and 2011, the Department participated in a multistate examination of Ocwen, as well as examinations of Litton and Homeward, the entities ultimately acquired by Ocwen. The examination of Ocwen identified, among other things, deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including (a) robo-signing, (b) inaccurate affidavits and failure to properly validate document execution processes, (c) missing documentation, (d) wrongful foreclosure, (e) failure to properly maintain books and records, and (f) initiation of foreclosure actions without proper legal standing.

3.      The examinations of Litton and Homeward identified substantial deficiencies, weaknesses, and violations of laws and regulations relating to, among other things, foreclosure governance, implementation of modification programs, record keeping, required notifications, and the charging of unallowable fees.

4.      The examination of Litton also revealed that, prior to Ocwen's acquisition of Litton, members of Litton's information technology staff falsified documents provided to the Department during the review of Litton's information technology infrastructure.

5.      In connection with Ocwen's acquisition of Litton in 2011 and in light of the examination findings for both Ocwen and Litton, the Department sought to ensure that Ocwen had sufficient capacity to properly acquire and manage a significant portfolio of distressed loans, including the ability to effectively manage the increased volume and comply with requirements under the federal Home Affordable Modification Program, internal loss mitigation policies and procedures, and laws and regulations governing mortgage loan servicing and foreclosure activities.

6.      To that end, Ocwen and the Department entered into an Agreement on Mortgage Servicing Practices on September 1, 2011, which required Ocwen to: (a) establish and maintain

sufficient capacity to properly acquire and manage its significant portfolio of distressed loans to ensure a smooth borrower transition; (b) engage in sound document execution and retention practices to ensure that mortgage files are accurate, complete, and reliable; and (c) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third party vendors to prevent improper foreclosures and maximize struggling borrowers' opportunities to keep their homes.

7.     In June 2012, the Department conducted a targeted examination of Ocwen to assess its compliance with the 2011 Agreement and Part 419 of the Superintendent's Regulations, which governs business conduct rules for servicers. The examination identified gaps in the servicing records of certain loans that indicated repeated non-compliance by Ocwen, including: (a) failing to send borrowers a 90-day notice prior to commencing a foreclosure action as required under New York Real Property Actions and Proceedings Law ("RPAPL") § 1304, (b) commencing foreclosure actions on subprime loans without affirmatively alleging in the complaint that Ocwen had standing to bring the foreclosure action as required by RPAPL § 1302, and (c) commencing foreclosure actions without sufficient documentation of its standing to do so.

8.     The targeted examination also identified instances that indicated widespread non-compliance with the 2011 Agreement including: (a) failing to provide borrowers with the direct contact information for their designated single point of contact, a customer care representative whose role is to understand each assigned borrower's circumstances and history to ensure that the borrower receives efficient and consistent customer care; (b) dual-tracking; (c) failing to conduct an independent review of loan modification denials; (d) failing to demonstrate adoption of policies and procedures to effectively track sanctioned third-party vendors, including local

foreclosure counsel; (e) failing to demonstrate implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and (f) failing to ensure that trial or permanent modifications granted to borrowers by a prior servicer are honored upon transfer to Ocwen.

9.      Consequently, on December 5, 2012, Ocwen entered into a Consent Order with the Department, which required Ocwen to retain an independent compliance monitor for two years. The Consent Order mandated that the Compliance Monitor, which would report directly to the Department, would "conduct a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures." The review would, at a minimum, consider (a) the adequacy of Ocwen's staffing levels, (b) the robustness of Ocwen's established policies and procedures, (c) the fairness of servicing fees and foreclosure charges, (d) the accuracy of borrower account information, (e) Ocwen's compliance with federal and state law, (f) borrower complaints and recordings of customer service, and (g) Ocwen's compliance with the Agreement.

10.      The Compliance Monitor began work in July 2013.

11.      In the course of the Compliance Monitor's review, it identified numerous and significant violations of the 2011 Agreement, as well as New York State laws and regulations.

12.      For example, a limited review by the Compliance Monitor of 478 New York loans that Ocwen had foreclosed upon revealed 1,358 violations of Ocwen's legal obligations, or about three violations per foreclosed loan. These violations included:

- failing to confirm that it had the right to foreclose before initiating foreclosure proceedings;

- failing to ensure that its statements to the court in foreclosure proceedings were correct;

- pursuing foreclosure even while modification applications were pending ("dual tracking");

- failing to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty; and

- failing to assign a designated customer care representative.

13.    The Department and the Compliance Monitor also identified, among other things, (a) inadequate and ineffective information technology systems and personnel, and (b) widespread conflicts of interest with related parties.

**Inadequate and Ineffective Information Technology Systems and Personnel**

14.    In the course of its review, the Compliance Monitor determined that Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. A frequent occurrence is that a fix to one system creates unintended consequences in other systems. As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records. There are insufficient controls in place—either manual or automated—to catch all of these errors and resolve them.

15.    For example, Ocwen's systems have been backdating letters for years. In many cases, borrowers received a letter denying a mortgage loan modification, and the letter was dated more than 30 days prior to the date that Ocwen mailed the letter. These borrowers were given 30 days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter. In other cases, Ocwen's systems show that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure—and the cure date was months prior to receipt of the letter. Ocwen's processes failed to identify and remedy these errors.

16.    Moreover, Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance. Ocwen ignored the issue for five months until the same employee raised it again. While Ocwen then began efforts to address the backdating issue, its investigation was incomplete and Ocwen has not fully resolved the issue to date, more than a year after its initial discovery.

17.    Ocwen's core servicing functions rely on its inadequate systems. Specifically, Ocwen uses comment codes entered either manually or automatically to service its portfolio; each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel. With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than 8,400 such codes. Often, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function. The result is an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative.

18.    Despite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans. Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors. For example, Ocwen's Chief Financial Officer recently acknowledged, in reference to its offshore customer care personnel, that Ocwen is simply "training people to read the scripts and the dialogue engines with feeling." Ocwen's policy is to require customer support staff to follow the scripts closely, and Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens. In some cases, this policy has frustrated struggling borrowers who have complex issues

that exceed the bounds of a script and have issues speaking with representatives at Ocwen capable of addressing their concerns. Moreover, Ocwen's customer care representatives in many cases provide conflicting responses to a borrower's question. Representatives have also failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower.

19. Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations. Prior to the Department's and the Compliance Monitor's review, Ocwen did not take adequate steps to implement reforms that it was legally obligated to implement pursuant to the 2011 Agreement.

### Widespread Conflicts of Interest with Related Parties

20. The Department's review of Ocwen's mortgage servicing practices also uncovered a number of conflicts of interest between Ocwen and four other public companies (the "related parties"),[1] all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen. In addition to serving as chairman of the board for Ocwen and each related company, Mr. Erbey's holdings in these companies total more than $1 billion. Other Ocwen executives and directors also own significant investments in both Ocwen and the related parties. Yet, Ocwen does not have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies.

---

[1] The related parties are, as of the date of this Consent Order, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., and any of their affiliates, predecessors and successors in interest, both past and present, and any of their officers, directors, partners, employees, consultants, representatives, and agents or other persons and entities acting under their control or on their behalf.

21.     Despite Mr. Erbey's holdings in these companies, Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties. Mr. Erbey, who owns approximately 15% of Ocwen's stock, and nearly double that percentage of the stock of Altisource Portfolio, has participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's forced placed insurance program in early 2014.

22.     Ocwen's close business relationship with related companies is particularly evident in its relationship with Altisource Portfolio, which has dozens of subsidiaries that perform fee-based services for Ocwen. In one example, Altisource Portfolio subsidiary Hubzu, an online auction site, hosts nearly all Ocwen auctions. In certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers—charges which are then passed on to borrowers and investors. Moreover, Ocwen engages Altisource Portfolio subsidiary REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform, at the same cost to borrowers and investors.

23.     Conflicts of interest are evident at other levels of the Ocwen organization. For example, during its review, the Monitor discovered that Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource Portfolio. The Chief Risk Officer reported directly to Mr. Erbey in both capacities. This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was of particular concern given his role as Chief Risk Officer.

**Settlement Provisions**

Monetary Payment

24.      Ocwen will pay the amount of $150 million as follows:

     a.    $100 million paid to the Department by December 31, 2014, as a civil monetary penalty pursuant to New York Banking Law § 44, to be used by the State of New York for housing, foreclosure relief, and community redevelopment programs supporting New York's housing recovery; and

     b.    $50 million deposited into an interest-bearing escrow account by December 31, 2014, to be paid as restitution to current and former Ocwen-serviced borrowers in New York, as follows:

         i.    $10,000 to each borrower whose home was foreclosed upon by Ocwen between January 1, 2009, and the date of this Consent Order; and

         ii.    The balance of the $50 million to be distributed equally among borrowers who had foreclosure actions filed against them by Ocwen between January 1, 2009, and the date of this Consent Order, but in which Ocwen did not complete such foreclosure.

25.      Ocwen agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the amount paid pursuant to this Consent Order.

Borrower Assistance

26.      For borrowers receiving payments pursuant to Paragraph 24(b)(ii), Ocwen will evaluate such borrowers for all applicable modifications and other foreclosure alternatives in light of their improved financial condition resulting from such payment.

27.    Beginning sixty (60) days after the date of execution of the Consent Order, and for a period of two years thereafter, Ocwen will provide upon request by a New York borrower that borrower's complete loan file, which includes all information from all systems, including comment codes, at no cost to the borrower, regardless of whether such borrower's loan is still serviced by Ocwen.

28.    Beginning sixty (60) days after the date of execution of the Consent Order, Ocwen will provide every New York borrower who is denied a modification, short sale, or deed-in-lieu of foreclosure, a detailed explanation of the reasons for denial.

29.    Beginning sixty (60) days after the date of execution of this Consent Order, for all New York borrowers who have been reported negatively by Ocwen to credit agencies since January 1, 2010, Ocwen will provide upon request at no cost a copy of such borrower's credit report (including credit scores) no more than once a year, regardless of whether such borrower's loan is still serviced by Ocwen. Ocwen will make sufficient staff available for borrowers to inquire about their credit reporting and will dedicate the resources necessary to investigate such inquiries and promptly correct any errors.

30.    The Operations Monitor will oversee Ocwen's compliance with these borrower assistance provisions and will work with Ocwen to develop appropriate procedures for such compliance.

Operations Monitor

31.    The Department will select in its sole discretion an independent on-site operations monitor (the "Operations Monitor") that will report directly to the Department.

32.    The Operations Monitor will review and assess the adequacy and effectiveness of Ocwen's operations. Such an assessment will include but is not limited to the following areas:

a. Information technology systems and personnel, including with respect to record keeping and borrower communications;

b. Number of personnel and the training and expertise of its personnel in all servicing operations;

c. Onboarding process for newly acquired mortgage servicing rights, including Ocwen's ability to onboard newly acquired MSRs without interruption to servicing newly acquired loans or its existing loan portfolio;

d. Controls in identifying and correcting errors made by Ocwen's personnel or systems;

e. Risk management functions;

f. Contracts or proposed contracts with third parties, including but not limited to related parties;

g. Fees charged by Ocwen to borrowers or mortgage investors; and

h. The Ocwen borrower experience.

33. The Operations Monitor will identify the criteria for determining what constitutes a "related party" for purposes of compliance with this Consent Order.

34. The purview of the Operations Monitor will extend to all matters directly or indirectly affecting New York borrowers, including matters that affect borrowers in all states or in multiple states that include New York.

35. The Operations Monitor will identify needed corrective measures to address identified weaknesses and deficiencies in Ocwen's operations, make recommendations to Ocwen and to the Superintendent, and oversee implementation of reforms. The Operations Monitor will

also develop benchmarks against which to assess Ocwen's progress in complying with recommended corrective measures.

36.     The Operations Monitor will review and assess Ocwen's current committees of the Board of Directors. Ocwen Financial Corporation's Board of Directors (the "Board") will consult with the Operations Monitor concerning, among other things, the structure, composition, and reporting lines of such committees, and whether certain committees should be either disbanded or created.

37.     The Board will consult with the Operations Monitor to determine which decisions should be committed to the specific oversight of the Board's independent directors, or a committee comprised of such independent directors, including, but not limited to:

     a.  Approval of transactions with related parties;

     b.  Approval of transactions to acquire mortgage servicing rights, sub-servicing rights, or otherwise to increase the number of loans serviced by Ocwen;

     c.  Approval of new relationships with third-party vendors;

     d.  Determinations as to whether Ocwen's servicing, compliance, and information technology functions are adequately staffed;

     e.  Determinations as to whether Ocwen's servicing, compliance, and information technology personnel are adequately trained;

     f.  Determinations as to whether Ocwen's information technology infrastructure and ongoing investment in information technology systems are adequate;

     g.  Determinations as to whether Ocwen is adequately addressing the issues identified by the Operations Monitor and the Compliance Monitor; and

    h.   Determinations as to whether Ocwen is treating borrowers fairly and is communicating with borrowers appropriately.

38.    The Board will consult with the Operations Monitor to determine whether any member of senior management should be terminated or whether additional officers should be retained to achieve the goals of complying with this Consent Order, and all applicable laws, regulations, and agreements, as well as creating a corporate culture of ethics, integrity, compliance, and responsiveness to borrowers.

39.    Ocwen may acquire MSRs upon (a) meeting benchmarks developed by the Operations Monitor concerning the adequacy of Ocwen's onboarding process for newly acquired MSRs and its ability to adequately service both those newly acquired MSRs and its existing loan portfolio, and (b) the Department's approval, not to be unreasonably withheld. The Operations Monitor will act with reasonable expedition to develop such benchmarks in consultation with Ocwen. These benchmarks will address, at a minimum, the following:

    a.   The development and implementation of a satisfactory compliance plan;

    b.   The development and implementation of a plan to resolve record-keeping and borrower communication issues;

    c.   The reasonableness of fees and expenses charged to borrowers and mortgage investors, including those charged directly or indirectly by related parties;

    d.   The development and performance of a risk assessment to identify potential risks and deficiencies in the onboarding process; and

    e.   The development of a written onboarding plan that addresses potential risks and deficiencies, including testing and quality control review periodically during the onboarding process.

40.    The Operations Monitor will semi-annually review and approve Ocwen's benchmark pricing and performance studies with respect to all fees or expenses charged to New York borrowers by any related party.

41.    The Operations Monitor will oversee and ensure Ocwen's implementation and adherence to the terms of this Consent Order.

42.    Within one hundred twenty (120) days of the date of the formal engagement of the Operations Monitor, the Operations Monitor will submit to the Parties a preliminary written report of findings, including, to the extent the Operations Monitor has had the opportunity to develop them, any proposed corrective measures and associated benchmarks (the "Operations Report"). The Operations Monitor will submit written monthly action progress reports ("Progress Reports") to the Parties. On a quarterly basis, starting ninety (90) days from the date of the first Operations Report, the Operations Monitor will issue an Operations Report covering the three-month period immediately preceding.

43.    Ocwen agrees to cooperate fully with the Operations Monitor by, including but not limited to, providing the Operations Monitor access to all relevant personnel and records necessary on a real-time basis, including those at any overseas locations, and including information on business decisions pertinent to the work of the Operations Monitor currently pending or recently made by Ocwen management or its Board of Directors, to allow the Operations Monitor to fulfill its duties.

44.    Any dispute as to the scope of the Operations Monitor's authority will be resolved by the Department in the exercise of its sole discretion after appropriate consultation with Ocwen and/or the Operations Monitor.

45.    Ocwen will pay all reasonable and necessary costs of the Operations Monitor.

46.    The terms of the Operations Monitor will extend for a period of twenty-four (24) months from the date of formal engagement which shall be no later than May 1, 2015. The Department may, in its sole discretion, extend the engagement another twelve (12) months if the Department determines that Ocwen has not sufficiently achieved benchmarks identified by the Operations Monitor.

Compliance Monitor

47.    The Compliance Monitor will remain engaged for at least three (3) months from the execution of this Consent Order. The Department may, in its sole discretion, extend the engagement of the Compliance Monitor for a period not to exceed an additional three (3) months.

48.    Following completion of the Compliance Monitor's engagement, the Operations Monitor may call upon the Compliance Monitor to perform work that draws on the Compliance Monitor's institutional knowledge of Ocwen.

49.    Prior to the Operations Monitor's engagement and for a short transitional period thereafter not to exceed forty-five (45) days, the Department may in its sole discretion direct the Compliance Monitor to fill any of the roles of the Operations Monitor described in this Consent Order.

Board of Directors

50.    Ocwen Financial Corporation will expand its Board of Directors by two independent board members (the "Additional Directors") in consultation with the Compliance Monitor or the Operations Monitor.

51.    The Additional Directors will not own equity in any related party.

52.    Ocwen's Board will contain no more than two executive directors at any time.

Conflicts of Interest

53.    With respect to mortgage loans serviced by Ocwen, Ocwen will conduct semi-annual benchmarking studies of pricing and performance standards with respect to all fees or expenses charged to New York borrowers or to investors on New York property by any related party, to determine whether the terms offered by the related party are commensurate with market rates or, if market rates are not available, are reasonably related to actual expenses incurred by the related party.  Maximum rates for services that are established by government-sponsored enterprises or other investors may not be presumed to be the market rate and may not substitute for actual assessment of market rates.

54.    Ocwen will not share any common officers or employees with any related party.

55.    Ocwen will not share risk, internal audit, or vendor oversight functions with any related party.

56.    Any Ocwen employee, officer, or director owning more than $200,000 equity ownership in any related party will be recused from negotiating, or voting to approve a transaction with the related party in which the employee, officer, or director has such equity ownership, or any transaction that indirectly benefits such related party if such transaction involves revenues or expense to Ocwen or a related party of $120,000 or more.

Management Changes

57.    Effective January 16, 2015, William Erbey will resign from his position as Executive Chairman of Ocwen, his position as Chairman of the Board of Directors of Altisource Portfolio, his position of Chairman of the Board of Directors of Altisource Residential Corporation, his position of Chairman of the Board of Directors of Altisource Asset Management Corporation, and his position of Chairman of the Board of Directors of Home Loan Servicing

Solutions Ltd. Mr. Erbey will have no directorial, management, oversight, consulting, or any other role at Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation. Effective at his resignation, Ocwen's Board members and management will not disclose to Mr. Erbey any non-public information about Ocwen that is not available to other shareholders. In the event that Ocwen discovers a violation of the terms of this Paragraph, Ocwen will notify the Department of the violation within three (3) business days of discovery.

No Indemnification

58.    Neither Ocwen, nor any of its parents or affiliates will, collectively or individually, seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to, payment made pursuant to any insurance policy, or from any of its parents or affiliates, with regard to any or all of the amounts payable pursuant to this Consent Order.

Breach of Consent Order

59.    In the event that the Department believes Ocwen to be in material breach of this Consent Order ("Breach"), the Department will provide written notice to Ocwen, and Ocwen must, within ten (10) business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no Breach has occurred or, to the extent pertinent, that the Breach has been cured.

60.    The parties understand and agree that Ocwen's failure to make the required showing within the designated time period will be presumptive evidence of Ocwen's Breach. Upon a finding of Breach, the Department has all the remedies available to it under the New York Banking and Financial Services Laws and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

273

Wavier of Rights

61.    The parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

Parties Bound by the Consent Order

62.    This Consent Order is binding on the Department and Ocwen, as well as Ocwen's successors and assigns that are under the Department's supervisory authority. This Consent Order does not bind any federal or other state agency or any law enforcement authority.

63.    Except as set forth in Paragraphs 64 and 65, no further action will be taken by the Department against Ocwen for the matters set forth in this Consent Order, provided that Ocwen complies with the terms of the Consent Order.

64.    Nothing in this Consent Order shall excuse Ocwen from paying required restitution to any borrowers harmed by its improper or illegal conduct, including the backdating of letters to borrowers. To the extent a borrower entitled to restitution has received a cash payment pursuant to this Consent Order, Ocwen may offset such payment against the restitution owed to such borrower.

65.    Notwithstanding any other provision in this Consent Order, the Department may undertake additional action against Ocwen for transactions or conduct that: (a) are not set forth in this Consent Order; (b) Ocwen did not disclose to the Compliance Monitor or the Department in connection with the Department's investigation into these matters; and (c) that the Department and Compliance Monitor were not otherwise aware of in connection with the Department's investigation and the work of the Compliance Monitor.

Notices

66.    All notices or communications regarding this Consent Order will be sent to:

274

For the Department:

Daniel Burstein
Executive Deputy Superintendent
Real Estate Finance Division
New York State Department of Financial Services
One State Street
New York, NY 10004

For Ocwen:

Timothy M. Hayes
Executive Vice President and General Counsel
Ocwen Financial Corporation
1661 Worthington Road #100
West Palm Beach, FL 33409

Miscellaneous

67.     Each provision of this Consent Order will remain effective and enforceable until

stayed, modified, suspended, or terminated by the Department.

68.     No promise, assurance, representation, or understanding other than those

contained in this Consent Order has been made to induce any party to agree to the provisions of

the Consent Order.

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this 22nd

day of December, 2014.

**OCWEN FINANCIAL CORPORATION**

By: _____
**RONALD FARIS**
**President and Chief Executive Officer**

**OCWEN LOAN SERVICING, LLC**

By: _____
**TIMOTHY M. HAYES**
**Executive Vice President**

**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES**

By: _____
**BENJAMIN M. LAWSKY**
**Superintendent of Financial Services**

20

For the Department:

Daniel Burstein
Executive Deputy Superintendent
Real Estate Finance Division
New York State Department of Financial Services
One State Street
New York, NY 10004

For Ocwen:

Timothy M. Hayes
Executive Vice President and General Counsel
Ocwen Financial Corporation
1661 Worthington Road #100
West Palm Beach, FL 33409

Miscellaneous

67.    Each provision of this Consent Order will remain effective and enforceable until

stayed, modified, suspended, or terminated by the Department.

68.    No promise, assurance, representation, or understanding other than those

contained in this Consent Order has been made to induce any party to agree to the provisions of

the Consent Order.

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this 19th

day of December, 2014.

**OCWEN FINANCIAL CORPORATION**

By: _____
**RONALD FARIS**
**President and Chief Executive Officer**

**NEW YORK STATE DEPARTMENT OF**
**FINANCIAL SERVICES**

By: _____
**BENJAMIN M. LAWSKY**
**Superintendent of Financial Services**

**OCWEN LOAN SERVICING, LLC**

By: _____
**TIMOTHY M. HAYES**
**Executive Vice President**

210

For the Department:

Daniel Burstein
Executive Deputy Superintendent
Real Estate Finance Division
New York State Department of Financial Services
One State Street
New York, NY 10004

For Ocwen

Timothy M. Hayes
Executive Vice President and General Counsel
Ocwen Financial Corporation
1661 Worthington Road #100
West Palm Beach, FL 33409

Miscellaneous

67.     Each provision of this Consent Order will remain effective and enforceable until

stayed, modified, suspended, or terminated by the Department.

68.     No promise, assurance, representation, or understanding other than those

contained in this Consent Order has been made to induce any party to agree to the provisions of

the Consent Order.

**IN WITNESS WHEREOF**, the parties have caused this Consent Order to be signed this 19th

day of December, 2014.

**OCWEN FINANCIAL CORPORATION**

By: _____
**RONALD FARIS**
**President and Chief Executive Officer**


**OCWEN LOAN SERVICING, LLC**

By: _____
**TIMOTHY M. HAYES**
**Executive Vice President**

**NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES**

By: _____
**BENJAMIN M. LAWSKY**
**Superintendent of Financial Services**

27

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

### CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS
### TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH
### CERTIFICATES SERIES 2006-3

### VS                          C.A. NO:1:18-cv-427-JJM

### KATHERINE L. CAITO
### INTERNAL REVENUE SERVICE

## <u>DEFENDANT'S STATEMENT OF DISPUTED FACTS IN SUPPORT OF ITS OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

Defendant, by her attorney, pursuant to DRI LR56(a) submits the following Statement of Disputed facts in support of her Objection to Plaintiff's Motion for Summary Judgment

1.    Defendant did execute the note referenced in number 1. However she disputes that the note has been authenticated as Sony Prudent, who is not the custodian of the mortgage note, in the affidavit for Summary Judgment could not authenticate the promissory note.

2.    There is no dispute that the mortgage was granted whereby the title to the property was granted to the original mortgagee with mortgage covenants.

3.      Number 3 is disputed because the terms of the mortgage was modified by the Mortgage Modification Agreement, Def's Motion to Strike and Affidavit Ex. A-4.

4.      Number 4 is disputed because the assignment did not purport to convey the mortgage to Citibank as Trustee without a reference to the trust. The named Trust did not exist under the name of Citibank as Trustee for American Home Mortgage Assets Trust 2006-3. See Defendant's Memorandum in Opposition to Motion for Summary Judgment Exs. 11-15.

5.      Number 5 is disputed because the assignment did not purport to convey the mortgage to Citibank as Trustee without a reference to the trust. The named Trust did not exist under the name of Citibank as Trustee for American Home Mortgage Assets Trust 2006-3. See Defendant's Memorandum in Opposition to Motion for Summary Judgment Exs. 11-15.

6.      Number 6 is disputed.  When the servicing of the mortgage loan was transferred to Ocwen Loan Servicing, LLC. Homeward Residential, Inc. provided notice to the Defendant of the transfer pursuant to Exhibit A-1. This notice indicated that the amount due on the loan was $0.00. Plaintiff has not provided any Homeward Residential, Inc. records or documents which indicate the date of the alleged default and the amount of the alleged

default. No specification was made as to the amount of the required monthly payment.

7.    There is no dispute that two Federal Court actions were filed in 2013. The first was dismissed for failure to serve the Defendants. The second case was dismissed with several other cases pursuant to FRCP 12(b)(6) on the grounds that the challenge of the Defendant to the assignment could not be undertaken because the failure to comply with the pooling and servicing agreement of a trust would be considered a voidable assignment which could be corrected. The settlement agreement did not specify that Citibank was trustee for American Home Mortgage Assets Trust 2006-3. Citibank did not sign this agreement.

8.    There is no dispute that Paragraph 22 states this language.

9.    This is disputed. See Affidavit of Katherine Caito and Exhibit A-4 which indicates that this letter was not a default letter, pursuant to the terms of the mortgage. Ocwen did not indicate in this letter that it was acting on behalf of Citibank as Trustee for American Home Mortgage Assets Trust 2006-3 or for any other trust.   The named trust does not exist. See Pl. Exh. 11-15.

10.    This is disputed as this letter was not a default letter which complied with the terms of the mortgage. See Affidavit of Katherine Caito

and Exhibit A-4 which indicates that this letter was not a default letter, pursuant to the terms of the mortgage. Ocwen did not indicate in this letter that it was acting on behalf of Citibank as Trustee for American Home Mortgage Assets Trust 2006-3 or for any other trust. The named trust does not exist. See Pl. Exh. 11-15. the amount of arrearage was not $2,201,915.26 as the Mortgage Modification Agreement was not complied with in calculating the amount due under the note and the mortgage.

11. This is disputed as this letter was not a default letter which complied with the terms of the mortgage. See Affidavit of Katherine Caito and Exhibit A-4 which indicates that this letter was not a default letter, pursuant to the terms of the mortgage. Ocwen did not indicate in this letter that it was acting on behalf of Citibank as Trustee for American Home Mortgage Assets Trust 2006-3 or for any other trust. The named trust does not exist. See Pl. Exh. 11-15. the amount of arrearage was not $2,201,915.26 as the Mortgage Modification Agreement was not complied with in calculating the amount due under the note and the mortgage.

12. This is disputed as this letter was not a default letter which complied with the terms of the mortgage. See Affidavit of Katherine Caito and Exhibit A-4 which indicates that this letter was not a default letter, pursuant to the terms of the mortgage. Ocwen did not indicate in this letter

281

that it was acting on behalf of Citibank as Trustee for American Home Mortgage Assets Trust 2006-3 or for any other trust. The named trust does not exist. See Pl. Exh. 11-15. the amount of arrearage was not $2,201,915.26 as the Mortgage Modification Agreement was not complied with in calculating the amount due under the note and the mortgage. The amount due is not $4,622,474.40 in principal, $1,350,968.95 and Escrow payments on the Note and the Mortgage. Nothing is owed under the mortgage. All obligations derive from the Note. However this amount is completely miscalculated and the affiant had not verified information regarding the records of the prior loan servicer.

KATHERINE L. CAITO

By her Attorney

July 15, 2019

/s/ John B. Ennis
John B. Ennis, Esq. #2135
1200 Reservoir Avenue
Cranston, RI 02920
401-943-9230
Jbelaw75@gmail.com


## CERTIFICATION

I hereby certify that I emailed a copy of the above Statement of Disputed Facts to the following electronically on this 15th day of July, 2019:

Samuel Bodurtha
Ethan Z. Tieger

/s/ John B. Ennis

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

## CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH CERTIFICATES SERIES 2006-3

### VS                                    C.A. NO:1:18-cv-427-JJM

## KATHERINE L. CAITO
## INTERNAL REVENUE SERVICE

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Defendant, by her attorney, pursuant to DRI LR56(a) submits the following Statement of Undisputed facts in support of her Objection to Plaintiff's Motion for Summary Judgment

1.     Paragraph 22 of Defendant's mortgage states in part:

**Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default**

218

on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.

2.    Lender did not provide such a notice.(Pl's Exhibit D)

3.    The notice provided to Defendant made no reference to the Lender nor Citibank as Trustee. (Pl's Exhibit D)

4.    The May 11, 2018 notice  did not accurately state the amount of the arrearage on the mortgage. (Pl's Exhibit 1) Defendant's affidavit in support of Motion for Summary Judgment.

5.    The May 11, 2018 notice did not advise the Defendant that she could reinstate after acceleration only until five days before the sale. (Pl's Exhibit D).

6.    The May 11, 2018 notice did not specify a particular date at least thirty days after the date the notice was deposited in the United States mail to cure the arrearage. (Pl's Exhibit D).

7.    The May 11, 2018 notice required that the arrearage be paid by certified funds. (Pl's Exhibit D).

8.    The mortgage did not require that any arrearage be paid by certified funds. (Pl's Exhibit B).

9.    The Defendant has have never sent or provided any lender or mortgagee or loan servicer a mortgage payment check with insufficient funds to pay the mortgage, which was returned unpaid. (Defendant's Affidavit)

10.    The Defendant was never advised by any lender or mortgagee or loan servicer that a check had been returned for nonpayment and that as a result all payments had to be paid by (a) cash;(b) money order;(c) certified check, bank check, treasurer's check, provided any such check is drawn upon and institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer. (Defendant's Affidavit).

11.    There is no trust with the name of American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates, Series 2006-3. See Defendant's Memorandum Exhibits 11-15.

12.    Ocwen Loan Servicing, LLC has admitted that its system or record, RealSphere was not accurate. Def Memorandum Ex16-19.

286

13.    The Defendant's note and mortgage were modified by a Mortgage Modification Agreement which changed the interest rate on the mortgage. Def Memorandum Ex A-1.

14.    The rate calculated by Ocwen for the Defendant was not the rate set by the Mortgage Modification Agreement. Def Exs. A-4 and A-5.

15.    The prior purported default letter dated October 30, 2015 was deposited in the US mail on October 31, 2015. Def Memorandum Ex A-3.

16.    Korde & Associates, P.C. was not licensed to practice law on October 30, 2015 or October 31, 2015 in Rhode Island. See Hall Affidavit and Ex K and L.

17.    Korde & Associates, P.C. and Shane Costa was not the agent for Ocwen or Citibank on October 30, 2015 or October 31, 2015 in Rhode Island. See Hall Affidavit and Ex K and L.


KATHERINE L. CAITO

By her Attorney


July 15, 2019

/s/ John B. Ennis
John B. Ennis, Esq. #2135
1200 Reservoir Avenue
Cranston, RI 02920
401-943-9230
Jbelaw75@gmail.com
221

## CERTIFICATION

I hereby certify that I emailed a copy of the above Statement of Undisputed Facts to the following electronically on this 15th day of July, 2019:

Samuel Bodurtha
Ethan Z. Tieger

/s/ John B. Ennis

288

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**CITIBANK, N.A AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH CERTIFICATES SERIES 2006-3**

**VS**                    **C.A. NO:1:18-cv-427-JJM**

**KATHERINE L. CAITO
INTERNAL REVENUE SERVICE**

## AFFIDAVIT OF JOSEPH C. MANERA, JR.

I, Joseph C. Manera, Jr., being duly sworn, state the following:

1.     I am an attorney at law, with an office located at 1062 Reservoir Avenue, Cranston, Rhode Island 02920.

2.     I have been licensed as an attorney in the State of Rhode Island since 1974.

3.     A significant portion of my law practice as an attorney has consisted of real estate closings and title searches.

4.     I am familiar with the charges for title searches and title reports.

5.     I have regularly conducted title searches and have hired title abstractors to do title searches and am familiar with the normal and reasonable cost for such title searches and title reports.

1

6.    I have reviewed Exhibit A, attached to this affidavit, which indicates that there was a $282.00 charge for a title report charged to the Defendant on November 6, 2019.

7.    The Defendant's property is located in Westerly where titles can be searched online.

8.    The charge of $282.00 for a Title Report in November, 2015 is not a reasonable charge for a title search and title report by a non- attorney. A reasonable charge for a non -attorney is no more than $150.00, which involves running the title from the start date and preparing a conclusion sheet. After the conclusion sheet is prepared, a report on title or a Title commitment would be issued stating the status of the title. A Title Commitment is prepared by the Title Company, which insures the title.

9.    If the search is done online, then the reasonable charge should be reduced below $150.00.

10.    I based my conclusions   on upon my experience as a Title Attorney and an Attorney who has done title searches and title reports and because I am familiar with the costs and charges for title searches and title reports since 1974.

2

_____
JOSEPH C. MANERA, JR.

Subscribed and sworn to before me on July 17, 2019 under the pains and

penalties of perjury.

_____
NOTARY PUBLIC

3

# EXHIBIT A

Case 1:18-cv-00427-JJM-LDA    Document 21-4    Filed 05/15/19    Page 2 of 3 PageID #: 271

Payment Reconciliation History

| Date Amount/Transaction Date | Date Payment Received | Date Payment Due | Description | Amount Applied/Assessed | Principal Application | Interest Application | Escrow Application | Optional Products | Late Charges | Fees/Other Fees Description | Suspense Application | Principal Balance | Escrow Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Beginning balance | 0.00 | | | | | 8,076.55 | -859.53 | 0.00 | 4,622,474.40 | 0.00 | 0.00 |

Payment Reconciliation History

Document 0011762123o Page: 96 Date Filed: 07/28/2020 Entry ID: 63560

INVOICE#: 4409    HUD.#: 1    DATE PAYMENT DUE: 05/01/2012    INTEREST RATE: 1.65000    PRINCIPAL BAL: 4,622,474.09

RECENT BAL: -240,430.82

Page
Run List/Filter:
05/13/2013  14:47

TOTAL: IPDB Recovered Fee
Guarantee ID D2920-6012

| Date Received Transaction Date | Description | Amount Applied/Unapplied | Principal Application | Interest Application | Escrow Application | Optional Products | Late Charges | Fees/ Other Description | Suspense Application | Principal Balance | Escrow Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/07/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 09/08/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 10/10/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 11/13/2017 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 12/13/2017 | Property Inspection Fee | -14.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -16.30 | 0.00 | 0.00 | 0.00 | 0.00 |
| 01/11/2018 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02/14/2018 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02/27/2018 | Service of Process | -10.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 03/05/2018 | Property Valuation | -10.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 03/21/2018 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | -10.08 | 0.00 | 0.00 | 0.00 | 0.00 |
| 04/10/2018 | Property Inspection Fee | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -109.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 05/06/2018 | Skip Trace/Search | -5.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 05/09/2018 | Service of Process | -20.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 06/20/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -5.46 | 0.00 | 0.00 | 0.00 | 0.00 |
| 07/26/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -22.10 | 0.00 | 0.00 | 0.00 | 0.00 |
| 08/29/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 09/29/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 10/23/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 12/03/2018 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 01/04/2019 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02/05/2019 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 03/05/2019 | Property Inspection | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| 04/24/2019 | Judge Subpoena | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -14.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 -21,262.05 | -4,221.49 | 0.00 | 0.00 | 0.00 | 0.00 |

229

294

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CITIBANK, N.A., AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2006-3, MORTGAGE BACKED PASS-THROUGH CERTIFICATES SERIES 2006-3, | |
| Plaintiff, | |
| v. | C.A. No. 1:18-cv-00427-JJM |
| KATHERINE L. CAITO, | |
| Defendant, | |
| v. | |
| INTERNAL REVENUE SERVICE, | |
| Interested Party. | |

## SUPPLEMENTAL AFFIDAVIT OF SONY PRUDENT IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO STRIKE

I, Sony Prudent, hereby declare and state as follows:

1.   I am a Senior Loan Analyst for Ocwen Financial Corporation, whose indirect subsidiary is PHH Mortgage Corporation ("PHH").

2.   I am over the age of 18 and competent to testify as to the matters contained in this affidavit.

3.   PHH is the current loan servicer for the subject mortgage loan on behalf of Plaintiff, Citibank, N.A., as Trustee for American Home Mortgage Assets Trust 2006-3, Mortgage Backed Pass-Through Certificates Series 2006-3 ("Citibank, as Trustee").

230

304090560V1: 1010069

4.      PHH merged with Ocwen Loan Servicing, LLC ("Ocwen") as of June 1, 2019. On or about June 4, 2019, PHH provided notice of service transfer to Defendant, Katherine L. Caito ("Caito"). PHH Mortgage Corporation has serviced Defendant's loan to the present day.

5.      On or about March 1, 2013, servicing of Defendant's loan was transferred from Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc.[1] Ocwen serviced Defendant's loan from March 1, 2013 up until June 4, 2019.

6.      Servicing of Defendant's loan transferred from Homeward to Ocwen as part of Ocwen Financial Corporation's purchase and acquisition of Homeward on or about December 31, 2012. Through that purchase and acquisition, Ocwen Loan Servicing, LLC acquired the proprietary and business records of Homeward and AHMSI, which included the records of Defendant's account.

7.      My job duties and responsibilities as a Loan Analyst include, among other things, regularly accessing and reviewing the computerized systems, together with the proprietary and business records that PHH uses to record and create information related to the mortgage loans serviced by PHH. I have access to the business records of PHH, including the business records relating to the loan at issue in this litigation. To the extent that the business records and/or information related to a subject loan were created by or came from other entities, prior holders and/or prior servicers of the loan, those records were received by PHH in the ordinary course of business, have been incorporated into and maintained as part of PHH's own business records in the regular course of its business, and are kept and routinely relied upon by PHH as a regular business practice in the ordinary course of its business.

8.      I have personal knowledge of the manner in which PHH's records are created and maintained. These records are made at the time of the act, transaction, occurrence or event

[1] In February of 2012, American Home Mortgage Servicing, Inc. changed its name to Homeward Residential, Inc.

304090560V1 1010069

231

reflected therein, or within a reasonable time thereafter, by or from information provided by a person with knowledge of the activity reflected in such records. These records are created, kept, and maintained in the regular course of PHH's business, and it is the regular course of PHH's business to make these records. PHH routinely relies on these records in the ordinary course of its business. I previously executed affidavits in support of CitiBank, as Trustee's motion for summary judgment and response Defendant's summary judgment motion based upon my personal review of PHH's Ocwen's, Homeward's, and AHMSI's books, records, and files for and relating to the Defendant's loan at issue and from my personal knowledge regarding how those records are kept and maintained. In particular, I have thoroughly reviewed the computerized systems, together with the proprietary and business records of PHH, Ocwen Loan Servicing, LLC, Homeward Residential, and AHMSI concerning then note and mortgage loan described in the complaint, including, but not limited to, all transactions and payment history concerning the subject loan.

9.      It is within my responsibilities as a loan analyst for PHH to review the records of PHH Mortgage Corporation, Ocwen Loan Servicing, LLC, Homeward, AHMSI, and CitiBank in addition to their agents, and to review and sign certifications and affidavits.

10.     Attached hereto as **Exhibit 1** is a true and accurate copy of excerpts of the Pooling and Servicing Agreement for the trust that currently owns the mortgage at issue in this litigation.

304090560V1 1010069

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT. EXECUTED ON ___July 29___, 2019.


PHH Mortgage Corporation, successor by merger to
Ocwen Loan Servicing, LLC

BY: Sony Prudent
TITLE: Senior Loan Analyst

304090560V1 1010069

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT. EXECUTED ON _____ July 29 ____. 2019.

PHH Mortgage Corporation, successor by merger to
Ocwen Loan Servicing, LLC

BY: Sozy Prudent
TITLE: Senior Loan Analyst

233

304090560V1 1010069

## CERTIFICATE OF SERVICE

I, Samuel C. Bodurtha, hereby certify that the documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on July 29, 2019.

/s/ Samuel C. Bodurtha
Samuel C. Bodurtha

304090560V1 1010069